**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. LR-5733
236 Tillou Road
South Orange, NJ 07079
Telephone: (973) 313-1887
Fax: (973) 833-0399
lrosen@rosenlegal.com

Lead Counsel for Lead Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALBERT SNELLINK, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>vs.<br><br>UNIVERSAL TRAVEL GROUP, INC., JIANGPING JIANG, YIZHAO ZHANG, JIANG XIE, JIDUAN YUAN, LAWRENCE LEE, and LIZONG WANG<br><br>Defendants. | CASE No.: 2:11-cv-2164 (KM) (MCA)<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

**Page**

**I.**    **NATURE OF THE ACTION** ............................................................ 2

**II.**   **JURISDICTION AND VENUE** ...................................................... 7

**III.**  **PARTIES** ............................................................................................ 7

    **A. Plaintiffs** ........................................................................................ 7

    **B. Defendants** .................................................................................... 8

**IV.**   **CONFIDENTIAL WITNESSES** .................................................. 12

**V.**    **BACKGROUND ON CHINA-BASED REVERSE MERGERS LIKE UTA** ............................................................................................... 16

**VI.**   **DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD** ................................................... 17

**VII.**  **UTA'S SUBSIDIARIES' SAIC FILINGS SHOW THAT UTA OVERSTATED TOP-LINE REVENUE AND GROSS PROFIT** ........ 22

    **A. UTA'S subsidiaries' SAIC filings accurately depict their financial condition** ......................................................................... 22

    **B. The SAIC filings show that UTA is inflating its top-line revenue and gross profits** ................................................................ 29

**VII.**  **UTA FALSELY DESCRIBED ITSELF AS AN "ONLINE TRAVEL AGENCY** ......................................................................................... 36

**IX.**   **UTA OVERSTATED THE NUMBER OF STAFF EMPLOYED IN ITS CALL CENTERS** ..................................................................... 41

**X.**    **UTA FALSELY CLAIMED TO HAVE SOLD ITS *TRIPEASY* KIOSKS AND IN ANY CASE THE *TRIPEASY* KIOSKS DID NOT GENERATE PROFITS** ............................................................ 43

**XI.**   **UTA OVERSTATED ITS CASH AND CASH EQUIVALENTS** ......... 47

**XII.**  **UTA'S AUDITOR RESIGNS AND ACCUSES UTA OF FRAUD** ....... 50

    **A. The revolving door of auditors** .................................................. 50

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION 11-CV-2769-JAK

**B. The confirmation process**.................................................. 52

**C. Lack of evidence of tour package contracts**................... 55

**D. Windes could no longer rely on Management's Representations**
............................................................................................ 55

**XIII. AFTER WINDES RESIGNS, UTA SELECTS AN AUDITOR THAT HAS BEEN REPEATEDLY SANCTIONED FOR ITS POOR-QUALITY AUDITS**.................................... 57

**XIV. ADDITIONAL FACTS PROBATIVE OF SCIENTER**........................ 59

**A. UTA alters its website to remove statements that analysts have demonstrated are false** ................................. 59

**B. Revolving door of questionable accountants and CFOs** ............... 60

**C. UTA is a serial capital-raiser despite purportedly being a business with intensely favorable cash flows and a fortress balance sheet**.................................................... 61

**D. UTA voluntarily withdraws its shares from listing after the NYSE expresses concern that UTA is engaged in fraud**............... 61

**E. UTA abandons its reporting obligations** ........................ 62

**XV. LOSS CAUSATION** ....................................................... 63

**A. The fraudulent "online travel agency" claims** ................. 63

**B. The fraudulent claim regarding the number of employees** ........... 64

**C. UTA Fails to File its Annual Report Because its Auditor Suspects Fraud**.................................................... 64

**D. Auditor Resignation Leads to Trading Halt and Share Price Decline**.................................................... 64

**XVI. RESPONDEAT SUPERIOR LIABILITY**................................ 66

**XVII. PLAINTIFFS' CLASS ACTION ALLEGATIONS**............................ 67

**A. Class action allegations** ................................. 67

**B. Applicability of presumption of reliance: Fraud-on-the-market doctrine** ................................. 69

Lead Plaintiffs P. Van Hove BVBA, Pascal Van Hove GCV, John Thollon, Michael Zabinski, Jean Doyle, and Mark Larosa, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Complaint against Universal Travel Group, Inc. ("UTA" or the "Company"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired the securities of UTA during the period from March 12, 2009 to April 11, 2011, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Defendant UTA is a Nevada corporation headquartered in Shenzhen, China.   UTA, through a number of subsidiaries, engages in three business segments: selling airline tickets ("air-ticketing"), hotel reservations, and packaged tours. Substantially all of UTA's business was conducted in China.

3.     These three segments accounted for all of UTA's revenues during the Class Period.

Amended Class Action Complaint For Violation Of The Securities Laws

4.      According to UTA's SEC filings, air ticketing accounted for 19% and 18% of UTA's revenue in 2008 and 2009, respectively. Air-ticketing accounted for 49% and 46% of UTA's gross profits[1] in 2008 and 2009, respectively.

5.      According to UTA's SEC filings, hotel reservations accounted for 13% of UTA's revenue in both 2008 and 2009.  Hotel reservations accounted for accounted for 23% and 27% of UTA's gross profits in 2008 and 2009, respectively.

6.      UTA wildly inflated its revenues and gross profits from both these segments, according to filings made by UTA's subsidiaries with the Chinese State Administration for Industry and Commerce (the "SAIC") and confidential witnesses with personal knowledge of the facts gained from working in UTA's business operations in China.

7.      Every financial metric -- revenue *or* gross profit from air-ticketing *or* hotel reservations in 2008 *or* 2009 -- was inflated by at least 1,000% in UTA's SEC filings. Gross profit from hotel reservations in 2008 was inflated by over 13,000%.

8.      In addition to inflating its financial statements, UTA fraudulently claimed to sell products through sales channels.

9.      UTA claimed to sell its products through four sales channels: its website, call centers, *TRIPEASY* Kiosks, and its own travel agency offices.

---

[1] Gross profit is revenue minus cost of goods sold (overhead, payroll, tax, and interest).

Amended Class Action Complaint For Violation Of The Securities Laws

10.     Until September 30, 2010, UTA claimed to be an "online travel agency", that happened to sell its products through the three other channels.

11.     On September 15, 2010, an analyst with a short position in UTA's stock revealed that UTA's website was non-functional – a significant problem for an "online travel agency". *It did not include real-time flight information*. Thus, it was impossible to book a ticket on UTA's website, and after attempting to do so, a customer would receive a message indicating that staff from UTA's call center would call her.

12.     That same day, UTA publicly threatened to sue Mr. Hempton. UTA's stock price fell, damaging investors.

13.     On September 30, 2010, UTA revealed that Mr. Hempton was correct; UTA only derived 2% of air-ticketing revenues from its website, and apparently derived no revenues from its website for either hotel reservations or packaged tours.

14.     On March 8, 2011, analyst Glaucus Research Group, which also had a short position in UTA's stock, revealed that UTA's SEC filings had inflated the number of employees in its call centers. UTA's 2010 10-K claimed 320 employees; Glaucus's research, confirmed by Plaintiffs' investigator, showed that UTA had approximately 100 call center employees.

15.   On September 10, 2010, UTA announced that it had sold its *TRIPEASY* Kiosks to Shenzhen Xunbao E-Commerce Co., Ltd., a travel insurance company, for more than 40 million RMB, or approximately $5.93 million.

16.   UTA filed what it claimed was the sale contract with the SEC. UTA claimed that it would maintain the exclusive right to sell its products on Shenzhen Xunbao's platforms.

17.   According to well-placed sources at both Shenzhen Xunbao and UTA, this sale never happened. Rather, although UTA began negotiating with Shenzhen Xunbao, UTA eventually recalled and retired the *TRIPEASY* Kiosks because they were unprofitable. In fact, as confirmed by its State Administration for Industry and Commerce ("SAIC") filings and a well-placed source, Shenzhen Xunbao ceased operating in late 2010 or early 2011.

18.   UTA has cycled through a large number of small, U.S.-based accounting firms. When its latest accountant, Windes & McClaughry Accountancy Corp. inspected UTA's financial statements for Fiscal Year 2010, it noticed that some of the documents UTA proffered to confirm items in the financial statements seemed inauthentic, i.e. forged. The confirmation process was conducted under circumstances which Windes found "suspicious".

19.     Having discovered evidence of fraud, Windes requested authority to perform audit procedures to assure itself and shareholders that Universal Travel Group was not engaged in fraud.

20.     Universal Travel Group and its audit committee declined to allow Windes to perform these additional audit procedures. As result, Windes resigned.

21.     On April 11, 2011, The New York Stock Exchange (the "NYSE") halted trading in UTA's shares. Trading was halted for over a year. Finally, rather than face an imminent delisting, UTA chose to delist its own shares. UTA stated that the NYSE's concerns were:

> [I]ssues raised by Windes & McGlaughry Accountancy Corporation when it resigned as the Company's independent public accounting firm in April 2011, including with respect to the adequacy of the Company's cooperation in the audit being conducted by Windes prior to its resignation and the authenticity of certain documents provided to Windes in connection with the audit, as reflected in the Company's Form 8-K filed April 14, 2011 and exhibits thereto; on-going delays in the filing of certain periodic SEC filings; the Exchange's concerns with respect to the adequacy of certain of the Company's filings in light of the extensive comments that the Company has received on such filings from the SEC Division of Corporation Finance; certain discrepancies between and among certain of the Company's PRC subsidiaries' filings with the PRC's State Administration for Industry and Commerce and its SEC filings; the Exchange's concerns with respect to the accuracy of certain information provided by the Company to the Exchange; the tax implications of the Company's cash payments for acquisitions in 2010; and the adequacy of the Company's internal controls.

22.     When trading resumed on the "pink-sheets", Universal Travel Group's share price fell from $3.96 to 0.71 -- a loss of 82%.

## II. JURISDICTION AND VENUE

23.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

24.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

25.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. § 1391(b).

26.    In connection with the acts, conduct and other wrongs alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the NYSE.

## III. PARTIES

### A.  Plaintiffs

27.    Plaintiff P. Van Hove, BVA, is a Belgian private limited liability company wholly owned by Pascal Van Hove. It purchased shares of UTA and was

damaged thereby. Its PSLRA certification was previously filed with the Court and is incorporated by reference.

28.   Plaintiff Pascal Van Hove GCV is a limited partnership wholly owned by Pascal Van Hove and his wife.  It purchased shares of UTA and was damaged thereby.  Its PSLRA certification was previously filed with the Court and is incorporated by reference.

29.   Plaintiff John Thollon purchased shares of UTA and was damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference.

30.   Plaintiff Michael Zabinski purchased shares of UTA and was damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference.

31.   Plaintiff Jean Doyle purchased shares of UTA and was damaged thereby. Her PSLRA certification was previously filed with the Court and is incorporated by reference.

32.   Plaintiff Mark Larosa purchased shares of UTA and was damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference.

**B.  Defendants**

33.     Defendant Jiangping Jiang was UTA's CEO at all times during the Class Period.

34.     Defendant Jiang Xie ("Xie") was UTA's CFO between the beginning of the Class Period and August 17, 2009, and again from August 16, 2010, until the end of the Class Period.

35.     Defendant Yizhao Zhang ("Zhang") served as the Company's Chief Financial Officer between August 17, 2009 and August 16, 2010 when he resigned. Defendant Zhang was also head of the audit committee of a disgraced China-based, U.S.-listed company called China Education Alliance, Inc. ("CEU"). On October 11, 2011, Judge Snyder, U.S.D.J. for the Central District of California, held that the plaintiffs had sufficiently alleged that CEU had committed securities fraud by (amongst other things) fraudulently maintaining two sets of books. *In re China Educ. Alliance, Inc., Secs. Litig.*, 10-CV-9239-CAS (JCx), 2011 WL 4978483 (C. D. Cal. Oct. 11, 2011). On April 6, 2012, Judge Snyder held that the plaintiffs had sufficiently alleged Zhang's liability as a controlling person of the fraud CEU committed. *In re China Educ. Alliance, Inc., Secs. Litig.*, 10-CV-9239-CAS (JCx), 2012 WL 1155860, at *1, *7  (C.D. Cal. April 6, 2012).  Zhang was also Chair of the Audit Committee of China Green Agriculture, Inc. China Green Agriculture has also been accused of securities fraud, as has Zhang in that action.

36.     Collectively, Defendants Jiang, Zhang, and Xie are the "Individual Officer Defendants".

37.     Defendant Lawrence Lee was appointed as independent director and chair of UTA's audit committee on August 17, 2009 and served in that capacity until the end of the Class Period.

38.     Defendant Jidon Yuan was a director of UTA and a member of its audit committee for the entire Class Period.

39.     Defendant Lizong Wang was a director of UTA for the entire class period.  As of December 31, 2009, Lizong Wang was also a member of UTA's audit committee. Defendant Wang remained in these positions until the end of the Class Period.

40.     Collectively, Defendants Lee, Yuan, and Wang are the "Director Defendants".

41.     Collectively, the Officer Defendants and the Director Defendants are the "Individual Defendants"

42.     Defendant UTA is a Nevada corporation headquartered in Shenzen, China.  The Company and its wholly owned operating subsidiaries purport to engage as a travel service Company in the People's Republic of China through a website and online bookings, kiosks, and a call center.  Between March 12 and May 27, 2009, UTA's stock was actively traded on the OTC:BB.  Between May 28

and October 26, 2009, UTA's stock was actively traded on the NYSE Amex (the "AMEX"). Between October 27, 2009, and the close of the Class Period, UTA was actively traded on the NYSE.

43.    As of December 31, 2010, UTA's organizational chart is as follows:



44.    As of December 31, 2009, UTA's organizational chart was as follows:

Amended Class Action Complaint For Violation Of The Securities Laws



## IV.  CONFIDENTIAL WITNESSES

45.   **CW 1** was the general manager of Universal Travel's corporate headquarters between at least March 2008 and May 2009. His employment was with Shenzhen Yuzhilu Aviation Service Co., Ltd. ("YZL"), UTA's largest subsidiary.

46.   CW 1 was overall head of the packaged tour business and the *TRIPEASY* Kiosk sales channel.

47.   Since at that time, Universal Travel did not have a COO, CW 1 was effectively YZL's COO. CW 1 reported directly to YZL's CEO.

48.     According to CW 1, Sales Terminals are used to log on to the Civil Aviation Administration of China (the "Aviation Administration") to obtain real-time flight information, including prices and availability.

49.     During CW 1's tenure, UTA did not employ its Sales Terminals to provide real-time flight information on its website. Rather, when a customer attempted to book a ticket, call center employees would log on the Aviation Administration using Sales Terminals, and would call the customer with real-time flight information.

50.     CW 1 recalls that at their peak during her[2] tenure, UTA's packaged tour sales for its Shenzhen office, by far its top grossing office, were only millions rather than tens of millions of RMB per month.

51.     For the year ended 2008, UTA's SEC filings claimed that its packaged tour sales were RMB 313,826,816.97.[3] For the year ended 2009, UTA's SEC filings claimed that its packaged tour sales were RMB 452,940,495.43. CW 1 stated that these numbers were "impossible".

52.     **CW 2** was a Sales Director at Chongqing Universal Travel E-Commerce Co. ("CTE") between at least March 2010 and June 2011.

---

[2] The use of gendered pronouns to designate a CW is arbitrary.

[3] Throughout, exchange rates used are 6.9511RMB/USD for FY 2008, 6.833 RMB/USD for FY 2009, and 6.77 RMB/USD for FY 2010.

53.    CW 2 was responsible for the sale of air tickets and hotel reservations, as well as packaged tours to corporate customers.

54.    According to CW 2, CTE, the subsidiary that UTA claimed was its "Second Base", was primarily engaged in air-ticketing. CTE was not engaged in selling packaged tours.   According to CW 2, CTE made roughly RMB 100,000/month in gross profits at its peak during his tenure from air-ticketing.

55.    CW 2 stated that when he joined the company in March 2010, he was taught not to check Universal Travel's website for flight information because the information provided was not real-time. CW 2 believes the information on UTA's website may have become real-time sometime in 2011.

56.    CW 2 states that CTE received approximately 20 *TRIPEASY* Kiosks, and placed them in busy malls and streets of Chongqing. However, customers were uninterested, so CTE recalled the machines and put them in the office.

57.    **CW 3** was a manager in the Shenzhen call center from November 2010 to June 2011. CW 3 was responsible for the general operation of the call center, including customer service, quality monitoring, and membership management.

58.    According to CW 3, when a customer attempted to book an order using the website, UTA would ask the customer for a phone number. UTA would quickly check the Aviation Administration's system, and within 10-30 minutes

Amended Class Action Complaint For Violation Of The Securities Laws

would call the customer at the phone number the customer designated. UTA would then provide a real-time quote for a flight.

59.     According to CW 3, during her tenure, the Shenzhen call center had 100 employees, of which 15 were management level and 85 were call center staff. There were no dramatic changes in employee head-count during her tenure.

60.     **CW 4** was a member of the *TRIPEASY* project team from June 2009 to September 2010. He worked in the Shenzhen branch of UTA. He was an operation and maintenance special officer, and his job responsibility was to run the *TRIPEASY* sales channel across subsidiaries. He reported to the head of the Operation & Maintenance department.

61.     According to CW 4, at first, *TRIPEASY* Kiosks were placed in busy intersections or shopping malls. However, UTA was losing money on each Kiosk because the operating system was too complicated and few people were using them. The operating cost for a Kiosk was RMB 1,000 per month.

62.     UTA decided to place the Kiosks in residential compounds. But the Kiosks were still unprofitable. CW 4 heard from a former co-worker that in late 2011, UTA planned to recall and discontinue the Kiosks from the compounds.

63.     CW 4 estimated that UTA had approximately 700 Kiosks in September 2010 in total. CW 4 stated that there could not be 1,523 *TRIPEASY* Kiosks, as UTA claimed.

64. **CW 5** was Director of the Strategy & Development Center at Shenzhen Xunbao E-Commerce Co. Ltd. between at least February 2010 and October 2010. Shenzhen Xunbao is ***not*** a subsidiary of UTA.

65. CW 5's responsibilities included negotiating the purchase by Shenzhen Xunbao of all of UTA's *TRIPEASY* Kiosks. The main representative from UTA's side was Defendant Jiangping Jiang.

66. According to UTA, UTA sold all of its *TRIPEASY* Kiosks to Shenzhen Xunbao in September 2010 for $5.93 million.

67. According to CW 5, Shenzhen Xunbao never acquired any *TRIPEASY* Kiosks from UTA prior to the end of his tenure in October 2010.

68. According to CW 5, Shenzhen Xunbao ceased operating in late 2010 or early 2011.

## V. BACKGROUND ON CHINA-BASED REVERSE MERGERS LIKE UTA

69. To have its stock publicly traded in the United States, Universal Travel employed a device called a "reverse merger" in 2006. In a reverse merger, a dormant publicly-traded shell company acquires a private company with an operating business. In return, the shareholders of the acquired private company obtain substantially all of the publicly-traded shell's shares. The former shareholders of the private company therefore become the shareholders of the public company.

70.     Reverse mergers bypass the traditional regulatory scrutiny involved in an IPO. Many China-based, U.S.-listed companies have abused the reverse merger process to defraud U.S. capital markets.

71.     This trend has been specifically noted by SEC Commissioner Luis A. Aguilar, who observed in an April 4, 2011 speech that many such companies "have significant accounting deficiencies or [are] vessels of outright fraud."[4]

72.     The Public Company Accounting Oversight Board (the "PCAOB"), an organization established by the Sarbanes-Oxley Act of 2002 (the "SOX") to regulate the accounting profession, has also warned accountants to exercise special care when auditing China-based, U.S.-listed reverse mergers.  In a practice alert dated October 3, 2011, the PCAOB warned auditors to be exceptionally diligent in performing audits of China-based issuers, noting that "[i]n just two months in 2011, more than 24 companies with their principal place of business in [China] [...] report[ed] auditor resignations, accounting irregularities, or both."[5]

73.     On August 21, 2006, Universal Travel Group completed a reverse merger with Tam of Henderson, Inc.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

## DURING THE CLASS PERIOD

---

[4] Available at
http://www.sec.gov/news/speech/2011/spch040411laa.htm#P31_12297
[5] Available at http://pcaobus.org/Standards/QandA/2011-10-03_APA_8.pdf.

74.     Defendants made several false and misleading statements during the Class Period.

75.     Beginning on April 8, 2009, until September 30, 2010, UTA represented that it was an "online travel agency". On September 15, 2010, short-seller analyst John Hempton of Bronte Capital revealed that UTA was not an online travel agency because its website was non-functional. On September 30, 2010, in an extraordinary press conference, UTA revealed that its online sales were limited to 2% of one of its segments, or less than 1% of both revenues and gross profits. It was thus not an online travel agency. Misrepresenting itself as an Internet-based business inflated the value of UTA's stock because investors attached a higher value to UTA's business based on the potential for faster and more scalable growth for an Internet vs. bricks and mortar based business. This is particularly true for a Chinese business because Internet use is still relatively low as a percentage of the total population (Internet penetration in China is half that in the U.S.) – meaning there is tremendous opportunity for growth for Chinese Internet businesses.

76.     The false statements regarding UTA's status as an "online travel agency" were repeated in at least the following documents during the Class Period:

a.  UTA's 2009 10-K, filed with the SEC on March 3, 2010;

b. UTA's 2009 Q1 10-Q, filed with the SEC on May 6, 2009, signed by Defendants Jianping Jiang and Jiang Xie ("Our goal is to become the foremost leading [sic] online travel services provider in all fields of the tourism industry including the aviation service, cargo agency, hotel booking and tour packaging segments in the People's Republic of China.")

c. UTA's 2009 Q2 10-Q, filed with the SEC on August 12, 2009, signed by Defendants Jianping Jiang and Jiang Xie (similar).

d. UTA's 2009 Q3 10-Q, filed with the SEC on November 16, 2009, signed by Defendants Jianping Jiang and Yizhao Zhang (same).

e.  UTA's 2010 Q1 10-Q, filed with the SEC on May 11, 2010, signed by Defendants Jianping Jiang and Yizhao Zhang (same).

f.  UTA's 2010 Q2 10-Q, filed with the SEC on May 11, 2010, signed by Defendants Jianping Jiang and Yizhao Zhang ("We continue to see success in cross marketing and selling our travel related products across our business segments and increased brand awareness from online resales and the deployment of our *TRIPEASY* kiosks.") (emphasis in original);

g. A registration statement on Form S-3, filed with the SEC on August 7, 2009, signed by Defendants Jianping Jiang, Jiang Xie, and Yizhao Zhang, and declared effective by the SEC on November 5, 2009  ("With the [reverse

merger], we shifted our business to the online travel service industry in China.");

h. A prospectus filed with the SEC on June 15, 2010 (similar);

i. A press release dated April 8, 2009;

77.    Beginning on September 10, 2010, UTA also made two false statements regarding its *TRIPEASY* Kiosks, which it categorized as an important source of revenue. UTA claimed, first, that it had sold the *TRIPEASY* Kiosks to Shenzhen Xunbao E-Commerce Co., Ltd., for approximately $5.93 million. It claimed, second, that it continued to have exclusive rights to use the *TRIPEASY* Kiosks for two years.

78.    In reality, high-level confidential witnesses with personal knowledge inside both Shenzhen Xunbao and UTA confirm that the sale never took place. Rather, UTA recalled and discontinued the *TRIPEASY* Kiosks because they were unprofitable.

79.    The false statements were repeated in the following documents:

a.  A "Purchase and Sale" agreement dated September 9, 2010, purporting to be signed by Long Shifan for Shenzhen Xunbao and Defendant Jiang for UTA, attached to a Form 8-K filed September 10, 2010;

b. A Press Release dated September 10, 2010, that quoted Defendant Jiang extensively;

Amended Class Action Complaint For Violation Of The Securities Laws

c. A Form 8-K filed with the SEC on September 10, 2010;

d. UTA's 2010 Q3 10-Q, filed with the SEC on November 15, 2010, and signed by Defendants Jiang and Xie;

e. A registration statement on Form S-8, filed with the SEC on December 1, 2010, and signed by Defendants Jiang, Xie, and Lee;

80.     Beginning at the start of the Class Period, UTA misrepresented the amounts it earned from its subsidiaries YZL, Shanghai Lanbao Travel Service Co., Ltd. ("SLB"), and Xi'an Golden Net Travel Serve Service Company Limited ("XGN") in 2008. According to UTA, these subsidiaries jointly generated more than $40 million in revenue in 2008.

81.     According to official Chinese corporate filings these subsidiaries each filed with the Chinese State Administration of Industry and Commerce (the "SAIC"), total revenue for these three subsidiaries was approximately $1,550,000.

82.     UTA repeated this false and misleading statement in its 2009 10-K, filed with the SEC on March 5, 2010.

83.     Finally, in its 2009 10-K filed with the SEC on March 5, 2010, UTA misrepresented both its top-line revenue and gross profits for fiscal year 2009.

84.     The subsidiaries' SAIC filings demonstrate that these statements were false.

## VII.  UTA'S  SUBSIDIARIES'  SAIC  FILINGS  SHOW  THAT  UTA OVERSTATED TOP-LINE REVENUE AND GROSS PROFIT

### A.  UTA'S subsidiaries' SAIC filings accurately depict their financial condition

85.     PRC companies are required to submit annual financial reports to the Chinese Administration of Industry and Commerce ("SAIC") – the business regulating agency in China.  When the reporting company is a foreign owned entity like three of UTA's subsidiaries, the financial statements must be audited.

86.     Differences between SAIC and SEC filings cannot be attributed to lax enforcement of laws in China as compared to the U.S.

87.     Reflecting their importance, SAIC filings must be signed by the legal representative of the entity submitting it.  The legal representative must state "I confirm that the content of the submitted company's annual inspection report is true."

88.     The financial statements in SAIC filings must be presented in accordance with generally accepted accounting principles in China ("Chinese GAAP").

89.     Filing false SAIC filings in the PRC will result in fines and the revocation of the entity's business license.  Without a business license an entity cannot legally operate in the PRC nor even maintain a bank account.

Amended Class Action Complaint For Violation Of The Securities Laws

90.    In contradiction, China-based defendants have little to fear from the U.S. SEC. For example, according to the SEC, Ming Zhao, the chairman and CEO of Puda Coal, Inc., a U.S. company that operated solely in China, literally stole the company's only operating subsidiary from its owners. *SEC v. Zhao*, 12-CV-1316 (S.D.N.Y.), at ¶ 2. Without disclosing that Puda was an empty shell, Mr. Zhao then sold $115 million of its literally worthless shares. Id. ¶ 19. The SEC filed a complaint on February 22, 2012. It has yet to serve Mr. Zhao or his codefendant.

91.    Nor can differences between SAIC and SEC filings be explained by inconsistent accounting principles.

92.    On revenue recognition, there are no differences between generally acceptable accounting principles in the United States ("U.S. GAAP") and Chinese GAAP.   Revenue recognition for the sale of goods in China is governed by Accounting Standards for Enterprises No. 14,[6] which provides (identically to U.S. GAAP):

> No revenue from selling goods may be recognized unless the following conditions are met simultaneously:
> (1)  The significant risks and rewards of ownership of the goods have been transferred to the buyer by the enterprise;
> (2) The enterprise retains neither continuous management right that usually keeps relation with the ownership nor effective control over the sold goods;
> (3) The relevant amount of revenue can be measured in a reliable way;
> (4) The relevant economic benefits may flow into the enterprise; and

---

[6]  Revenues; Promulgation date: 02-15-2006; Effective date:01-01-2007; Department: China Ministry of Finance; Subject:  Accounting.

(5) The relevant costs incurred or to be incurred can be measured in a reliable way.

93.    Authoritative bodies have specifically noted that there are no differences between U.S. GAAP and Chinese GAAP on revenue recognition. Thus, the Committee of European Securities Regulators ("CESR") noted that there are no differences between U.S. GAAP and International Financial Reporting Standards ("IFRS").  CESR's advice on the equivalence of Chinese, Japanese and US GAAPs 25 (2007), 2nd entry on page.  The Committee further noted that there are no significant differences between IFRS and Chinese GAAP on revenue recognition. *Id.* at 35, 6th entry on page. Thus, by inference, there are no significant differences between U.S. GAAP and Chinese GAAP on revenue recognition.

94.    As further evidence of the reliability of AIC filings, well-known auditing firm Deloitte & Touche Tomatsu LLP ("DTT") noisily resigned as registered independent auditor to Chinese-based company China MediaExpress Holdings, Inc. ("CCME"), citing in part the fact that CCME's  AIC filings did not match CCME's SEC filings.

95.    Indeed, in this case, the New York Stock Exchange (the "NYSE") was sufficiently disturbed by the differences between UTA's SEC and SAIC filings that the NYSE listed it as one reason why UTA no longer qualified for listing -- according to UTA.

96.     Confidential Witnesses lend additional support to the conclusion that UTA's subsidiaries' SAIC filings rather than UTA's SEC filings accurately set out UTA's financial metrics.

97.     For example, according to CW 2, CTE made at most 100,000 RMB per month -- about $175,000 per year -- in gross profits from air-ticketing, its primary activity. Yet according to UTA's SEC filings, UTA's two subsidiaries YZL and CTE made, in total, $15,350,956 in gross profits from air-ticketing alone in 2010.

98.     According to CW 2, then, CTE's revenues from air-ticketing should be a drop in the bucket compared to UTA's revenues from YZL. Yet a December 2011 presentation highlights UTA's two 24 hour call centers -- CTE's and YZL's -- placing them on an even footing.

99.     Similarly, the "About Universal Travel" portion of UTA's press releases now describe CTE as UTA's "second home base", even though in 2010 UTA claimed to have earned $41,096,000 in gross profits. It is hard to imagine that an office generating about $175,000 in gross profits annually can be a "second home base" to a company claiming to generate over $40 million in gross profit annually. It is, at best, an outpost.

100.    Indeed, when presented with the revenue stated in UTA's SEC filings purportedly generated by UTA's packaged tour business, the CW in charge of

UTA's packaged tour business responded that the SEC-reported numbers were "impossible".

101.   Similarly, CW 3 claims that there were 100 employees in UTA's main call center in Shenzhen. According to Glaucus, who interviewed a witness with knowledge, there were only a handful more in the other offices. Yet UTA claims that it had 320 employees in its call centers.

102.   Plaintiffs' investigator provides additional reasons to believe that UTA's Chinese filings, and not its SEC filings, are accurate. According to UTA's SEC filings, XGN generated over $17.5 million in revenue from packaged tours in 2008. This is a picture of XGN's main (of three purported)[7] packaged tour office:

---

[7] Plaintiffs have been unable to confirm the existence of the two other packaged tour offices. According to UTA's SEC filings, the three offices require aggregate monthly rent payments of $1,217.

Amended Class Action Complaint For Violation Of The Securities Laws



103. According to staff interviewed by Plaintiffs' investigator, XGN's main packaged tour office has four employees.

104. Finally, UTA's advertising expenditures are consistent with its SAIC filings and not its SEC filings.

105. UTA's three lines of business require heavy advertising expenditures.

106. Potential consumers will not know that UTA's website exists unless UTA advertises its existence.

107. Potential consumers will not know to call UTA's call center unless they know that UTA exists and permits them to book flights.

108.   Potential customers would not have known that they could have booked tickets at *TRIPEASY* Kiosks unless UTA advertised both their existence and location. Or, more to the point, they could not have known that they could attempt to book tickets and then receive a call from UTA without advertising.

109.   UTA's China-based competitors spend tens of millions of dollars annually on advertising.  UTA, however, only spends hundreds of thousands of dollars, or about one hundredth what its competitors spend:

|  | UTA[8] | Ctrip | eLong |
|---|---|---|---|
| 2010 | $372,283 | $68,680,712 | $25,351,912 |
| 2009 | $317,254 | $50,585,168 | $19,513,243 |
| 2008 | $148,903 | $42,021,720 | $23,968,963 |

110.   Yet even though UTA spends one hundredth what its competitors spend in marketing, it claims to generate similar results:

|  | UTA | Ctrip | eLong |
|---|---|---|---|
| 2010 | $153,318,946 | $592,050,111 | $65,408,752 |
| 2009 | $95,802,474 | $464,653,489 | $52,090,225 |
| 2008 | $65,821,838 | $310,957,086 | $47,129,523 |

---

[8] All numbers are from the three companies' respective annual reports on Form 10-K.

Amended Class Action Complaint For Violation Of The Securities Laws

111.   Thus, UTA's advertising as a percentage of revenues is orders of magnitude below Ctrip's and eLong's:

|  | UTA | Ctrip | eLong |
|---|---|---|---|
| 2010 | 0.24% | 11.58% | 38.8% |
| 2009 | 0.33% | 10.86% | 37.4% |
| 2008 | 0.22% | 13% | 50.74% |

112.   According to UTA, its advertising expenses "consist primarily of costs of promotion for corporate image and product marketing and costs of direct advertising."

113.   According to its 2008, 2009, and 2010 10-Ks, UTA's advertisement budget consists of advertisements "for the general public through roadside billboards, brochures, internet ads, cell phone message ads, newspapers and magazine ads."

114.   Hence, there is every reason to believe that UTA's subsidiaries' SAIC filings are accurate and that UTA's SEC filings are not.

**B. The SAIC filings show that UTA is inflating its top-line revenue and gross profits**

**1)  2008**

115.   In its 2008 10-K, UTA represented that its subsidiaries' financial metrics were as follows:

| in USD | YZL | SLB | XGN |
|---|---|---|---|
| Revenue | 12,333,527 | 8,340,519 | 17,598,524 |
| Gross profit | 11,711,458 | 5,690,803 | 2,604,387 |

116.   Plaintiffs obtained the SAIC filings for each of YZL, SLB, and XGN. YZL and SLB are foreign-owned enterprises; thus, their SAIC filings must be audited. The following chart shows the auditors for those subsidiaries whose SAIC filings must be audited:

| Subsidiary | Auditor |
|---|---|
| YZL | Shenzhen Zhongrui Huazheng CPA Firm |
| Hebei Tianyuan Travel Company | Heibei Beitai Fangzhou CPA Firm |
| Huangshan Holiday Travel Service Company | Huangshan Haowang CPA Firm |

117. The following table presents financial metrics for the three subsidiaries reported to the Chinese government:

| in USD[9] | YZL | SLB | XGN |
|---|---|---|---|
| Revenue | 713,166.64 | 116,020.16 | 767,839.62 |
| Gross profit | 713,166.64 | 41,572.19 | 22,798.84 |

118. The following table shows the overstatement of YZL's revenues and gross profit in UTA's SEC filings for fiscal 2008 by dollar amount and percentage:

| in USD, except percentage | In USD | By percentage |
|---|---|---|
| Revenue | 11,620,360 | 1,629% |
| Gross profit | 10,998,291 | 1,542% |

119. The following table shows the overstatement of SLB's revenues and gross profit in UTA's SEC filings for fiscal 2008 by dollar amount and percentage:

| in USD, except percentage | In USD | By percentage |
|---|---|---|
| Revenue | 8,224,498 | 7,089% |

---

[9] See note 3, supra, for exchange rates used in this Complaint.

Amended Class Action Complaint For Violation Of The Securities Laws

| Gross profit | 5,649,230 | 13,589% |

120.   The following table shows overstatement of XGN's revenue and gross profit in UTA's SEC filings for fiscal 2008 by dollar amount and percentage:

| in USD, except percentage | In USD | By percentage |
|---|---|---|
| Revenue | 16,830,684 | 2,192% |
| Gross profit | 2,581,588 | 11,323% |

121.   As to YZL and SLB, these dramatic overstatements were repeated in UTA's 2009 10-K. In that 10-K, UTA repeated its segment analysis for 2008, though identifying the segments as "air-ticketing", "hotel reservations", and "packaged tours", rather than by the name of the subsidiary involved in the segment. But in 2008, YZL was the only subsidiary that sold air-tickets, and SLB was the only subsidiary that made hotel reservations.

122.   Indeed, the description of revenues from each segment in the 2009 10-K matches dollar-for-dollar the description of revenues from each subsidiary in the 2008 10-K:

| in USD | YZL/Air ticketing | SLB/hotel reservations |
|---|---|---|

Amended Class Action Complaint For Violation Of The Securities Laws

| 2008 10-K | 12,333,527 | 8,340,519 |
|---|---|---|
| 2008 financial numbers from 2009 10-K[10] | 12,333,527 | 8,340,519 |

**2) 2009**

123.   Plaintiffs obtained the SAIC filings of 10 of UTA's 11 subsidiaries; of these 9 (of 11) included financial statements. The two subsidiaries' whose SAIC filings Plaintiffs were not able to obtain are:

a.  Chongqing Universal Travel E-Commerce Co., Ltd. ("CTE"); and

b.  Foshan Overseas Universal Travel Co., Ltd. ("Foshan"), a company selling package tours;

124.   Plaintiffs have combined the 9 financial statements they were able to obtain, by adding up revenue, gross income, and cash and cash equivalents.

125.   Plaintiffs' method of combining the financial statements here, in the case of revenue, should overstate the consolidated revenue from UTA's financial statements. That is because consolidation removes intra-company revenue.

126.   In addition, according to CW 2, CTE's monthly gross profits at their peak were approximately RMB 100,000 between at least March 2010 and June 2011, and CTE is not at all engaged in packaged tours. Assuming generously that

---

[10] Source:  Page 31.

Amended Class Action Complaint For Violation Of The Securities Laws

"primarily" only means that 51% of its gross profits comes from air-ticketing and that generously that CTE made peak sales every month, CTE's gross profits are still no more than about RMB 1,200,000 in 2009, since CTE was only established on June 19, 2009. Since UTA claimed gross margins in air-ticketing of approximately 80% in 2009, CTE's revenues were approximately 1,500,000 in 2009.

127.   The following chart combines the revenue and net income of the subsidiaries UTA had in 2009,[11] excluding Foshan:

|  | 2009 in RMB | 2009 in USD[12] |
|---|---|---|
| Revenue | 20,172,787 | 2,952,259.18 |
| Gross Profit | 2,188,965.04 | 320,351.97 |

128.   The following chart compares the combined revenue and net income of UTA's subsidiaries for 2009 with the net income and gross profit UTA claimed to have earned in its consolidated SEC-filed financial statements:

|  | SAIC (less Foshan) | SEC | SEC overstatement in USD | SEC overstatement in percentage |
|---|---|---|---|---|
| Revenue | 2,597,318.60 | 97,875,552 | 95,278,233.40 | 3,600% |

---

[11] UTA acquired five new subsidiaries in 2010. Their revenue and gross income is not added to UTA's revenues and gross profits for FY 2009.

[12] Assumes exchange rate of 6.833.

| Gross Profit | 320,351.97 | 32,373,126 | 32,052,534.03 | 10,005% |

129.   Similarly, a segment-by-segment analysis reveals that UTA materially overstated its revenues.

130.   According to its 2009 10-K, UTA has three sources of revenue:  air-ticketing, hotel reservations, and packaged (or package) tours.

131.   Air-ticketing is conducted by two subsidiaries:  Shenzhen Yuzhilu Aviation Service Co., Ltd. ("YZL"), and CTE.

132.   YZL and CTE's revenues for Fiscal Year 2009 were respectively, according to SAIC filings and CW 2, $904,694.57 and at most $240,000.

133.   Thus, their combined revenue is approximately $1,145,000.

134.   UTA reported that it earned $17,509,195 in revenue from its air-ticketing segment. Even assuming that all of YZL and CTE's revenues came from air-ticketing, it is not possible for UTA to have earned as much from air-ticketing as it claims.

135.   Rather, according to the SAIC filings for YZL and CTE, UTA's revenue from this segment was overstated by at least $16,360,000.

136.   Hotel reservations are conducted by two subsidiaries -- Shanghai Lanbao Travel Service Company Limited ("SLB") and YZL. According to its SAIC filings, SLB earned $253,934.87 in revenue in 2009, while YZL earned $904,694.57 in revenues.

137.    Thus their combined revenue in 2009 was at most $1,160,000.

138.    According to UTA's SEC filings, its revenue from hotel reservations was $13,044,815 in 2009. Thus, even if YZL's *entire* revenues are attributed to *both* hotel reservations and air ticketing, UTA still overstated its revenue from hotel reservations by almost $12,000,000.

## VIII. UTA FALSELY DESCRIBED ITSELF AS AN "ONLINE TRAVEL AGENCY"

139.    On April 8, 2009, UTA issued a press release which stated in relevant part:

> Universal Travel Group, Inc. [...] ("Universal Travel Group" or the "Company"), a growing travel services provider in the People's Republic of China ("PRC") specializing in online and customer representative services to the travel service industry offering packaged tours, air ticketing, hotel reservation and air cargo agency services, today announced the launch of its newly designed corporate website.
>
> The new website will integrate the Company's three previous, separate ones (Classic, *TRIPEASY*, and Easytrip versions) into a single more integrated and streamlined platform. Accessible via http://www.cnutg.com , the website is a result of a year of research and development based on customer ratings and feedback. *It offers comprehensive and timely travel information and services, including guaranteed low prices, high visual appeal, map support technology and easy payment functions.* Additionally, new functionality such as the ability for customers to purchase cell phone minutes using the website should drive additional customers to the site.
>
> The Company believes that with the website's rich feature set, value-added information and functionality, and the consolidation of its three separate sites, it will be able to improve its service standards, resulting in increased loyalty and customer satisfaction. More importantly, the Company expects the net effect will be a higher level of customers satisfaction and improved profitability. *It expects to*

*achieve a 5% to 10% increase in its online revenue generated by its air-ticketing and hotel reservation businesses within one year.*

"We are pleased to unveil our state-of-the-art, user-friendly website, which is in line with our goal to provide reliable and quality services through innovative technology," stated Ms. Jiangping Jiang, CEO of Universal Travel Group. "*With the newly integrated website, booking vacations will be easier than ever for travelers.*"

China has surpassed the U.S. to become the world's largest internet-using population. However, the proportion of internet users among the total population is still lower than the global average, as well as the number of internet users that actually purchase tickets online, *which presents a significant opportunity for Universal Travel Group*. The new website along with the Company's developments with regards to its *TRIPEASY* Kiosks should result in a growing customer base, helping to drive its reputation as a leading travel service provider in the PRC.

[emphasis added].

140.   According to UTA's 2009 10-K, filed with the SEC on March 5, 2009, UTA is an "online travel service industry in the People' Republic of China".[13]

141.   UTA represented that its website could be used to make reservations or book tickets as to its three lines of businesses, air-ticketing, hotel bookings, and packaged tours.

142.   As to air-ticketing, UTA represented that "our customers *pay for their tickets online* or through our *TRIPEASY* [Kiosks] with credit cards or bank debit cards and are then issued their tickets."[14]

143.   As to hotel reservations, UTA represented that "[o]ur customers reserve hotel rooms through us, *our website*, or our [*TRIPEASY*] Kiosks."[15]

---

[13] 2009 10-K at 3.

[14] Source:  2009 10-K filed March 5, 2010, at 4 (emphasis added).

Amended Class Action Complaint For Violation Of The Securities Laws

144.   As to packaged tours, UTA represented that "[o]ur customers may make an order for a packaged tour by booking it directly through us, our website or [*TRIPEASY*] Kiosks."

145.   UTA added that "[w]e aim to be the foremost leading online travel services provider in the People's Republic of China, especially in the air ticketing service, hotel booking and packaged tour providing sectors."[16]

146.   These statements were false and misleading. During the Class Period, UTA's website was non-functional. It did not permit customers to either make reservations or book trips.

147.   According to CW 2, during the Class Period, UTA's website did not provide real-time price information on flights. Thus, a customer could not book a flight through UTA's website because UTA could not be assured that the flight was even available at the quoted price. When a customer sought to book a flight online, an electronic (email) notice was generated to UTA's call center. The staff then checked with the Civil Aviation Administration of China (a regulatory agency), obtained a real-time quote, and returned the customer's call and tried to book the customer's ticket.

148.   Thus, UTA falsely claimed that customers could pay for their tickets online. It also falsely represented that its website had real-time price information.

_____

[15] *Id.* at 7 (emphasis added).

[16] *Id.* at 26.

Amended Class Action Complaint For Violation Of The Securities Laws

149.   More fundamentally, UTA falsely claimed that it is an "online travel service agency", when in reality it is traditional bricks and mortar travel agency (a low growth business) with a non-functioning website.

150.   On September 15, 2010, analyst John Hempton of Bronte Capital recounted his attempts to book airline tickets through UTA's website.

151.   Mr. Hempton attempted to book an airline ticket through UTA's English-language website by paying either with cash or a credit card.

152.   After filling in all available information, instead of booking the ticket, UTA's website generated an error message. It was thus literally impossible to purchase a ticket on UTA's English-language website

153.   Similarly, analyst Hempton reported that it was impossible to purchase a ticket on UTA's Chinese-language website. Instead of booking a ticket, the user would receive a message stating that they would receive a call from a UTA representative to book a ticket.

154.   Similarly, UTA's website did not provide the option to make a hotel reservation. While UTA's website has a button that says "book", this button does not work.

155.   Mr. Hempton posted a video of himself attempting to book tickets through UTA's website:

http://www.youtube.com/watch?v=Jd3mq3HMUnw&feature=player_embedded.

156.   According to China Rank, a website that ranks Chinese websites by traffic, UTA's website receives approximately one unique visitor per million internet users in China.

157.   UTA's competitors Ctrip.com and eLong receive, respectively, 1500 times more and 450 times more traffic than UTA. Yet UTA claims that it earned about one quarter of Ctrip's revenues, and about two and a half times eLong's revenues.

158.   UTA denied Mr. Hempton's statements that UTA's website was nonfunctional, and threatened legal action. However, UTA immediately began changing the website to destroy the evidence uncovered by Mr. Hempton without alerting investors.

159.   For example, on September 15, Mr. Hempton had pointed out that UTA's website gave a traveler the option of picking up her tickets at the airport. Mr. Hempton attempted to book a flight from BeiJiang to Yichang. By selecting the option to pick up tickets at the airport, UTA required Mr. Hempton to pick up tickets at the Shenzhen airport. Since Shenzhen is located 1200 miles from BeiJiang, it would not be possible for a traveler to pick up tickets there. On September 16, 2010, UTA removed this function from its website. The video is available at http://brontecapital.blogspot.com/2010/09/universal-travel-group-another-video.html.

160.   After Mr. Hempton revealed that UTA's website was non-functional, UTA admitted that the vast majority of its revenues *did not* come from its website. In a conference call dated September 29, 2010,[17] Defendant Xie was quoted as saying:

a.  For air ticketing, 20% of revenue is "online related", i.e. "is generated by [UTA's] website", and 2% are paid online. Presumably, customers representing the 20% of revenue that is "online related" booked a trip and received a subsequent call from the call center.

b. For hotel reservations, 30% of revenue is "online related", "[b]ut most of the online transactions are still handled and finalized by our call representatives."

161.   Hence  UTA is *not* an "online travel service industry in the People' Republic of China". It is a call center with a website.

162.   Hence it was false to say that "our customers *pay for their tickets online* or through our *TRIPEASY* [Kiosks]". The vast majority of customers paid for their tickets by speaking with a representative through a call center.

## IX. UTA OVERSTATED THE NUMBER OF STAFF EMPLOYED IN ITS CALL CENTERS

---

[17] Available at
http://us.cnutg.com/UpLoadFiles/20120521/2012052116541290.pdf.

163.   According to its 2009 10-K, UTA had approximately 500 employees working in its three call centers.[18]

164.   According to its 2010 10-K, UTA had approximately 320 employees working in its three call centers.

165.   The three call centers are located in Shenzhen, Shanghai, and Chongqing.

166.   According to UTA's 2010 10-K, the Shanghai call center only has 20 seats.

167.   According to CW 3, there were approximately 100 employees in UTA's Shenzhen call center between October 2010 and June 2011. Of these, approximately 15 were managers, and 85 were call center staff. There were no large changes in the number of employees at the call centers.

168.   Glaucus had reported that a reliable source stated that the Shenzhen office employed only 100 representatives. CW 3 thus confirms Glaucus's findings.

169.   In addition, Glaucus reported that there were a "handful" of representatives in the other call centers. Glaucus's findings are confirmed by UTA's own SEC filings, which claim that there are only 20 seats in the Shanghai office.

_____

[18] 2009 10-K, at 11.

170.   Hence, the vast majority of UTA's call-center employees are located in Shenzhen. But there were only 85 call-center staff in Shenzhen -- nowhere near the 320 or 500 that UTA claimed to employ.

171.   That UTA overstated the number of employees in its call centers is further evidence that it overstated its revenues.

## X. UTA FALSELY CLAIMED TO HAVE SOLD ITS *TRIPEASY* KIOSKS AND IN ANY CASE THE *TRIPEASY* KIOSKS DID NOT GENERATE PROFITS

172.   According to a press release dated September 10, 2010, UTA allegedly sold its 1,523 *TRIPEASY* Kiosks to Shenzhen Xunbao E-Commerce Co., Ltd., for more than 40 million RMB, or approximately $5.93 million.

173.   According to UTA, Shenzhen Xunbao is a travel insurance company.

174.   According to UTA, UTA was granted exclusivity to sell its products through the Kiosks for two years. Shenzhen Xunbao could not sell any other travel company's products on the Kiosks it allegedly bought from UTA.

175.   Defendant Jiang was quoted as saying:

We do not expect this transaction to reduce our top-line, at least for the next two years, as we have secured exclusive air ticketing, hotel reservation and package tour travel product sales rights via the kiosk network. Our travel product offerings are complementary to Shenzhen Xunbao's travel insurance products and, as a result, we expect to negotiate a mutually beneficial arrangement to continue to utilize the *TRIPEASY* Kiosks as one of our multiple sales channels after the initial two-year period expires. In terms of cost savings, we expect an

increase in our gross margin as a result of eliminating costs associated
with the kiosks.

176.   UTA even filed a contract with the SEC that purported to dispose of
the *TRIPEASY* Kiosks to Shenzhen Xunbao.

177.   In addition, the statement was repeated in UTA's 2010 10-K.

178.   The statement was false. According to CW 5, *UTA never sold the
TRIPEASY Kiosks at all*.

179.   CW 5 was the Shenzhen Xunbao employee in charge of leading the
negotiations with UTA for the sale of *TRIPEASY* Kiosks. CW 5 confirms that the
negotiations were terminated.

180.   CW 5 was employed at Shenzhen Xunbao until October 2010. CW 5
confirms that Shenzhen Xunbao made no payment to UTA during his tenure.

181.   According to CW 5, Shenzhen Xunbao no longer operates, as of late
2010 or early 2011. This is confirmed by Shenzhen Xunbao's SAIC filings.

182.   Hence, every statement referencing the sale of *TRIPEASY* Kiosks was
false and misleading.

183.   CW 5's account is confirmed by CW 4. CW 4 was the person in
charge of the *TRIPEASY* Kiosk project at UTA until September 2010. Even though
the sale would have occurred on his watch, CW 4 does not remember any sale of
*TRIPEASY* Kiosks.

184.   Indeed, according to CW 4 who obtained this information from former colleagues, UTA planned to recall its *TRIPEASY* Kiosks in late 2011. It is not possible for UTA to recall the Kiosks if it no longer owned them.

185.   The true reason UTA was anxious to dispose of *TRIPEASY* Kiosks is that maintenance costs and depreciation of the Kiosks exceeded revenues the Kiosks.

186.   According to CW 4, the maintenance expenses for one *TRIPEASY* Kiosk was RMB 1,000 per month. In addition, UTA was required to pay the property managers where the Kiosks were placed a fee.

187.   Moreover, a Kiosk cost between 15,000 and 20,000 RMB.

188.   The net result was that the Kiosks were not profitable.

189.   According to CW 4, because the Kiosks were not profitable, UTA terminated the contracts it had with property managers, and planned to recall and discontinue all the Kiosks.

190.   CW 4 also stated that he remembered that UTA had about 700 Kiosks in total.

191.   UTA did not want to disclose it was voluntarily withdrawing the *TRIPEASY* Kiosks discontinuing this aspect of its business because it had previously falsely represented that the *TRIPEASY* Kiosks were profitable.

192.   Under header "Our Future Goals and Expansion Plans", UTA's 2009

10-K provided the following discussion:

We introduced the Kiosksin [sic] selected major cities in the PRC, with 623 Kiosks rolled out in 2009. We plan to further introduce the Kiosks to other cities in the PRC. Locations of our Kiosks will include hotels, office buildings, banks, shopping malls and MTR stations. The Company will promote the Kiosks via local media such as newspapers, billboards and internet ads, including its own award-winning website, www.cnutg.com, as well as other related websites, which will in turn further the Company's brand recognition. The Kiosks themselves will provide a strong media platform to strengthen Universal Travel Group's franchise. Additionally, the Kiosks' interface will feature the same look, feel and functionality as Universal Travel Group's new website, www.cnutg.com.cn, which integrates the Company's diversified services into a new platform with selected value-added features and functionality.

The Kiosks are interactive terminals placed in strategically targeted public areas. They enable convenient, fast and easy to use, real-time air ticketing inquiries, reservations and purchases, as well as hotel and tour reservations. The Kiosks provide full 360° views of hotels and travel destinations and accept payment via bank cards, debit cards and VISA. According to Credit Suisse Research, the number of domestic travelers in the PRC that use online travel services continues to rise, accounting for 16% of users in 2007, up from 12% in 2005. Major cities such as Shanghai and Shenzhen have a higher proportion of people using online travel services as compared to the rest of the PRC, representing 23% and 20% of the users in 2007, respectively. According to the China Internet Network Information Center, the PRC is the world's largest market for internet users. Despite this, 95% of internet users still do not make purchases over the internet. The Kiosks eliminate the need for a personal computer or online access in order to make travel arrangements and are specifically targeted at this demographic of users. We expect to roll out 1,400 additional Kiosks in 2010.

The Kiosks, together with our website and call center, will serve to integrate our air ticket sales, hotel room sales, and packaged

Amended Class Action Complaint For Violation Of The Securities Laws

tours businesses. We are working on a cost-effective way for a potential rollout by bundling it with Byte Power (CQ) Info Tech Limited's (a subsidiary of Byte Power Group Limited - ASE: BPG.AX) E-Kiosks. *This will allow us to enter a new market in Chongqing quickly and efficiently.*

[emphasis added]

193.   The *TRIPEASY* Kiosks were a failure. Indeed, according to CW 2, they were not even used in Chongqing.

194.   Thus, had UTA not fraudulently claimed to have sold all its *TRIPEASY* Kiosks, it would have been forced to admit that the *TRIPEASY* Kiosks were a failure.

## XI. UTA OVERSTATED ITS CASH AND CASH EQUIVALENTS

195.   UTA claimed to have had $56,664,313, $43,591,459, and $37,883,072, in cash and cash equivalents respectively, on September 30, June 30, and March 31, 2010.

196.   UTA claimed to have had $39,618,988 in cash and cash equivalents on December 31, 2010.

197.   UTA claimed to have earned $143,102 in interest income on these cash balances over all of 2010.

198.   Even assuming a low-end balance of $40 million, the interest earned by UTA on this balance amounts to 0.35% on an annual basis.

199.   It is implausible that UTA would earn a yield of 0.35% on its cash balances.  According to the Bank of China, the very least interest that should be

Amended Class Action Complaint For Violation Of The Securities Laws

earned for RMB-denominated accounts is 0.36% (for a demand deposit). Lump sum deposits should earn between 2.25% and 4.55% depending on the length of the deposit.[19]

200.   Indeed according to UTA's 2010 10-K (filed with the SEC after the Class Period), UTA earns interest rates of "1.89%, 2.1%, and 2.22%" on $19,681,308 investments with HappyFund of China Construction Bank. If this figure were accurate, UTA should have earned nearly $400,000 in interest on that deposit alone in 2010.

201.   Hence, it is more plausible that UTA did not actually have the cash balances it claims to have had.

202.   On a conference call on September 20, 2010, Defendant Xie claimed that as of June 30, 2010, UTA held $19 million from a secondary offering, and $25 million as US or HK dollar denominated accounts in an offshore bank. UTA claimed that it earned "minimal" interest on the US or HK dollar accounts in an offshore (i.e., non-China) bank.

203.   This claim is difficult to credit. For one thing, UTA is a China-based company with operations almost exclusively in China. Indeed, UTA claims that "[a]s of December 31, 2010 and 2009, the accounts of [UTA] were maintained, and its financial statements were expressed, in Chinese Yuan Renminbi."

---

[19] Rates are available at
http://www.boc.cn/en/bocinfo/bi4/201012/t20101225_1247526.html.

Amended Class Action Complaint For Violation Of The Securities Laws

204.   Yet it claims to have placed the majority of its cash in US and HK dollar denominated accounts. It is difficult to understand UTA's need to keep its cash in denominations that were *not* its functional currency. Because the cash UTA allegedly held was generated by its business, it would have had to convert the cash its business earned -- Renminbi -- to U.S. and HK dollars. It is unclear what purpose such conversion would serve; in its operations and for its acquisitions, UTA uses Renminbi in its operations. Thus, to use its currency reserves, UTA would have to convert it back to Renminbi.

205.   UTA allegedly did all of this to maintain its cash in accounts that bore negligible interest.

206.   It is particularly baffling that UTA would do so even though it could have been earning nearly 2% interest simply by placing the dollars in RMB denominated accounts.

207.   UTA's non-culpable inference is that it is grossly mismanaged; it simply forgot that it had nearly $25 million in cash from which it could earn over $400,000 in interest annually.

208.   The more plausible inference is fraudulent. UTA lied about the $25 million, and could not earn any interest, and therefore reported no interest income.

209.   The fraudulent inference is buttressed by UTA's recourse to capital markets. According to UTA's 10-Q for the quarter ending September 30, 2009, UTA had almost $23.5 million in cash and cash equivalents on that date.

210.   Yet UTA raised $19 million in December 2009.[20] The stated purpose of the proceeds was "general corporate purposes", which is odd since UTA generates positive cash flows from operations, and apparently already held $23.5 million.

211.   Shortly thereafter, UTA began an acquisition spree. It would eventually acquire four new subsidiaries for total cash consideration of $18.22 million, all completed before June 28, 2010.[21] That is nearly all of the money it earned from its December 2009 capital raise.

212.   On June 21, 2010, UTA returned to capital markets, and obtained an additional $19 million in funds.

## XII. UTA'S AUDITOR RESIGNS AND ACCUSES UTA OF FRAUD

### A.  The revolving door of auditors

---

[20] The total offering amount was $20 million, with $1 million going to the underwriter.

[21] Consists of the acquisition of Huangshan Holiday Travel Service Company for $2.34 million, completed on March 26, 2010; acquisition of Hebei Tianyuan Travel Agency for $3.52 million, completed on March 29, 2010; acquisition of Zhengzhou Yulongkang Travel Service Company for $5.16 million, completed on March 29, 2010; acquisition of Shanxi Jinyang Travel Agency Co., Ltd., for $2.04 million in cash, completed on June 28, 2010; acquisition of Kunming Business Travel Agency Co., Ltd., for $5.16 million, completed on June 28, 2010.

213.   UTA has cycled through a number of auditors.

214.   Its auditor for its 2009 financial statements was Acquavella, Chiarelli, Shuster, Berkower & Co., LLP ("ACSB"). UTA retained ACSB on June 30, 2009 and dismissed it on September 1, 2010.

215.   ACSB is an accounting firm with 52 accountants located in New Jersey.

216.   On September 1, 2010, UTA retained Goldman Kurland Mohidin ("GKM"). On September 29, 2010 -- less than a month later -- GKM resigned without providing a reason.

217.   On a conference call the day of GKM's resignation, Defendant Xie stated that "[o]ur new auditors, GKM, have not yet performed any review or audit of our financial statements and have not expressed any concerns to management regarding our previous financial statements."

218.   GKM is a small Encino, California-based accounting firm with 13 accountants.

219.   On September 30, 2010, UTA retained Windes & McClaughry Accountancy Corporation as its registered independent accountant.

220.   Windes is a Long Beach, California-based accounting firm with 98 accountants.

221.   On April 10, 2011, UTA announced that Windes was resigning from its role as registered independent accounting firm.

222.   UTA's announcement represented to investors that Windes's reason for resigning was that "[m]anagement and/or the Audit Committee [was] non-responsive, unwilling or reluctant to proceed in good faith and [imposed] scope limitations on Windes' audit procedures."

223.   UTA's announcement further represented that Windes had identified (1) "issues related to the authenticity of confirmations" and "confirmation procedures carried out under circumstances which Windes believed to be suspicious"; and (2) "issues concerning the lack of evidence of certain tour package contracts and related cash payments." Windes sought to resolve these issues, but UTA was not willing to proceed in good faith.

224.   Windes stated that its reason was that "[m]anagement and/or the Audit Committee being non-responsive, unwilling or reluctant to proceed in good faith and imposing scope limitations on Windes's audit procedures."

**B.  The confirmation process**

225.   Auditors must examine, on a test basis, whether a company they audit (the "Audited Company") genuinely sold goods, purchased supplies, received cash, paid out cash, or had cash on hand. (Generally Accepted Auditing Standard ("GAAS") No. 3.)

226.   To do so, an auditor corresponds directly with the Audited Company's supplier, customer, or bank (the "Confirming Entities") to confirm the transaction. (AU Section 330.04.)

227.   The auditor obtains the addresses for the Confirming Entities directly from the Audited Company's accounting records -- generally, from its general ledger.

228.   The auditor corresponds with the Confirming Entities by sending a confirmation form to the address obtained by the Audited Company's accounting records. (*Id.*)

229.   The Confirming Entities then reply, confirming the amounts provided by the Audited Company. (*Id.*)

230.   Windes' accusation regarding the confirmation process gives rise to two possibilities, both of which ground a strong inference of scienter.

231.   *First*, it is possible that the address for the Confirming Entities in UTA's records is an address to which UTA has access.

232.   Then, UTA would receive the confirmations, fill it out itself, and send them to Windes -- "confirming" an address to which it has access, however, the confirmation form will be sent to the Audited Company rather than to the Confirming Entity.

233.   In UTA's case, it is possible that UTA had Windes send out confirmation letters to addresses that were controlled by UTA.   UTA then replied to Windes's request for confirmation. UTA responded to the confirmation letters as the Confirming Entity -- even though UTA was the Audited Company, and should not have responded as the Confirming Entity.

234.   This bypasses the audit process, which is designed to ensure that the Confirming Entity itself confirms the claims UTA regarding its sales, purchases, and cash.

235.   There is no non-fraudulent reason for UTA to have Windes send confirmation letters to addresses UTA controls.

236.   This is by far the most likely explanation for Windes' accusations, since it will lead to Windes receiving inauthentic documents under confirmation procedures which are suspicious.

237.   Second, it is possible that UTA acted in concert with the Confirming Entities to provide false confirmation. For example, another China-based U.S. listed company under investigation by the SEC -- Longtop Financial Technologies, Inc. -- acted in concert with employees of the local bank branch, who falsely confirmed that Longtop held an account with it.

238.   There is no non-fraudulent reason for UTA to conspire with the Confirming Entities to provide false confirmations.

## C.  Lack of evidence of tour package contracts

239.   Audit standards require auditors to obtain competent evidence that the financial statements accurately depict UTA's financial condition. GAAS No. 3.

240.   Auditors are not permitted to rely solely on the representations of management. (AU Section 333.02.)

241.   Rather, auditors are required to obtain direct evidence that balance sheet items, and sometimes cash flow and income statement items, are correctly stated.

242.   Thus, Windes was required to obtain, on a test basis, direct evidence that the packaged tours had been sold, and that UTA had obtained payments for the sales.

243.   When it sought evidence that certain transactions recorded in UTA's general ledger actually took place, it could find no evidence. The inference is that the transactions never took place.

## D.  Windes could no longer rely on Management's Representations

244.   After it determined that audit confirmations were inauthentic, Windes sought to investigate the reason UTA had arranged to submit inauthentic audit confirmations.

245.   Specifically, it sought to have the Audit Committee investigate the inauthentic confirmations.

246.   Similarly, after it determined that there was no evidence to support the fact that transactions actually recorded in UTA's accounting records actually took place, Windes sought to undertake further proceedings to investigate whether UTA actually sold the

247.   Any company that was not engaged in fraud would have readily assented and assisted its auditors in carrying out further audit procedures.

248.   Any responsible audit committee would have insisted that the company carry out this fundamental audit obligation.

249.   For example, a company will attempt to ensure that its accounting records accurately reflect the transactions it undertook. If a company's accounting records record revenue from transactions that never actually occurred, such a company would want to investigate the allegations. This is particularly true if the allegations come from the company's registered independent accountant -- a third-party paid hundreds of thousands of dollars specifically to ensure the accuracy of the company's financial statements.

250.   After having conducted an investigation, the company would then know who was responsible for recording revenue from non-existent transactions. It could discipline, or if necessary terminate, the persons responsible, to ensure that its accounting records accurately reflected its financial condition.

251.   But UTA refused to allow Windes to perform additional tests to determine whether the accounting records for the packaged tours had been falsified.

252.   Windes also suggested that UTA conduct an independent Audit Committee investigation. UTA refused to conduct the investigation.

253.   UTA's actions thus caused Windes to lose faith in management and the Audit Committee's "commitment to sound corporate governance *and reliable financial reporting*." (2010 10-K at 44, emphasis added).

254.   In addition, Management and the audit committee took unilateral action which "impaired [Windes'] independence as it related to [UTA]".

## XIII.  AFTER WINDES RESIGNS, UTA SELECTS AN AUDITOR THAT HAS BEEN REPEATEDLY SANCTIONED FOR ITS POOR-QUALITY AUDITS

255.   Even as it announced that Windes had resigned, UTA announced that it had replaced Windes with EFP Rotenberg & Co., LLP.

256.   EFP Rotenberg is firm based out of Rochester, NY, with 132 accountants.

257.   EFP Rotenberg's audits of China-based issuers are actually conducted by a China-based accounting firm called BeiJiang Yongtuo CPA's. EFP Rotenberg merely supervises BeiJiang Yongtuo's work, and signs the relevant paperwork.

258.   The Public Company Accounting Oversight Board (the "PCAOB") is an organization established by the Sarbanes-Oxley Act of 2002 (the "SOX") to regulate the accounting profession.

259.   Accounting firms wishing to audit SEC-filing issuers must register with the PCAOB.

260.   As part of its mandate, the PCAOB regularly audits PCAOB-registered firms.

261.   The PCAOB audited EFP Rotenberg in both 2008 and 2010.

262.   In 2008, the PCAOB identified "what it considered to be audit deficiencies [of such an extent that EFP Rotenberg] did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements."

263.   For example, EFP Rotenberg had failed "to identify, or to address appropriately, a departure from GAAP that related to a potentially material misstatement in [...] audited financial statements."

264.   The 2010 inspection report was much harsher. Then, the PCAOB found that in various audits EFP Rotenberg had failed to produce sufficient evidence to support its opinion relating to:

a. Accounts receivable;

b. Inventory;

c. Cash;

d. Revenue;

e. Deferred tax assets;

f. Property and equipment;

g. Stock-based compensation; and

h. Warrants.

## XIV. ADDITIONAL FACTS PROBATIVE OF SCIENTER

### A. UTA alters its website to remove statements that analysts have demonstrated are false

265. In addition to the alterations noted by Mr. Hempton, above, other analysts noted that the Company removed fraudulent claims once it was publicly pointed out that they were false.

266. According to sell-side analyst[22] Thomas Pfister of RedChip, prior to Mr. Hempton's accusations, UTA's investor relations website claimed that their hotel reservation systems covered "more than 30,000 hotels". After Mr. Hempton's accusations, UTA "revised" this figure to 8,000.

267. Because it was concerned that UTA was engaged in fraud, RedChip dropped coverage of UTA.

---

[22]Sell-side analysts offer recommendations to investors regarding stock purchases based on their research.

268.   RedChip is a *financial public relations firm* focused on analyzing small-cap Chinese firms like UTA with a host of China-based clients. For RedChip to call a China-based company fraudulent is against its financial interests.

## B. Revolving door of questionable accountants and CFOs

269.   UTA has gone through five auditors since 2006.

270.   By letter dated May 4, 2009, the SEC specifically raised with UTA questions about the ability of a small U.S.-based auditing firm adequately to audit UTA's financial statements. UTA went on to hire three more small U.S.-based auditing firms rather than hiring a larger auditor or one with operations in the PRC.

271.   In addition, UTA has rapidly cycled through CFOs:

a.  Xin Zhang was appointed on July 12, 2006, and resigned on February 17, 2009;

b. 27 year-old Jiang Xie was appointed on February 17, 2009, and resigned on August 17, 2009;

c. Yizhao Zhang, who is also head of the audit committee of the fraudulent NYSE-listed China Education Alliance, Inc., was appointed on August 17, 2009, and resigned on August 16, 2010.

d. Jiang Xie, now aged 28, was reappointed CFO of UTA on August 17, 2010.

**C.  UTA is a serial capital-raiser despite purportedly being a business with intensely favorable cash flows and a fortress balance sheet**

272.   Between January 1, 2008, and December 31, 2010, UTA's operations purportedly generated $31,057,199.

273.   At no time between December 31, 2008, and December 31, 2010, did UTA ever purportedly have less than $15 million.

274.   Despite this fortress balance sheet, in the same period, UTA raised $46,430,797 from selling its shares. The majority of UTA's financing activities (more than $37 million net) were in 2009-2010.

**D.   UTA voluntarily withdraws its shares from listing after the NYSE expresses concerns that UTA is engaged in fraud**

275.   On April 16, 2012, UTA announced that it was voluntarily withdrawing its shares from listing on the NYSE.

276.   At that time, the NYSE had had trading in UTA's shares halted for over a year.

277.   UTA's voluntary withdrawal noted that the NYSE "has indicated that [UTA] faces the prospect of delisting" because of the following issues (among others):

> [I]ssues raised by Windes & McGlaughry Accountancy Corporation when it resigned as the Company's independent public accounting firm in April 2011, including with respect to the adequacy of the Company's cooperation in the audit being conducted by Windes prior

to its resignation and the authenticity of certain documents provided to Windes in connection with the audit, as reflected in the Company's Form 8-K filed April 14, 2011 and exhibits thereto; on-going delays in the filing of certain periodic SEC filings; the Exchange's concerns with respect to the adequacy of certain of the Company's filings in light of the extensive comments that the Company has received on such filings from the SEC Division of Corporation Finance; certain discrepancies between and among certain of the Company's PRC subsidiaries' filings with the PRC's State Administration for Industry and Commerce and its SEC filings; the Exchange's concerns with respect to the accuracy of certain information provided by the Company to the Exchange; the tax implications of the Company's cash payments for acquisitions in 2010; and the adequacy of the Company's internal controls.

## E.  UTA abandons its reporting obligations

278.   In the Press Release announcing delisting of its stock from the NYSE dated April 16, 2012, UTA announced that "the Company will continue to be subject to the reporting requirements of the Securities Exchange Act of 1934."

279.   UTA added that "by the next 10-Q reporting date, [it] intends to regain compliance in connection with the timely filing of all periodic and other reports with the SEC".

280.   Since making this announcement, UTA has not filed any periodic reports with the SEC.

281.   As of the filing of this complaint, UTA was required to file:

a.  Its 10-K for FY 2011;

b. Its 10-Q for the first quarter of 2012;

c. Its 10-Q for the second quarter of 2012;

282.   UTA has not made these required filings.

283.   UTA has sought an extension of the time to file its 10-Q. Its stated

reason was:

> Universal Travel Group (the "Company") is unable to obtain the
> information necessary to complete the preparation of the Company's
> financial statements for the quarter ended June 30, 2012 and the
> review of these financial statements by the Company's auditor in time
> for filing. As a result of this delay, the Company is unable to file its
> Quarterly Report on Form 10-Q within the prescribed time period
> without unreasonable effort or expense. The Company expects to file
> within the extension period.

## XV. LOSS CAUSATION

284.   This case involves several fraudulent statements. The disclosure of

information related to each fraudulent statement caused an immediate drop in

UTA's stock price.

### A. The fraudulent "online travel agency" claims

285.   During the Class Period, UTA fraudulently billed itself as an "online

travel agency". In reality, the vast majority of its revenues comes from its call

center. It is thus not an online travel agency, but a call center with a website.

286.   The truth that UTA was not an "online travel agency" was revealed on

September 15, 2010, when Mr. Hempton demonstrated that UTA's website was not

functional.

287.   The news caused UTA's stock price to fall from a close of $4.77 on September 14 to a close of $3.86 on September 15, a fall of 19%.

## B. The fraudulent claim regarding the number of employees

288.   On March 8, 2011, Glaucus issued a report that, among other things, revealed that UTA had approximately 100 employees in its call centers, rather than the 320 it claimed in its SEC filings.

The report caused UTA's stock price to fall from $6.18 to $5.71 on heavy volume, a fall of 7.6%.

## C.  UTA Fails to File its Annual Report Because its Auditor Suspects Fraud

289.   On March 29, 2011 UTA announced that it was postponing its fiscal year 2010 earnings conference call.  UTA claimed the postponement was not due to any accounting irregularities.

290.  On March 30, 2011, UTA announced that it was unable to file its annual report on form 10-K because of "a delay in assembling the information."

291.  In truth, UTA's accountants had refused to certify the financial statements because they suspected fraud on the part of UTA management.

292.   As a result of its inability to file its annual financial statements, UTA stock dropped or $1.06/share or 19.6%.

## D.  Auditor Resignation Leads to Trading Halt and Share Price Decline

293.  On April 11, 2011, trading in UTA's shares was halted. The halt price was $3.96.

294.  On April 14, 2011, UTA filed an 8-K with the SEC announcing Windes' resignation, and the reasons for it.

295.  UTA reversed itself and announced that the real reason it delayed filing its annual report on form 10-K is because its auditors, Windes McClaughry Accountancy Corporation, had resigned because:

> [T]hhe Company's management and/or the Audit Committee being non-responsive, unwilling or reluctant to proceed in good faith and imposing scope limitations on Windes' audit procedures.
>
> Windes also stated that it had lost confidence in the Board of Director's and the Audit Committee's commitment to sound corporate governance and reliable financial reporting.  Prior to its resignation,
>
> Windes raised the following issues, some of which may be considered to be disagreements, encountered during the audit, including issues related to the authenticity of confirmations, a loss of confidence in confirmation procedures carried out under circumstances which Windes believed to be suspicious; issues concerning the lack of evidence of certain tour package contracts and related cash payments.
>
> As a result, Windes had requested authority to perform additional audit procedures and the above issues to be addressed by an independent Audit Committee investigation. Windes stated in its resignation letter that, in its view, the Company was not willing to proceed in good faith with the course of action requested by Windes. Windes also stated in its resignation letter that in its opinion, it believed that certain

statements made by Management and the Audit Committee,
between March 29, 2011 and its resignation letter, impaired
its independence as it related to the Company.

296.   On April 16, 2012, UTA issued a Press Release announcing its intention to voluntarily delist its shares in light of the NYSE's intention to delist them. The letter also set out the concerns the NYSE had regarding the accuracy of UTA's financial statements.

297.   On May 7, 2012, UTA resumed trading, and closed that day at $0.71. This is a drop of over 82%.

298.   This drop was the direct result of the adverse news that UTA's auditors had resigned due to Defendants' accounting improprieties and that the NYSE was to delist its shares as a result of suspected fraud.

## XVI.  RESPONDEAT SUPERIOR LIABILITY

299.   UTA is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

300.   The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to RINO under *respondeat* superior and agency principles.

## XVII. PLAINTIFFS' CLASS ACTION ALLEGATIONS

### A.  Class action allegations

301.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of UTA during the Class Period. Excluded from the Class are the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

302.  The members of the Class are so numerous that joinder of all members is impracticable.  Between March 12 and May 27, 2009,  UTA's stock was actively traded on the OTC:BB.  Between May 28 and October 26, 2009, UTA's stock was actively traded on the NYSE Amex (the "AMEX"). Between October 27, 2009, and the close of the Class Period, UTA was actively traded on the NYSE.

303.   While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by UTA or its

transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

304.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

305.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

306.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

>  (a) whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
>  (b)   whether statements made by the Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of the Company; and
>
>  (c)  to what extent the members of the Class have sustained damages, and the proper measure of damages.

307.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

Amended Class Action Complaint For Violation Of The Securities Laws

impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## B. Applicability of presumption of reliance: Fraud-on-the-market doctrine

308.   At all relevant times, the market for UTA's common stock was an efficient market for the following reasons, among others:

(a)    Between March 12 and May 27, 2009, UTA's stock was actively traded on the OTC:BB.  Between May 28 and October 26, 2009, UTA's stock was actively traded on the NYSE Amex (the "AMEX"). Between October 27, 2009, and the close of the Class Period, UTA was actively traded on the NYSE.  All three of these exchanges are highly automated and efficient;

(b)    During the class period over 2% of all outstanding shares were bought and sold on a weekly basis, establishing a *strong* presumption of an efficient market;

(c)    As a regulated issuer, UTA filed periodic public reports with the SEC, the OTC:BB, the AMEX, and the NYSE;

(d)     UTA was eligible to file (and did file) a Registration Statement on Form S-3 with the SEC during the Class Period;

(e)     UTA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)     At least 25 NASD member firms were active market-makers in UTA stock at all times during the Class Period that it was traded on the OTC:BB; and

(g)     Unexpected material news about UTA was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

(h)     UTA was followed by several securities analysts employed by major brokerage firms including RedChip Companies, Inc., Dutton Associates, the Maxim Group, Glaucus Research, and Bronte Capital (among others), who wrote reports that were

distributed to the sales force and certain customers of their respective firms during the Class Period;

309.   As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the Company's stock price.  Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices, and a presumption of reliance applies.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against the Officer Defendants and UTA

310.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

311.   During the Class Period, defendants named in this count carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase UTA's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants named in this count, and each of them, took the actions set forth herein.

Amended Class Action Complaint For Violation Of The Securities Laws

312.   Defendants named in this count (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for UTA's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

313.   Defendants named in this count, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of UTA as specified herein.

314.   Defendants named in this count employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in the light of the circumstances under which they

were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

315.   Defendants named in this count had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available.   Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by overstatements and misstatements of the Company's financial condition throughout the Class Period, if the Defendants named in this count did not have actual knowledge of the misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

316.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of UTA's securities was artificially inflated during the Class Period.   In ignorance of the fact that market prices of the Company's publicly-traded securities

were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants named in this count, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Defendants named in this count, but not disclosed in public statements by the Defendants named in this count during the Class Period, Plaintiffs and the other members of the Class acquired UTA common stock during the Class Period at artificially high prices, and were, or will be, damaged thereby.

317.   At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding UTA's financial results, which was not disclosed by the Defendants named in this count, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their UTA's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

318.   As a direct and proximate result of the Defendants named in this count's wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of UTA's securities during the Class Period.

319.   This action was filed within two years of discovery of the fraud and within five years of each Plaintiffs' purchases of securities giving rise to the cause of action.

**SECOND CLAIM**
**Violation of Section 20(a) Of**
**The Exchange Act Against the Individual Defendants**

320.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

321.   The Individual Defendants acted as controlling persons of UTA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly

after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

322.   In particular, each Individual Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

323.   As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

324.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

325.   This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under

Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

(b)   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

Dated: September 7, 2012                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

_____
Laurence M. Rosen LR-5733
236 Tillou Road
South Orange, NJ 07079
Telephone: (973) 313-1887
Fax: (973) 833-0399
lrosen@rosenlegal.com

Lead Counsel for Lead Plaintiffs

Amended Class Action Complaint For Violation Of The Securities Laws