# WEINER | LESNIAK LLP

### ATTORNEYS AT LAW
www.weinerlesniak.com

CLARK E. ALPERT
Member of the Firm

calpert@weinerlesniak.com
Direct Dial: 973-352-8620

December 4, 2015

**VIA ELECTRONIC FILING**
Honorable James B. Clark, III, U.S.M.J.
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

> Re:  **P. Van Hove BVBA, et als. v. Universal Travel Group, Inc., et als.**
>      **Case No.: 2:11-cv-2164 (KM-SCM)**

Dear Magistrate Judge Clark:

This letter follows up on a portion of our discussion during yesterday's conference call. More specifically, at our request and Your Honor's direction, plaintiff's counsel then sent us a redline of the differences between the Third Amended Complaint as had been approved by the Court, and the Third Amended Complaint as subsequently filed by plaintiffs. The extent of the changes is set forth in that redline received by us yesterday, a courtesy copy of which is annexed hereto.

Because of the extensive nature of the changes, it seemed important for both Your Honor and Judge McNulty to have available (and be 'working off of') the version actually filed, as opposed to the version actually approved. Out of necessity, Defendants' motions to dismiss tracked the version actually filed, as we worked diligently to be able to file our motion during the 'stub' week before Thanksgiving.

I do recall having to switch gears in the middle of our preparation when we realized we were referring to the "wrong" paragraphs from the "wrong" version. If any relief is needed from the Court with regard to this issue, we will so advise Your Honor after studying the redlined changes further and retracing our steps.

I thank the Court for its courtesies in considering this submission.

Respectfully submitted,
WEINER LESNIAK, LLP

By: _____
Clark E. Alpert

CEA/smm
Encl.
cc w/encl. via ECF:
    Honorable Kevin McNulty, U.S.D.J.
    All Counsel

1009516_1

**Clark E. Alpert**

| | |
|---|---|
| **From:** | Jonathan Horne <JHorne@rosenlegal.com> |
| **Sent:** | Wednesday, December 02, 2015 11:53 AM |
| **To:** | Marco F. Ferreira; allison.wuertz@kattenlaw.com; Rosen, Laurence; william.kelly@wilsonelser.com |
| **Cc:** | Clark E. Alpert; nicole.liebman@wilsonelser.com |
| **Subject:** | Snellink v. Universal Travel Group, Inc. |
| **Attachments:** | TAC redline.pdf |

Counsel:

I have attached a redline of the Third Amended Complaint against the [Proposed] Third Amended Complaint.

Regards,

Jonathan Horne
The Rosen Law Firm, P.A.
275 Madison Avenue, 34th Floor
New York, NY, 10016
212-686-2603 (direct)
917-509-6721 (cell)
212-686-1060 (main)
jhorne@rosenlegal.com

1

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. LR-5733
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Telephone: (973) 313-1887
Fax: (973) 833-0399
lrosen@rosenlegal.com

Lead Counsel for Lead Plaintiffs

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| P. VAN HOVE BVBA, PASCAL VAN HOVE GCV, JOHN THOLLON, MICHAEL ZABINSKI, JEAN DOYLE, AND MARK LAROSA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>vs.<br><br>UNIVERSAL TRAVEL GROUP, INC., JIANGPING JIANG, YIZHAO ZHANG, JIANG XIE, JIDUAN YUAN, LAWRENCE LEE, LIZONG WANG, DAVID T. SVOBODA, AND ACQUAVELLA, CHIARELLI, SHUSTER & CO., LLP, ACQUAVELLA, CHIARELLI, SHUSTER, BERKOWER & CO., LLP, JOSEPH P. ACQUAVELLA, SANTO CHIARELLI, SAMUEL SHUSTER, AND MAURICE BERKOWER,<br><br>Defendants. | CASE No.: 2:11-cv-2164 (KM) (MCA)<br><br>[PROPOSED]————THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS<br><br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

1

~~I.    NATURE OF THE ACTION~~ ............................................................................ 4

~~II.   JURISDICTION AND VENUE~~ ....................................................................... 10

~~III.  PARTIES~~ ......................................................................................................... 10

~~a.   Plaintiffs~~ ....................................................................................................... 10

~~b.   Defendants~~ ..................................................................................................... 11

~~c.   Confidential witnesses.~~ ................................................................................. 17

~~IV.   DEFENDANTS MADE FALSE STATEMENTS WITH SCIENTER~~ ........ 21

~~a.   False statements concerning the reason UTA sought to raise cash and its cash reserves.~~ ............................................................................................................. 21

~~b.   False statements about its operations.~~ ......................................................... 27

~~i.    UTA does not operate in the "online travel service industry".~~ .............. 27

~~ii.   UTA falsely stated that it had sold the TRIPEASY Kiosks.~~ .................... 30

~~iii.  Defendants overstated the number of employees UTA had in its call centers.~~ ..... 33

~~iv.   UTA overstated its revenues.~~ .................................................................... 34

~~1.    SAIC filings are reliable.~~ .......................................................................... 34

~~2.    UTA's SAIC filings show it earned much less revenue than it claimed in its SEC filings.~~ ......................................................................................................... 36

~~c.   Defendants falsely claimed that UTA owned its "subsidiaries."~~ ................ 39

~~d.   For three years, UTA engages corrupt auditor David T. Svoboda; upon being appointed as UTA's new auditor, Windes quickly discovers that defendants had been committing fraud.~~ ............................................................................................... 42

~~V.    OTHER FACTS PROBATIVE OF UTA DEFENDANTS' SCIENTER.~~ ........ 45

~~a.   UTA delists, its officers resign, and it disappears.~~ ..................................... 45

~~b.   The SEC discovers that UTA, Xie, and Jiang committed fraud.~~ ................ 47

~~i.    SEC complaints are only filed after the Commission itself, with the proposed defendants' response in hand, votes to authorize filing.~~ ...................................... 47

~~ii.   The SEC charges UTA, Jiang, and Xie with fraud.~~ ................................. 48

~~c.   UTA's non-existent internal controls.~~ .......................................................... 50

~~d.   A huge number of Chinese reverse-mergers have committed spectacular fraud.~~ ... 51

~~VI.   THE AUDITOR DEFENDANTS' LIABILITY~~ ............................................. 52

~~a.   Auditor defendants' positions and roles.~~ ..................................................... 52

~~b.   Auditor defendants' statements.~~ ................................................................... 53

~~c.   Auditors' responsibilities~~ .............................................................................. 56

2

d.   ACSB and Svoboda violated PCAOB Standards because they did not plan the
audit ................................................................................................................ 58

e.   ACSB and Svoboda violated PCAOB Standards because they were not
independent and did not express professional skepticism. ............................... 59

f.   ACSB and Svoboda violated PCAOB Standards because they did not maintain
adequate quality control. ................................................................................ 60

g.   ACSB did not follow up when its confirmations were not returned .................. 61

h.   Svoboda commits fraud to pass an inspection. ................................................ 65

i.   The Auditor Defendants continue to assert that their audit report was true even
after they tampered with the audit working papers to pass an inspection ................. 66

j.   Successor liability. ........................................................................................ 67

VII.   LOSS CAUSATION ............................................................................................ 68

a.   The fraudulent claims that UTA was an online travel agency and that it had tens of
millions of dollars in cash reserves. ................................................................... 68

b.   The fraudulent claim regarding the number of employees ............................... 68

c.   UTA Fails to File its Annual Report Because its Auditor Suspects Fraud ............. 69

d.   Auditor Resignation Leads to Trading Halt and Share Price Decline .................. 69

VIII.   RESPONDEAT SUPERIOR LIABILITY ............................................................. 70

IX.   PLAINTIFFS' CLASS ACTION ALLEGATIONS ................................................ 71

a.   Class action allegations ................................................................................. 71

b.   Applicability of presumption of reliance: Fraud-on-the-market doctrine .............. 72

Formatted: Font: Times New Roman

Lead Plaintiffs P. Van Hove BVBA, Pascal Van Hove GCV, John Thollon, Michael Zabinski, Jean Doyle, and Mark Larosa, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Complaint against Universal Travel Group, Inc. ("UTA" or the "Company"), Jiangping Jiang, Yizhao Zhang, Jiang Xie, Jiduan Yuan, Lawrence Lee, Lizong Wang, (collectively, the "UTA Defendants"),   David T. Svoboda, Acquavella, Chiarelli, Shuster & Co., LLP, Acquavella, Chiarelli, Shuster, Berkower & Co., LLP, Joseph P. Acquavella, Santo Chiarelli, Samuel Shuster, and Maurice Berkower (all defendants other than the UTA Defendants are the "Auditor Defendants"; collectively, the UTA Defendants and teh Auditor Defendants are the "Defendants") allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.[1]

## I.   NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all persons or entities who purchased or otherwise acquired the securities of UTA between March 12, 2009 to April 11, 2011, both dates inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Though itUTA is a Nevada company whose stockshares traded on the New York Stock Exchange (the "NYSE"), UTA'sbut whose operations taketook place entirely in China. But this little disconnect isIt purports to be a travel agency.

---

[1] Exhibit 1 contains a list of proper names used in this Complaint, and is incorporated by reference.

4

2.3.    The Class Period begins with the least~~filing~~ of ~~the mismatches between~~ UTA's ~~actual operations~~2008 10-K, and ~~the~~ persists until the resignation of UTA's auditor for its 2010 financial statements ~~it makes to investors~~. The Defendants are UTA, certain of its officers and directors, and UTA's auditors for each of the years ended December 31, 2008 and 2009.

4.      ~~Indeed,~~ The Defendants engineered a brazen fraud that misrepresented the core of UTA's business and also wildly overstated UTA's ~~revenue~~revenues.

3.5.    *First,* UTA's subsidiaries filed audited financial statements with Chinese regulatory authorities. These filings, many of which were signed by ~~more than 3,60%~~UTA's CEO, show that UTA overstated its 2008 SEC-reported revenues by at least 360%, and its 2009 SEC-reported revenues by at least 1,407%. UTA overstated revenues over all of its segments. For example, UTA's 2009 revenues from air ticketing were not $17.5 million, but less than $1 million.

4.6.    ~~And another example of Defendants' fraud concerns the foundational question of what kind of business UTA is in.~~*Second,* Defendants marketed UTA to US capital markets as an "online travel agency", which aimed to be the "foremost leading online travel services provider in [China]." Defendants claimed that UTA's website offered "comprehensive and timely travel information and services, including [...] easy payment function" and compared ~~themselves~~UTA to Chinese online travel giants Ctrip.com and eLong. UTA claimed that its customers "pay for their [air] tickets online or through our TRIPEASY Kiosks".

~~5.      UTA claimed that their customers "pay for their [air] tickets online or through our TRIPEASY Kiosks".~~

5

6.7.    But UTA's claims that it was an online travel agency and that customers pay for their tickets online or through Kiosks were false.

7.8.    UTA had three segments: air-ticketing, hotel reservations, and packaged tours. As it revealed in an extraordinary conference call released to investors on September 30, 2010, *none* of its sales in hotel reservations and packaged tours were made online, and *only 2%* of its air-ticketing sales were made online.

8.9.    ~~Indeed, for~~For most of the Class Period, it was literally impossible to book air tickets through UTA's website. Since UTA did not have real-time flight information, it could not determine whether the flight the customer sought to book was still available. Attempting to book a flight through UTA's website merely sent notification to a UTA call-center employee. The employee then checked with the Civil Aviation Administration of China (a regulatory agency), obtained a real-time quote, called the customer and tried to book the customer's ticket.

~~9.      On September 15, analyst John Hempton published a report showing that UTA's website could not actually book a flight, and pointing out other very obvious errors in UTA's website. That day, its stock price fell by 19%, damaging investors.~~

10.     And Defendants' false statements about the kind of business UTA was in were neither the beginning nor the end of their fraud. Defendants' other false statements to investors during the Class Period include:

   a.   ~~Overstated revenues: The vast majority of UTA's SEC-reported revenues — at least 78.4% in 2008, and at least 93.3% in 2009 — were imaginary.~~

6

b.a.        **False claims to own its subsidiaries**: Defendants claimed that

UTA owned all of its "subsidiaries". But UTA only owned three of its

"subsidiaries" outright. The remainder – 8 subsidiaries, accounting for the

majority of UTA's purported revenues – were owned by unrelated third

parties.

c.b.**False claims to have sold poorly performing business assets at a**

**profit**: UTA told investors it made many of its sales through TRIPEASY

Kiosks, which are self-serve kiosks through which customers can book

UTA trips. But the TRIPEASY Kiosks were wildly unprofitable,

notwithstanding what UTA told investors. In September 2010, UTA

claimed it sold the Kiosks off to Shenzhen ~~Xubao~~Xunbao, and claimed

Shenzhen Xunbao had paid it $5.93 million~~, which it later~~. UTA claimed

that this $5.93 million was actually paid to ~~have received.~~it. But though

UTA began negotiations with Shenzhen Xunbao to sell the TRIPEASY

Kiosks, the negotiations fell through when Shenzhen Xunbao's head,

Long Shifan – a longtime friend of UTA's CEO – was arrested for

repeatedly hacking into a Chinese state enterprise database. Shenzhen

~~Xubao~~Xunbao never bought the TRIPEASY Kiosks from UTA, and never

paid any money to UTA; in fact, ~~it~~Shenzhen Xunbao shut down in late

2010 and was dissolved shortly thereafter.

d.c.**Unaccounted--for cash**: UTA sold $47 million of its shares to investors in

Formatted: Justified

the U.S. between 2008 and June 2010 and claimed to have a-$43 million

of cash in USD as of June 30, 2010. UTA told investors it had sold these

7

shares to acquire subsidiaries and that it had actually spent the cash and acquired subsidiaries. ~~But these claims were false. As soon as~~In fact, shortly after each offering, UTA ~~raised the cash, it~~transferred the cash it had raised to a Hong Kong bank account over which ~~its~~UTA's CEO had sole signing authority. The bank account was held by a company UTA did not own, ~~or~~and did not even claim to own, as a subsidiary~~, which.~~ UTA then transferred the cash to twenty-seven companies and five individuals ~~that were not banks and over~~in the PRC which UTA did not ~~have~~control. UTA thus did not use the cash it raised to acquire subsidiaries~~—~~, its CEO embezzled it. Defendants have not been able to show that the cash was ever returned, and UTA has since lost its NYSE listing and disappeared from US capital markets – causing investors a complete loss.

*Auditor defendants*

11.     UTA managed to hide its fraud because of ~~the auditor defendants'~~its auditors' recklessness.

12.     UTA assumed its current corporate form (with fewer subsidiaries) when it engaged in a reverse merger with YZ in or around June 2006. Then, UTA "bought" YZL, and in return, shareholders of YZL received substantially all of UTA's shares. Thus, in economic substance, YZL acquired UTA in the reverse merger. Thus, at the close of the Class Period, UTA had been in U.S. capital markets since June 2006.

13.     Between June 2006 and 2010, Defendant David Svoboda, a CPA, was the partner in charge of UTA's audits. For 2006-2008 Morgenstern, Svoboda & Baer CPAs ("MSB") were UTA's auditors and Svoboda led the audits as an MSB partner. In 2009,

8

Defendant Acquavella, Chiarelli, Shuster & Berkower & Co., LLP ("ACSB") became UTA's ~~supposedly~~purportedly independent ~~auditors~~auditor, and Svoboda led the audit of UTA as an ACSB partner.

14.     For each of those years (2006-2009), Svoboda and the firms that employed him issued audit reports certifying that the audit had been conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States) (the "PCAOB").[2] Svoboda and the firms also certified that UTA's financial statements were presented in accordance with generally accepted accounting principles ("GAAP").

15.     Svoboda's audit reports were included in UTA's 10-Ks, where they reassured investors that an independent professional had audited UTA's financial statements properly and was providing reasonable assurance that the financial statements did not contain materially false statements.

16.     But UTA's 2009 financial statements contained the many false statements listed here, and likely many more. ~~UTA's audited financial statements contained~~ Further, ACSB's audit did not catch ~~these many~~ false statements because ACSB did not perform its audit in accordance with PCAOB auditing standards. As just one example, auditors must carefully plan an audit to determine which procedures they must take to provide reasonable assurances that the financial statements they audit do not contain material misstatements. Failing to take into account the company's specific circumstances in planning procedures is a *per se* violation of PCAOB auditing standards. But to plan the

---

[2]  The PCAOB is a nonprofit corporation established by Congress to oversee the audits of public companies in order to protect the interests of investors and further the public interest in the preparation of informative, accurate and independent audit reports.  The U.S. Securities & Exchange Commission has oversight authority over the PCAOB, including the approval of the Board's rules, standards, and budget.~~.~~

UTA audit, Svoboda just copied another company's audit plan, giving no thought to UTA's specific circumstances. And for decades, every auditor has known that to express appropriate professional skepticism, an auditor cannot ~~prepared~~prepare the financial statements he or she is auditing, as an auditor cannot independently audit its own work. Svoboda disregarded this fundamental rule requiring the auditor be independent from the preparer of the financial statements, preparing UTA's financial statements before auditing the financial statements he had prepared. ~~One cannot independently audit one's own work. It is not surprising that Svoboda and ACSB determined that UTA's financial statements did not contain material errors.~~

17.   When Svoboda was notified that the ~~Public Company Accounting Oversight Board~~PCAOB would inspect ACSB, he held a meeting with ACSB staff. He ordered them to forge documents relating to the audit of UTA, backdate them, and place them in the UTA audit file, hoping to fool the PCAOB into thinking ~~his~~ACSB's audit of UTA ~~was adequate;~~comported with PCAOB Standards. Svoboda thus clearly knew it was not and was desperately trying to cover up his fraud. And indeed, as a result of its inspection, and ACSB's fraudulent audit of UTA, the PCAOB revoked ACSB's license, and ordered Svoboda never to associate with any firm auditing public companies.

~~For the audit of its 2010 financial statements, UTA engaged~~*Loss causation*

18.   On September 15, analyst John Hempton published a ~~new auditor; this new auditor's partner~~report showing that Universal Travel's website could not actually book a flight, and pointing out other errors ~~in charge of the UTA audit~~Universal Travel's website that showed it was not ~~Svoboda. The new auditor quickly discovered UTA's~~

10

~~false statements were false, resigned and accused UTA of fraud. UTA's~~used to make any reservations. That day, Universal Travel's stock price fell by 19%, damaging investors.

19.    On March 30, 2011, Universal Travel announced that it would delay filing its 10-K. Universal Travel falsely blamed "a delay in assembling the information." In truth, the delay was ~~halted for nearly a year~~caused by the auditor's confronting Universal Travel with evidence of its fraud. The markets discerned that Universal Travel's excuse was misleading, and ~~in~~its stock price fell by $1.06.

20.    Then, on April ~~2012, when it resumed~~ 11, 2011, the New York Stock Exchange halted trading~~, UTA's~~ in Universal Travel's shares~~ lost~~. On April 14, 2011, Universal Travel announced the reason for the halt: that its auditor had resigned after uncovering part of the fraud, and that Universal Travel had forbidden the auditor from continuing its investigation. Finally, on April 16, 2012, Universal Travel announced that it would be delisted because it could not address the New York Stock Exchange's concern that it was committing fraud.

~~18.~~21.  Trading began again over-the-counter on May 7, 2012. That day, Universal Travel's stock price fell by $3.25, or about 82% ~~of their value.~~%.

~~19.~~22.  UTA's investors have lost almost their entire investments because of Defendants' fraud.

## II.    JURISDICTION AND VENUE

~~20.~~23.  The  claims herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11

21. 24.  This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

22. 25.  Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), 28 U.S.C. § 1391(b), and 28 U.S.C. § 1391(d). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading financial and other information, occurred in substantial part in this District.

### III.   PARTIES
#### a.   *Plaintiffs*

23. 26.  Plaintiff P. Van Hove, BVA, is a Belgian private limited liability company wholly owned by Pascal Van Hove. It purchased shares of UTA and was damaged thereby. Its PSLRA certification was previously filed with the Court and is incorporated by reference.

24. 27.  Plaintiff Pascal Van Hove GCV is a limited partnership wholly owned by Pascal Van Hove and his wife.  It purchased shares of UTA and was damaged thereby. Its PSLRA certification was previously filed with the Court and is incorporated by reference.

25. 28.  Plaintiff John Thollon purchased shares of UTA and was damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference.

26. 29.  Plaintiff Michael Zabinski purchased shares of UTA and was damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference.

27. 30.  Plaintiff Jean Doyle purchased shares of UTA and was damaged thereby. Her PSLRA certification was previously filed with the Court and is incorporated by reference.

28. 31.  Plaintiff Mark Larosa purchased shares of UTA and was damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference.

*b. Defendants*

29. 32.  Defendant Jiangping Jiang was UTA's CEO at all times during the Class Period.

30. 33.  Defendant Jiang Xie ("Xie") was UTA's CFO between the beginning of the Class Period and August 17, 2009, and again from August 16, 2010, until the end of the Class Period. Mr. Xie has holds a Doctor of Business Administration from the People's University of China; and he graduated from Economics & Business Faculty, University of Sydney, located in Sydney, Australia, with aa Bachelor of Commerce degree, major in Accounting and E-Commerce in 2005. Mr. from the University of Sydney. Xie is also a member of the Association of Credited Chartered Accountants, which is the equivalent of being a Certified Public Accountant.

31. 34.  Defendant Yizhao Zhang ("Zhang") served as the Company's Chief Financial Officer between August 17, 2009 and his resignation on August 16, 2010 when he resigned. He is a certified public accountant of the state of Delaware, and a member of the American Institute of Certified Public Accountants (AICPA). Mr. Zhang graduated with holds a bachelor's degree in economics from Fudan University, Shanghai in 1992 and received an MBA degree with financial analysis and accounting concentrations from the State University of New York at Buffalo in 2003..

13

32.35.  Securities fraud is something of a profession for Zhang. He was also head of the audit committee of a disgraced China-based, U.S.-listed company called China Education Alliance, Inc. ("CEU"). On October 11, 2011, Judge Snyder, U.S.D.J. for the Central District of California, held that the plaintiffs had sufficiently alleged that CEU had committed securities fraud by (amongst other things) fraudulently maintaining two sets of books. *In re China Educ. Alliance, Inc., Secs. Litig.*, 10-CV-9239-CAS (JCx), 2011 WL 4978483 (C. D. Cal. Oct. 11, 2011). On April 6, 2012, Judge Snyder held that the plaintiffs had sufficiently alleged Zhang's liability as a controlling person of the fraud CEU committed. *In re China Educ. Alliance, Inc., Secs. Litig.*, 10-CV-9239-CAS (JCx), 2012 WL 1155860, at *1, *7 (C.D. Cal. April 6, 2012).  Zhang was also Chair of the Audit Committee of China Green Agriculture, Inc., another China-based company that committed securities fraud, and the court there held that the plaintiffs had adequately alleged that Zhang made his China Green Agriculture false statements false statements with scienter. *Elliot v. China Green Agricultures, Inc.*, 3:10-CV-0648-LRH-WGC, 2012 WL 5398863, at *7 (D. Nev. Nov. 2, 2012).

33.36.  Collectively, Defendants Jiang, Zhang, and Xie are the "Individual Officer Defendants".

34.37.  Defendant Lawrence Lee was appointed as independent director and chair of UTA's audit committee on August 17, 2009 and served in that capacity until the end of the Class Period. Mr. Lee served as chief financial officer of Synutra International, Inc. a NASDAQ-listed company, from October 1, 2007 to November 15, 2009. From August 1, 2004 to September 30, 2007, Mr. Lee was vice president and chief financial officer of Kasen International Holdings Limited, a public company listed on the Hong Kong Stock

~~Exchange. Prior to that, Mr. Lee served as chief financial officer at Eagle Brand Holdings Limited, a company listed on the Singapore Stock Exchange. Mr. Lee's experience also includes serving as a financial controller at the Korean division of Exel Plc, and serving as a senior auditor at Waste Management Inc.'s international department in London. Mr. Lee is an fellow member of the Association of Chartered Certified Accountants (ACCA), equivalent to a Certified Public Accountant. Mr. Lee received a bachelor's degree in management and engineering from Beijing Institute of Technology, a master's degree in economics from Renmin University of China, and a master's degree in accounting and finance from the London School of Economics.~~

~~35.~~38.  Defendant Jidon Yuan was a director of UTA and a member of its audit committee for the entire Class Period.

~~36.~~39.  Defendant Lizong Wang was a director of UTA for the entire class period. As of December 31, 2009, Lizong Wang was also a member of UTA's audit committee. Defendant Wang remained in these positions until the end of the Class Period.

~~37.~~40.  According to its charter, UTA's audit committee's responsibilities included:

    a.  The Committee shall review with management, the internal auditor and the independent auditor the scope, planning and staffing of the proposed audit for the current year. The Committee shall also review the internal audit function's organization, responsibilities, plans, modifications to annual plan, results, budget and staffing. In addition, management shall consult with the Committee on the appointment, replacement, reassignment or dismissal of the principal internal auditor. The Committee

15

shall ensure co-ordination between the internal and external auditors, and
to ensure that the internal audit function is adequately resourced and has
appropriate standing within the Company, and to review and monitor the
effectiveness of the internal audit function. The Committee shall focus
particularly on:

> (iii) holding regular private meetings with the head of internal
> audit, and obtaining their views on management's involvement in
> the financial reporting process and, in particular, the ability of
> management to override information processed by the Company's
> financial reporting system;

b. The independent auditor shall report directly to the [Audit] Committee,
which shall be responsible for:

[]

> (ii) discussing with the independent auditor the scope of their
> work, key risks areas, how the audit plan responds to the risk of
> financial statement misstatement, and approving modifications to
> the annual audit plan;
>
> (iii) discussing the use of any other auditing firm in performing
> work related to the audit (subsidiaries) and understanding the
> rationale behind such decisions;
>
> (iv) receiving and reviewing all required communications from the
> independent auditor; and

16

    c.  The Committee shall have the sole authority to preapprove any non-audit services to be provided by the independent auditor. The Committee shall review with the lead audit partner whether any of the audit team members receive any discretionary compensation from the audit firm with respect to non-audit services procured by the independent auditor. The Committee shall ensure that the provision by an external auditor of non-audit services does not impair the external auditor's independence or objectivity. When assessing the external auditor's independence or objectivity in relation to the provision of non-audit services, the Committee shall consider:

[]

(ii) whether there are safeguards in place to ensure that there is no threat to objectivity and independence in the conduct of the audit resulting from the provision of such services by the external auditor;

38.41.  Collectively, Defendants Lee, Yuan, and Wang are the "Director Defendants".

39.42.  Collectively, the Officer Defendants and the Director Defendants are the "Individual UTA Defendants".

40.43.  Defendant UTA is a Nevada corporation headquartered in Shenzen, China. The Company and its wholly owned operating subsidiaries purport to engage as a travel service Company in the People's Republic of China through a website and online bookings, kiosks, and a call center.  Between March 12 and May 27, 2009, UTA's stock was actively traded on the OTC:BB.  Between May 28 and October 26, 2009, UTA's

17

stock was actively traded on the NYSE Amex (the "AMEX"). Between October 27,

2009, and the close of the Class Period, UTA was actively traded on the NYSE.

41.44.  Collectively, the Individual UTA Defendants and UTA are the "UTA

Defendants."

*Auditor Defendants*

42.45.  Defendant ACSB was UTA's auditor for the 2009 10-K.

43.46.  Defendant Svoboda was the partner in charge of UTA audits between

2006 and 2009. Defendant Svoboda has more than 33 years of accounting experience.

44.47.  Defendant Joseph P. Acquavella was an ACSB named partner, and was its

managing partner. Defendant Acquavella has over 36 years of accounting experience.

45.48.  Defendant Santo Chiarelli was an ACSB named partner. Defendant

Chiarelli signed ACSB's annual reports to the PCAOB. Chiarelli was an accounting and

auditing partner. Chiarelli was ACSB's primary contact with the PCAOB. Chiarelli has

more than 31 years of accounting experience.

46.49.  Defendant Samuel Shuster was an ACSB named partner. Shuster has more

than 29 years of accounting experience.

47.50.  Defendant Maurice Berkower was an ACSB named partner. He was the

reviewing partner of the UTA audit. Berkower has over 30 years of accounting

experience.

48.51.  Defendant Acquavella, Chiarelli, Shuster & Co., LLP ("ACS") was

founded in 2012 by Defendants Shuster, Chiarelli, and Acquavella, and is named as

successor to ACSB.

49 52.  Collectively, ACSB, Svoboda, Acquavella, Chiarelli, Shuster, Berkower, and ACS are the "Auditor Defendants."

    *c.  Confidential witnesses.*

50 53.  **CW 1** was the general manager of Universal Travel's UTA's corporate headquarters between at least March 2008 and May 2009. He worked for YZL, UTA's largest subsidiary.

51 54.  CW 1 was overall head of the packaged tour and TRIPEASY Kiosk businesses.

52 55.  At that time UTA did not have a COO. Thus, CW 1 was effectively YZL's COO. CW 1 reported directly to YZL's head, Defendant Jiang.

53 56.  CW 1 confirms that UTA was not an online travel agency as it had falsely represented to investors.

54 57.  CW 1 reports that UTA used Sales Terminals to log on to the Civil Aviation Administration of China (the "Aviation Administration") to obtain real-time flight information, including prices and availability.

55 58.  During CW 1's tenure, UTA did not use its Sales Terminals to provide real-time flight information on its website. Rather, when a customer attempted to book a ticket, call center employees would log on the Aviation Administration using the Sales Terminals, and would call the customer with real-time flight information. Only then could the customer book a flight.

56.59.  For the year ended 2008, UTA's SEC filings claimed that its packaged tour sales were RMB 313,826,816.97.[3] For the year ended 2009, UTA's SEC filings claimed that its packaged tour sales were RMB 452,940,495.43.

57.60.  CW 1 stated that these numbers were "impossible." Rather, CW 1 recalls that at their peak during her[4] tenure, UTA's Shenzhen office, by far its top grossing office, did not sell tens of millions of RMB worth of package tours per month, as would have been required for UTA to make the total sales it reported.

58.61.  **CW 2** was a Sales Director at Chongqing Universal Travel E-Commerce Co. ("CTE") between at least March 2010 and June 2011.

59.62.  CW 2 was in charge of air ticket sales, corporate packaged tours, and hotel reservations.

60.63.  CW 2 reports that CTE was primarily engaged in air ticket sales. CTE did not sell packaged tours. CW 2 reports that CTE made roughly RMB 100,000/month in gross profits at its peak during his tenure.

61.64.  CW 2 stated that when he joined the company in March 2010, he was taught not to check Universal Travel'sUTA's website for flight information because the information provided was not real-time. CW 2 believes the information on UTA's website may have become real-time sometime in 2011.

62.65.  CW 2 states that CTE received approximately 20 TRIPEASY Kiosks, and placed them in busy malls and streets of Chongqing. However, customers were uninterested, so CTE recalled the machines and stored them in their offices.

---

[3] Throughout, exchange rates used are 6.9511RMB/USD for FY 2008, 6.833 RMB/USD for FY 2009, and 6.77 RMB/USD for FY 2010.
[4] The use ofComplaint assigns arbitrary gendered pronouns to designate a CW is arbitraryconfidential witnesses.

63. 66.  **CW 3** was a manager in the Shenzhen call center from November 2010 to June 2011. CW 3 was responsible for the general operation of the call center, including customer service, quality monitoring, and membership management.

64. 67.  CW 3 reports that when a customer attempted to book an order using the website, UTA would ask the customer for a phone number. UTA would quickly check the Aviation Administration's system, and within 10-30 minutes would call the customer at the phone number the customer designated. UTA would then provide a real-time quote for a flight.

65. 68.  CW 3 reports that during her tenure, the Shenzhen call center had 100 employees, of which 15 were management level and 85 were call center staff. There were no dramatic changes in employee head-count during her tenure.

66. 69.  **CW 4** was a member of the *TRIPEASY* project team from June 2009 to September 2010. He worked in the Shenzhen branch of UTA. He was an operation and maintenance special officer, and his job responsibility was to run the TRIPEASY sales channel across subsidiaries. He reported to the head of the Operation & Maintenance department.

67. 70.  CW 4 reports that, at first, TRIPEASY Kiosks were placed in busy intersections or shopping malls. However, UTA was losing money on each Kiosk because the operating system was too complicated and few people were using them. The operating cost for a Kiosk was RMB 1,000 per month.

68. 71.  UTA decided to place the Kiosks in residential compounds. But the Kiosks were still unprofitable. CW 4 heard from a former co-worker that in late 2011, UTA planned to recall and discontinue the Kiosks from the compounds.

69.72.  CW 4 estimated that UTA had approximately 700 Kiosks in September 2010 in total. CW 4 stated that there could not be 1,523 *TRIPEASY* Kiosks, as UTA claimed.

70.73.  CW 5 was Director of the Strategy & Development Center at Shenzhen Xunbao E-Commerce Co. Ltd. between at least February 2010 and October 2010. Shenzhen Xunbao is *not* a subsidiary of UTA.

71.74.  CW 5's responsibilities included negotiating the purchase by Shenzhen Xunbao of all of UTA's TRIPEASY Kiosks. The main representative from UTA's side was Defendant Jiangping Jiang.

72.75.  UTA reported that it sold all of its TRIPEASY Kiosks to Shenzhen Xunbao in September 2010 for $5.93 million.

73.76.  CW 5 reports that Shenzhen Xunbao never acquired any TRIPEASY Kiosks from UTA, nor paid money to UTA for them prior to the end of his tenure in October 2010.

74.77.  CW 5 reports that Shenzhen Xunbao ceased operating in late 2010 or early 2011.

IV.   **DEFENDANTS MADE FALSE STATEMENTS WITH SCIENTER**
   a.  *False statements concerning about the reason UTA sought to raise cash and its cash reserves.*

75.78.  Prior to the Class Period, UTA had conducted a private placement, which raised gross proceeds of $7.1 million (the "2008 Private Placement.")

76.79.  Despite claiming to generate large amounts of cash and to have huge cash reserves throughout the Class Period, UTA raised about $40 million in two capital raises

22

during the Class Period -- $20 million in December 2009 (net proceeds to UTA of $19 million) (the "2009 Offering"), and $20 million in June 2010 (net proceeds to UTA of $18,768,054) (the "2010 Offering").

77.80.  UTA's SEC filings repeatedly and uniformly claimed that the cash it raised was being put to good use. As UTA told it, it was either kept safely in banks, or carefully invested in making strategic acquisitions.

78.81.  UTA told investors it would use the proceeds of the 2008 Private Placement for general and administrative expenses.

79.82.  The proceeds of the 2008 Private Placement were reflected on UTA's balance sheet in its 2008 10-K. Specifically, UTA's balance sheet as of December 31, 2008, stated that its cash and cash equivalents were $16.2 million, as against $2.7 million in 2007.

80.83.  Similarly, UTA stated in its 2008 10-K that its cash and liquidity needs "have been funded primarily through cash flows from operations, short-term borrowings, and a private investment of equity securities." 2008 10-K (unpaginated).

81.84.  UTA told investors it would invest the proceeds of the 2009 Offering, until they were spent, in short-term, investment grade, interest-bearing securities.

82.85.  The proceeds of the 2009 Offering were reflected on UTA's balance sheet in its 2009 10-K. Specifically, UTA's balance sheet as of December 31, 2009, stated that its cash and cash equivalents were about $36.7 million.

83.86.  Similarly, UTA stated in its 2009 10-K that its cash and liquidity needs "have been funded primarily through cash flows from operations, short-term borrowings, and a private investment of equity securities." 2009 10-K, at 37.

84.~87.~ In each of its 2010 10-Qs, UTA claimed that:

    a.  "Cash for operations and liquidity needs are funded primarily through cash flows from operations and equity raise" (Q1 2010 10-Q at 44, Q2 2010 10-Q at 50, Q3 2010 10-Q at 45);

    b.  UTA's cash and cash equivalents consisted primarily of prime institutional money market funds with no maturities limit as well as bank account balances (Q1 2010 10-Q at 13, Q2 2010 10-Q at 12 and Q3 2010 10-Q at 9).

85.~88.~ Defendants repeatedly stated that the funds from the 2010 Offering would be used to acquire four subsidiaries: Tianjin Hongxun Aviation Agency Co., Ltd., Shanxi Jinyang Travel Agency Co., Ltd., Kumming Business Travel Agency Co., Ltd. and Shadong Century Aviation Development Co., Ltd.:

    a.  *All UTA Defendants*: the 2010 Prospectus provided that "We intend to use all of the approximately $18.7 million of net proceeds of this offering, plus $0.8 million of our working capital, to complete the previously announced acquisitions of Tianjin Hongxun Aviation Agency Co., Ltd., Shanxi Jinyang Travel Agency Co., Ltd., Kumming Business Travel Agency Co., Ltd. and Shadong Century Aviation Development Co., Ltd.  See "'Use of ~Proceeds"~Proceeds' on page S-7 for more information on the use of proceeds."

    b.  In a press release dated June 16, 2010, *Defendant Jiang* was quoted as saying that "the proceeds from this financing will be used to fund the cash

portion of the four recently announced acquisitions and for working capital to expand our core business segments."

c. On the Q3 2010 Earnings Call, *Defendant Zhang* said "But in this competitive market *and in order to grow faster and achieve the best interest of our shareholders, we raised some capital and made some ~~accreditive [sic~~[accretive] acquisitions and we are building up the revenue and the net income.*"

d. On the Q3 2010 Earnings Call, *Defendant Xie* was asked "Would the company consider growing or slowing the pace of acquisitions in order to be able to grow using their free cash flow instead of coming to the market and raising cash in ways that have not really benefited [Earnings Per Share] growth" and answered:

"*I think the priority is to execute our strategy and also the financing has been done is historic. So we need to look forward, look longer term into development of the company. The way you have been asking your question is kind of accusing the management and I think the way you ask question is like giving a speech here. I don't think that's proper way of asking the questions – right? The next question please.*"

~~86.~~89.   UTA's statements concerning the use of proceeds were false, because ~~it~~UTA did not invest the proceeds of the 2009 Offering in securities and because it did not use the proceeds of the 2010 Offering to buy the identified subsidiaries. The cash and cash equivalent entries on its balance sheet reflecting the funds from the offering were also false. ~~And UTA's statements that it funded its~~

25

87.90. Shortly after receiving the proceeds of each capital raise, UTA shifted transferred the funds to a Hong Kong bank account held by "Universal Travel Group (Hong Kong) Limited" ("UTA (HK)"). UTA has never stated that it has a Hong Kong subsidiary. Whether a subsidiary or not, UTA's controls over UTA (HK) were deficient; indeed, Defendant Jiang had sole authority over the UTA (HK) bank account to which the proceeds were shifted transferred.

88.91. Between September 2008 and May 2011, UTA then distributed all the funds to twenty-seven unrelated companies and five unknown individuals (the "Strangers Transferees").

89.92. Once the funds were distributed to the Strangers Transferees, UTA had no control over them.

90.93. A company may not consolidate onto its balance as cash and cash equivalents funds over which it has no control.

91.94. Accordingly, UTA's financial statements made the following false statements:

      a. The "cash and cash equivalents" entry on UTA's 2008 balance sheet was $12,564,894. But this entry reflected portions of the 2008 Private Placement's net proceeds. Since the 2008 Private Placement's proceeds were, at that time, either in UTA (HK)'s bank account or in the custody of the Strangers with one of the Strangers Transferees, UTA did not have control over the proceeds, they were not its "cash and cash equivalents", and the entry for "cash and cash equivalents" was therefore overstated;

      b. The cash and cash equivalents entry on UTA's 2009 balance sheet was $36,677,422. But this entry reflected, at a minimum, $19 million that UTA had raised in the 2009 Offering taking place that December. Since the 2009 Offering's proceeds were, at that time, either in UTA (HK)'s bank account or in the custody of the Strangers Transferees, UTA did not have control over the proceeds, they were not its "cash and cash equivalents", and the entry for "cash and cash equivalents" was therefore overstated by at least $19 million;

26

c. The cash and cash equivalents entry on UTA's Q3 2009 financial statements ~~overstated~~ was $43,591,459. But this entry reflected, at a minimum, $18.7 million that UTA had raised in the 2010 Offering taking place that June. Since the 2010 Offering's proceeds were, at that time, either in UTA (HK)'s bank account or in the custody of the ~~Strangers~~Transferees, UTA did not have control over the proceeds, they were not its "cash and cash equivalents", and the entry for "cash and cash equivalents" was therefore overstated by at least $18.7 million;

d. All financial statements stated that UTA met its liquidity needs in part through equity raises, which was not true because the cash from UTA's equity raises were recklessly disseminated through the ~~Strangers~~Transferees throughout China, and UTA thus did not use them.

~~92.~~95.   Because UTA had to conceal the fact that it did not have access to, or control over, the cash it raised, Defendants made many more false statement. One example ~~are~~is Defendants' false ~~statements~~statement concerning the reason they were earning very little interest on their purportedly large cash reserves.

~~93.~~96.   For example, UTA claimed to have had $37,883,072, $56,664,313, and $43,591,459, in cash and cash equivalents ~~respectively,~~ on September 30, June 30, and March 31, 2010, respectively. Yet it claimed to have earned $143,102 in interest income on these cash balances over all of 2010, for an annualized interest rate of about 0.17%

~~94.~~97.   According to the Bank of China, the very least interest that should be earned for RMB-denominated accounts is 0.36% (for a demand deposit). Lump sum deposits should earn between 2.25% and 4.55% depending on the length of the deposit.[5]

~~95.~~98.   Indeed according to UTA's 2010 10-K (filed with the SEC after the Class Period), UTA earns interest rates of "1.89%, 2.1%, and 2.22%" on $19,681,308 in investments with HappyFund of China Construction Bank. If this figure were accurate,

---

[5] Rates are available at
http://www.boc.cn/en/bocinfo/bi4/201012/t20101225_1247526.html.

UTA should have earned nearly $400,000 in interest on ~~that~~the HappyFund deposit alone in 2010.

~~96.~~99.   On September 15 and 20, John Hempton, a hedge fund manager publicly suggested that UTA's true cash balances may be much less than reported.  Hempton drew attention to the small amount of interest income UTA reported. He pointed out that, had UTA's cash balances really been as reported, than it would have earned four times as much interest income as reported, simply by placing the funds in an interest-bearing account. Mr. Hempton raised four possible explanations:

      a.   Management forgot to park the money in an interest bearing account;

      b.   Someone is stealing the interest;

      c.   UTA's books are inaccurate; or

      d.   UTA's cash does not exist.

~~97.~~100.   Mr. Hempton stated that he believed UTA's cash did not exist.

~~98.~~101.   On a conference call on September 29, 2010, in a prepared question & answer session, UTA caused Defendant Xie to be asked what its current cash balance was and where it was held. Defendant Xie told investors that as of June 30, 2010, UTA held $43 million in US dollars in cash in an offshore bank, which bore "minimal" interest.

~~99.~~102.   The truth is much simpler: the cash was not earning interest because the ~~Strangers~~Transferees held it. Thus, Xie's statement was false, and Mr. Hempton was right.

~~100.~~103.   Indeed, the facts support an inference that Jiang and Xie simply misappropriated the funds.  ~~Universal Travel~~UTA claimed to be generating far more cash

28

from its operations than it needed. However, Defendants falsely stated that UTA needed the cash it raised in the Offerings to fund its acquisitions. Defendants then falsely stated that the cash had actually been used to make the acquisitions. When Mr. Hempton asked Defendants why UTA was not earning interest on its cash, Xie falsely stated that the cash was held with banks in accounts earning little cash. And although some company records reflected that the cash had been returned to UTA, the SEC has alleged that UTA has not established an audit trail showing that the funds actually were returned.

101.104.    UTA has now disappeared from U.S. capital markets, and shareholders have not receivedbeen returned a penny of the $47. million UTA claims to have raised.

102.105.    Since Defendants lied about the need for cash, lied about how they were spending the cash they raised, lied about where the cash was held, could not show that they had returned the cash they caused to be disseminated to third parties all over China, and since UTA and Defendants have now disappeared, the most plausible inference is that the Defendants simply stole the cash.

      b. *False statements about* ~~its~~*UTA's operations.*
          i. *UTA does not operate in the "online travel service industry".*
103.106.    Before September 30, 2010, UTA stated that it operated an online travel agency:

      a. "With the acquisition of Full Power [on July 12, 2006] and hence YZL, we shifted our business to the online travel service industry in [China]," in 2008 10-K (unpaginated), and 2009 10-K at 3.

29

b. "We aim to be the foremost leading online travel services provider in [China]", in Q1 2009 10-Q, at 4; 2009 10-K at 26, Q1 2010 10-Q, at 40.

c. "Our customers pay for their [air] tickets online or through our TRIPEASY Travel Service Kiosks." UTA never mentioned any other way for customers to buy tickets in its 2009 10-K at 5.

d. UTA's main competitors in the online booking industry for air-tickets and hotel reservations included Ctrip.com International, Ltd. and eLong, Inc., two <u>online</u> travel agencies <s>that operate largely from websites</s>, 2008 10-K at 7 (unpaginated), 2009 10-K at 10.

e. On April 8, 2009, UTA issued a press release, announcing that its website "*offers comprehensive and timely travel information and services, including [...] easy payment function.*"

<s>104.</s>107.      These statements were false and misleading. During the Class Period, UTA's website was non-functional. It did not permit customers to either make reservations or book trips.

<s>105.</s>108.      According to CW 2, during the Class Period, UTA's website did not provide real-time price information on flights. Thus, a customer could not book a flight through UTA's website because UTA could not be assured that the flight was even available at the quoted price. When a customer sought to book a flight online, an electronic (email) notice was generated to UTA's call center. The staff then checked with the Civil Aviation Administration of China (a regulatory agency), obtained a real-time quote<s>, and returned the customer's call and tried</s> for the flight, and called the customer to <u>try</u> to book the customer's ticket.

106.109.       On September 15, Mr. Hempton published an article that showed that UTA's website was not functional. For example, Mr. Hempton reports that when he sought to book a flight from Beijing to Yichang, UTA's website required him to pick up his ticket in Shenzhen, about 1,200 miles from Beijing. Mr. Hempton further reported that it was impossible to pay for a flight on either the English or Chinese language version of UTA's website.

107.110.       On September 30, 2010, in response to Mr. Hempton's articles, UTA provided a prepared question and answer session, in which Defendant Xie provided prepared answers to questions that had purportedly been submitted to UTA. Defendant Xie admitted that only 20% of UTA's air-ticketing revenues were "online related" in a transaction generated from its website, and less than 2% were paid online. Thus, UTA purportedly sold 2.4 million air tickets in 2009, but only sold 48,000, or about 130 a per day, that resulted from email inquiries to its website, which were followed up by telephone and converted to a sale by telephone or in person paid for online. Thus, the statements that UTA's competitors were companies like Ctrip.com and eLong, which were web-based travel agencies, that UTA focused on the online travel service industry, and that it aimed to be China's leading online travel agency were false. Further, because the remaining 80% of air ticket sales were booked through its call center or unidentified wholesalers, the statement that that the customers paid for their tickets either online or through TRIPEASY Kiosks was false, because most customers still bought their tickets through UTA's call center and wholesaler channels.

          ii.   *UTA falsely stated that it had sold the TRIPEASY Kiosks.*

31

108.111.       TRIPEASY Kiosks are ATM-sized machines which UTA purported to have placed in public areas. UTA claimed that the Kiosks could be used to make travel reservations.

109.112.       According to CW 4, the maintenance expenses for one TRIPEASY Kiosk was were about RMB 1,000 per month. In addition, UTA was required to pay the property managers where the Kiosks were placed a fee.

110.113.       TRIPEASY Kiosks cost between 15,000 and 20,000 RMB.

111.114.       CW 4 also reported that UTA had about 700 Kiosks in total in September 2010.

112.115.       UTA did not want to disclose it was voluntarily withdrawing the TRIPEASY Kiosks discontinuing this aspect of its business because it had previously falsely represented that the TRIPEASY Kiosks were profitable.

113.116.       Under header "Our Future Goals and Expansion Plans", UTA's 2009 10-K provided the following discussion:

> We introduced the Kiosksin [sic] selected major cities in the PRC, with 623 Kiosks rolled out in 2009. We plan to further introduce the Kiosks to other cities in the PRC. Locations of our Kiosks will include hotels, office buildings, banks, shopping malls and MTR stations. The Company will promote the Kiosks via local media such as newspapers, billboards and internet ads, including its own award-winning website, www.cnutg.com, as well as other related websites, which will in turn further the Company's brand recognition. The Kiosks themselves will provide a strong media platform to strengthen Universal Travel Group's franchise. Additionally, the Kiosks' interface will feature the same look, feel and functionality as Universal Travel Group's new website, www.cnutg.com.cn, which integrates the Company's diversified services into a new platform with selected value- added features and functionality.
>
> The Kiosks are interactive terminals placed in strategically targeted public areas. They enable convenient, fast and easy to use, real-time air ticketing inquiries, reservations and purchases, as well as hotel and tour reservations. The Kiosks provide full 360° views of hotels and travel

32

destinations and accept payment via bank cards, debit cards and VISA. According to Credit Suisse Research, the number of domestic travelers in the PRC that use online travel services continues to rise, accounting for 16% of users in 2007, up from 12% in 2005. Major cities such as Shanghai and Shenzhen have a higher proportion of people using online travel services as compared to the rest of the PRC, representing 23% and 20% of the users in 2007, respectively. According to the China Internet Network Information Center, the PRC is the world's largest market for internet users. Despite this, 95% of internet users still do not make purchases over the internet. The Kiosks eliminate the need for a personal computer or online access in order to make travel arrangements and are specifically targeted at this demographic of users. We expect to roll out 1,400 additional Kiosks in 2010.

The Kiosks, together with our website and call center, will serve to integrate our air ticket sales, hotel room sales, and packaged tours businesses. We are working on a cost-effective way for a potential rollout by bundling it with Byte Power (CQ) Info Tech Limited's (a subsidiary of Byte Power Group Limited - ASE: BPG.AX) E-Kiosks. *This will allow us to enter a new market in Chongqing quickly and efficiently.*

[emphasis added]

~~114.~~117.      But the TRIPEASY Kiosks' maintenance costs and depreciation exceeded their revenues.

~~115.~~118.      The TRIPEASY Kiosks were a failure. Indeed, CW 2 reports that they were not even used by CTE.

~~116.~~119.      And CW 4 reports that because the TRIPEASY Kiosks were not profitable, UTA terminated the contracts it had with property managers, and planned to recall the Kiosks and discontinue their operations.

~~117.~~120.      In September 2010, UTA claimed to have sold the TRIPEASY Kiosks at a gain.

~~118.~~121.      ~~According to a~~In its press release dated September 10, 2010, UTA claimed to have sold its 1,523 TRIPEASY Kiosks to Shenzhen Xunbao E-Commerce

33

Co., Ltd~.~ ("Shenzhen Xunbao"), for more than 40 million RMB, or approximately $5.93 million.

~~119.~~122.       ~~According to~~In the same press release, UTA claimed that, Shenzhen Xunbao is a travel insurance company.

~~120.   According to UTA~~In the same press release, UTA was granted exclusivity to sell its products through the Kiosks, now owned by Shenzhen Xunbao, for two years. Shenzhen Xunbao could not sell any other travel company's products on the Kiosks it allegedly bought from UTA.

~~121.~~123.       Defendant Jiang was also quoted as saying:

> We do not expect this transaction to reduce our top-line, at least for the next two years, as we have secured exclusive air ticketing, hotel reservation and package tour travel product sales rights via the kiosk network. Our travel product offerings are complementary to Shenzhen Xunbao's travel insurance products and, as a result, we expect to negotiate a mutually beneficial arrangement to continue to utilize the TRIPEASY Kiosks as one of our multiple sales channels after the initial two-year period expires. In terms of cost savings, we expect an increase in our gross margin as a result of eliminating costs associated with the kiosks.

~~122.~~124.       UTA filed a contract with the SEC that purported to dispose of the TRIPEASY Kiosks to Shenzhen Xunbao as an exhibit to the September 10, 2010 press release.

~~123.~~125.       UTA stated in its 2010 10-K that it had sold the TRIPEASY Kiosks, and that it had been paid $1,492,961 on September 10, 2010, $1,891,268 on November 8, 2010, and the balance of $2,314,259 on February 24, 2011.

~~124.~~126.       UTA never sold the TRIPEASY Kiosks. And it never received any money for them.

~~125.~~127.       CW 5 was the Shenzhen Xunbao employee who led negotiations with UTA in the TRIPEASY Kiosk sale. CW 5 confirms that the negotiations were

terminated by September 2010. CW 5 confirms that when he was one of its employees, Shenzhen Xunbao did not make any payment to UTA.

126.128.    CW 5 was employed at Shenzhen Xunbao until October 2010. CW 5 confirms that Shenzhen Xunbao made no payment to UTA during his tenure. CW 5 was one of the last employees remaining at Shenzhen Xunbao when he resigned.

127.129.    According to media reports in China, Shenzhen Xunbao's general manager Long Shifan (CW 5's immediate supervisor) was arrested in 2010 for stealing information from TravelSky Technology Company, a state-owned enterprise that helps airlines manage ticket sales. Long Shifan was tried and convicted, and sentenced to prison time.

128.130.    Long Shifan and Defendant Jiang have known each other for a long time; Shifan was Jiang's boss when both worked at Shenzhen Airline, which she did between 1991 and 1998.

129.131.    According to CW 5, Shenzhen Xunbao stopped operating because of Shifan's arrest, and was dissolved in late 2010 or early 2011.

130.132.    Thus, (a) UTA never sold the TRIPEASY Kiosks, and (b) UTA did not receive payment for the TRIPEASY Kiosks from Shenzhen Xunbao.

131.133.    Hence, every statement referencing the sale of TRIPEASY Kiosks was false.

132.134.    CW 5's account is confirmed by CW 4. CW 4 was the person in charge of the TRIPEASY Kiosk project at UTA until September 2010. Even though the sale would have occurred on his watch, CW 4 does not remember any sale of TRIPEASY Kiosks.

133.135. Indeed, according to CW 4 who obtained this information from former colleagues, UTA planned to recall its TRIPEASY Kiosks in late 2011. It could not recall its TRIPEASY Kiosks if it had already sold them to Shenzhen Xunbao.

         *iii.*   *Defendants overstated the number of employees UTA had in its call centers.*

134.136. The 2009 10-K states that UTA has 500 employees in three call centers at the time of filing (March 2010). In the Q4 2009 Earnings Call, Defendant Zhang added that the distribution was about 300 in the main Shenzhen call center, another 100 in a second Shenzhen call center, and another 100 in CTE.

135.137. In its 2010 10-K, UTA stated that it had 320 employees working at its three call centers at the time of filing (June 2011).

136.138. CW 3, who was a manager in UTA's main Shenzhen call center from November 2010 to June 2011, reports that there were 100 employees in UTA's main Shenzhen call center. There were no large changes in the number of employees at the call center.

137.139. Similarly, when analyst firm Glaucus Research Group called UTA's main Shenzhen call center in or around early 2011, the UTA representative stated that there were only 100 call-center employees during the day and 12 after hours.

         *iv.*   *UTA overstated its revenues.*
            1.   SAIC filings are reliable.

138.140. PRC companies are required to submit annual financial reports to the Chinese Administration of Industry and Commerce ("SAIC") – a business regulating agency in China[6].[7] The annual reports include annual financial statements, list of

---

[6]   The SAIC (State Administration for Industry and Commerce) is the Chinese

36

directors, officers, legal representatives, and shareholders, capitalization by shareholder,

affiliates, and scope of authorized business.

~~139.~~141.        When the reporting company is a foreign owned entity like YZL,

the AIC-filed financial reports must be audited. In conducting audits for AIC filings, PRC

companies are required to follow Chinese GAAP.

~~140.~~142.        Reflecting their importance, AIC filings must be signed by the

legal representative of the entity submitting it. -The legal representative must state "I

confirm that the content of the submitted company's annual inspection report is true."

~~141.~~143.        Under PRC law, penalties for filing false SAIC filings include

fines and revocation of the entity's business license.

~~142.~~144.        If an entity's business license is revoked, the People's Bank of

China  requires the bank account of that entity to be closed.

~~143.~~145.        Without a business license the entity cannot legally conduct

business in the PRC.  Thus, UTA had a strong incentive to file accurate annual reports



~~government body that regulates industry and commerce in China.  It is primarily~~
~~responsible for business registrations, issuing and renewing business licenses and acts as~~
~~the government supervisor of corporations. All Chinese companies are required to 1) file~~
~~audited financial statements pursuant to Chinese GAAP with the Chinese government~~
~~annually or bi-annually; 2) file amendments to its business registration records whenever~~
~~there is a change to its owners, business address, legal representative and board of~~
~~directors and etc. within 15 or 30 days of such changes depending on character of its~~
~~business.~~

[7]   The SAIC (State Administration for Industry and Commerce) is the Chinese
government body that regulates industry and commerce in China.  It is primarily
responsible for business registrations, issuing and renewing business licenses and acts as
the government supervisor of corporations. All Chinese companies are required to 1) file
audited financial statements pursuant to Chinese GAAP with the Chinese government
annually or bi-annually; 2) file amendments to its business registration records whenever
there is a change to its owners, business address, legal representative and board of
directors and etc. within 15 or 30 days of such changes depending on character of its
business.

with the SAIC because its business could be shut down if it was caught filing false

financial statements.

~~144.~~146.      On revenue recognition, there are no differences between U.S.

GAAP and Chinese GAAP.  Revenue recognition for the sale of goods in China is

governed by Accounting Standards for Enterprises No. 14,[8] which provides (identically to

U.S. GAAP):

> No revenue from selling goods may be recognized unless the following
> conditions are met simultaneously:
>
> (1)  The significant risks and rewards of ownership of the goods have
> been transferred to the buyer by the enterprise;
>
> (2) The enterprise retains neither continuous management right that
> usually keeps relation with the ownership nor effective control over the
> sold goods;
>
> (3) The relevant amount of revenue can be measured in a reliable way;
>
> (4) The relevant economic benefits may flow into the enterprise; and
>
> (5) The relevant costs incurred or to be incurred can be measured in a
> reliable way.

~~145.~~147.      Authoritative bodies have specifically noted that there are no

differences between U.S. GAAP and Chinese GAAP on revenue recognition.  Thus, the

Committee of European Securities Regulators ("CESR") noted that there are no

differences between U.S. GAAP and International Financial Reporting Standards

("IFRS").  CESR's advice on the equivalence of Chinese, Japanese and US GAAP at 25

(2007), 2nd entry on page.  The Committee further noted that there are no significant

differences between IFRS and Chinese GAAP on revenue recognition.  *Id.* at 35, 6th

---

[8]   Revenues; Promulgation date: 02-15-2006; Effective date:01-01-2007;  Department:——
China Ministry of Finance; Subject:  Accounting.

entry on page. Thus, by inference, there are no significant differences between U.S. GAAP and Chinese GAAP on revenue recognition.

146.148.      As further evidence of the reliability of SAIC filings, well-known auditing firm Deloitte- Touche Tohmatsu LLP noisily resigned as registered independent auditor to Chinese-based company ChinaMedia Express Holdings, Inc. ("CCME"), citing in part the fact that CCME's  SAIC filings did not match its SEC filings.

2. UTA's SAIC filings show it earned much less revenue than it claimed in its SEC filings.

147.149.      Through the entire Class Period, UTA earned revenues from three segments: air ticketing, hotel reservations, and packaged tours.[9]

148.150.      In fiscal year 2008, only one subsidiary operated in its air ticketing segment (YZL), and one in its hotel reservation segment (SLB). Two subsidiaries (XGN and FOI) sold packaged tours. One subsidiary, Shenzhen Speedy Dragon ("SSD") operated in the cargo business.

149.151.      UTA provided revenue breakdowns for air ticketing, hotel reservations, and packaged tours, as well as subsidiary-by-subsidiary revenue breakdowns.

150.152.      Plaintiffs obtained the SAIC filings of YLZ, SLB, XGN, and FOI. As a wholly foreign owned company, YZL's SAIC filings were required to be audited, and were audited by Shenzhen Zhongrui Huazheng CPA Firm.

151.153.      Table I below shows that the SAIC filings of YZL, SLB, XGN, and FOI show demonstrate that UTA wildly overstated its 2008 revenues from air ticketing, hotel reservations, and packaged tours.

_____
[9] In 2008, UTA also earned revenues from SSD.

39

~~152.~~154.      UTA's total 2008 reported revenues were $76,759,411. Even if UTA's reported revenues from Speedy Dragon (cargo segment) were accurate, the air ticketing overstatement means that at least 15.1% of UTA's 2008 revenues were air ticketing revenues that Defendants had simply made up, that at least 10.9% of its 2008 revenues were hotel reservation revenues Defendants had just made up, and that 52.4% of UTA's total 2008 revenues were packaged tour revenues Defendants had just made up. Thus, at a minimum, 78.4% – almost four fifths – of UTA's 2008 SEC-reported revenues were imaginary.

*Table I*

| 2008 | Air ticketing | Hotel reservations | Packaged tours | Total 2008 |
|---|---|---|---|---|
| Engaged in by | YZL | SLB | XGN and FOI | All Subs Incl. SSD |
| SEC reported revenues | $12,333,527 | $8,340,519 | $45,147,792 | $76,759,411 |
| True revenues (from SAIC filings) | $713,166.64 | $116,020 | $4,922,636[10] | $16,689,396[11] |
| Revenue overstatement (in dollars) | $11,620,360 | $8,224,498 | $40,225,156 | $60,070,014 |
| Revenue overstatement (by percentage) | 1,629% | 7,089% | 817% | 360% |
| Audited? | Yes | No | No | |
| Signatory | Defendant Jiang | Jian Wang | Bo Geng (XGN) | |
| Overstated revenues as percentage of | 15.1% | 10.9% | 52.4%[12] | |

---

[10]  Consists of $767,839.62 from XGN, and $4,154,796.34 from FOI.

[11]  Assumes SSD's revenues in 10-K are accurate and credits 100% of SSD revenues.

[12]  The disproportionate weight of revenues from packaged tours is mainly a result of accounting. UTA recognizes revenues on a net basis for air ticketing and hotel reservations, but on a gross basis for packaged tours. Thus, packaged tour revenues are the value of total sales made by UTA, rather than UTA's commission, and air ticketing and hotel reservation revenues are the value of the commission UTA charges on such sales.

| UTA's total 2008 revenues | | | | |
|---|---|---|---|---|

*Source for SEC numbers: 2008 10-K, at F-19; 2009 10-K, at 31.*

~~153.~~ 155.    In fiscal year 2009, only one subsidiary (SLB) operated in the hotel reservations segment. Two subsidiaries (YZL and CTE) operated in the air ticketing segment, and three subsidiaries (XGN, FOI, and STA) operated in the packaged tour segment.

~~154.~~ 156.    Plaintiffs obtained fiscal 2009 SAIC filings for each of SLB, YZL, CTE,[13] ZGN, FOI, and STA.

~~155.~~ 157.    Table II below shows that the SAIC filings of SLB, YZL, CTE, XGN, FOI, and STA show that UTA wildly overstated its 2009 revenues from air ticketing, hotel reservations, and packaged tours.

~~156.~~ 158.    UTA's total 2009 SEC-reported revenues were $97,875,522. Its subsidiaries' SAIC filings show that its 2009 revenue numbers were overstated by at least $91,382,294, meaning that about 93.3% of UTA's 2009 SEC-reported revenues were imaginary.

*Table II*

| 2009 | *Air ticketing* | *Hotel reservations* | *Packaged tours* | *Total all Subsidiaries* |
|---|---|---|---|---|
| Engaged in by | YZL and CTE | SLB | XGN, FOI, and STA | YZL, CTE, SLB XGN, FOI, STA |
| SEC reported revenues | $17,509,195 | $13,044,815 | $67,321,542 | $97,875,552 |
| True revenues (from SAIC filings) | $907,186[14] | $253,935 | $5,332,137[15] | $6,493,258 |

---

[13] CTE's low SAIC-reported revenues are corroborated by CW 3, who reports that CTE's gross profits from March 2010 to July 2012 were about RMB 100,000 at their peak.
[14] Consists of $904,694.57 from YZL and $2,491.36 from CTE.
[15] Consists of $1,438,689.16 from XGN, $3,758,029.86 from FOI, and $135,417.71 from STA.

| Revenue overstatement (in dollars) | $~~12,790,880~~16,602,009 | $16,602,009 ~~12,790,880~~ | $61,989,405 | $91,382,294 |
|---|---|---|---|---|
| Revenue overstatement (by percentage) | 1,~~410~~830% | ~~6,538~~5,037 % | 1,163% | 1,407% |
| Signatory | Defendant Jiang (YZL and CTE) | Jian Wang | Bo Geng (XGN) | |
| Overstated revenues as percentage of UTA's total 2009 revenues | 13.1% | 17.0% | 63.3% | |

*Source for SEC numbers: 2009 10-K, at 31.*

  c. *Defendants falsely claimed that UTA owned its "subsidiaries."*

  ~~157.~~159.  In the 2008 10-K, whose filing begins the Class Period, UTA claimed to wholly own six subsidiaries: YZL, SLB, XGN, FOI, STA and SSD. –STA had no revenue in 2008, as it commenced operations in mid-2009.

  ~~158.~~160.  In 2009, UTA established a new subsidiary (CTE) (established March 23, 2009) and disposed of SSD.  It thus claimed to own six subsidiaries in its fiscal 2009 10-K (YZL, SLB, XGN, FOI, STA and CTE).

  ~~159.~~161.  In Q1-Q3 2010, UTA claimed that it acquired five new subsidiaries: Huangshuan Holiday (March 26, 2010), Tianyuan (March 29, 2010), Zhengzhou Yulongkang (March 29, 2010), Kunming Business Travel (June 28, 2010), and Shanxi Jinyang (June 28, 2010).

  ~~160.~~162.  UTA's various SEC filings falsely stated that these companies were subsidiaries:

| Filing | Date filed | Signatories | Subsidiaries Defendants falsely claimed UTA wholly owned |
|---|---|---|---|
| 2008 10-K | March 12, 2009 | Jiang, Xie, Zhang, | SLB, XGN, STA, |

42

| | | Yuan, Wang | FOI, SSD |
|---|---|---|---|
| 2009 10-K | March 5, 2010 | Jiang, Zhang, Xie, Lee, Yuan, Wang | SLB, XGN, STA, FOI |
| Q1 2010 10-Q | May 10, 2010 | Jiang, Zhang | SLB, XGN, STA, FOI, Huangshuan Holiday, Tianyuan, and Zhengzhou Yulongkang |
| Q2 2010 10-Q | August 10, 2010 | Jiang, Zhang | SLB, XGN, STA, FOI, Huangshuan Holiday, Tianyuan, and Zhengzhou Yulongkang, |
| Q3 2010 10-Q | November 15, 2010 | Jiang, Zhang | SLB, XGN, STA, FOI, Huangshuan Holiday, Tianyuan, Zhengzhou Yulongkang, Kunming Business Travel, and Shanxi Jinyang |

161.163.    According to the subsidiaries' SAIC filings obtained by Plaintiffs, UTA did not own several entities Defendants claimed were its subsidiaries. SAIC filings show that, during the Class Period:

   a.   XGN was owned 90% by Shenzhi Yuzhixing Aviation Service Co., Ltd., and 10% by Bo Geng and Xinhua Zhao, two third parties;

   b.   FOI was owned 95% by Foshan EuroAsia Culture Broadcast Co., Ltd., a third-party company, and 5% by Sida He, a third party;

   c.   Until July 2010, STA was owned 90% by Yulan Li, and 10% by Fan Wu. Thereafter, it was owned 10% by Miquan Jiang, 45% by Fan Wu, third parties, and 45% by Jing Xie, UTA's CFO; and

d.  Each of Huangshuan Holiday, Tianyuan, Zhengzhou Yulongkang Travel,
and Shanxi Jinyang were all owned by STA; because STA was not itself
owned by UTA, neither were these four "subsidiaries".

~~162.~~164.     Thus, in reality, UTA only owned three subsidiaries: YZL, SLB,
and CTE.

~~163.~~165.     The only interest UTA had in the remaining subsidiaries were
through a "Variable Interest Entity" (VIE) structure. In this structure, ~~Universal
Travel~~UTA does not outright own the "subsidiaries", instead entering into contracts with
them seeking to transfer some or all of the economic substance of ownership to ~~Universal
Travel.~~UTA.

~~164.~~166.     But this structure causes substantial risk to investors not present
with outright ownership. UTA's rights depend on the terms of the agreements, their
enforceability under PRC law, and UTA's willingness to enforce them.[16] In a complaint
charging UTA, Jiang, and Xie, with fraud, the SEC charged that the statement that UTA
owned its subsidiaries was materially false because of these risks. None of the contracts
purportedly binding the "subsidiaries" to UTA has been disclosed. And that UTA simply
disappeared from US capital markets after it was accused of fraud suggests that the
contracts were not an adequate substitute for direct ownership.

~~165.~~167.     Thus, Defendants' statements that UTA owned the subsidiaries
were materially false. That UTA misrepresented its ownership of its subsidiaries as
described above is corroborated by a civil complaint filed by the SEC against UTA for
violation of securities laws, and by later admissions of UTA.

---

[16] Jing Xie owns 45% of STA, making it quite unlikely that he would enforce UTA's
rights against himself.

## V.    THE AUDITOR DEFENDANTS' LIABILITY

*~~d.~~a.For three years, UTA engages corrupt auditor David T. Svoboda; upon being appointed as UTA's new auditor, Windes quickly discovers that defendants had been committing fraud.*

~~166.~~168.      UTA's auditor for its 2008 fiscal year was Morgenstern, Svoboda & Baer CPA's ~~[sic]~~ PC ("MSB"). MSB partner Defendant David T. Svoboda was the partner in charge.

~~167.~~169.      According to a third-party complaint filed by MSB charging Defendant Svoboda with professional negligence, while at MSB, Svoboda "failed to adhere to the accepted standard of care" in performing another audit, "negligen[tly]" causing the China-based client's financial statements to incorrectly state its assets. Notably, MSB made this admission in litigation brought by the client's shareholders against it and Svoboda, meaning that MSB thereby admitted that it had made a false statement in a case seeking to hold it responsible for this alleged false statement, an admission against its interests.[17]

~~168.~~170.      UTA's auditor for its 2009 financial statements was ACSB. UTA retained ACSB on June 30, 2009 and dismissed it on September 1, 2010.

~~169.~~171.      ACSB is an accounting firm with 52 accountants. It is located in New Jersey.

~~170.    As alleged in ¶¶52-67 below, ACSB's audit was so deficient that the PCAOB imposed a monetary sanction on it and took away its license to audit public companies; though ACSB may re-apply in two years, the PCAOB has no obligation to grant its application. The ACSB partner in charge of the audit—Defendant Svoboda—was censured and was barred from associating with a firm that does any public company~~

---

[17] *Jason v. China Organic Agriculture, Inc.*, 11-cv-08623-JMF, Dkt. # 16, at ¶¶ 19, 23.

45

auditing for three years; though he may re-apply after then, the PCAOB has no obligation to grant his application either.

~~171.~~172.        On September 1, 2010, UTA engaged Goldman Kurland Mohidin ("GKM"). On September 29, 2010 -- less than a month later -- GKM resigned without providing a reason.

~~172.~~173.        On a conference call the day of GKM's resignation, Defendant Xie stated that "[o]ur new auditors, GKM, have not yet performed any review or audit of our financial statements and have not expressed any concerns to management regarding our previous financial statements."

~~173.~~174.        GKM is a small Encino, California-based accounting firm with 13 accountants.

~~174.~~175.        On September 30, 2010, UTA retained Windes & McClaughry Accountancy Corporation as its registered independent accountant.

~~175.~~176.        Windes is a Long Beach, California-based accounting firm with 98 accountants. Windes's audit uncovered fraud.

~~176.~~177.        Auditors must confirm various financial statement entries with third parties (say, confirming cash held in bank accounts by corresponding directly with the bank). Windes mailed over 500 confirmations to addresses supplied by ~~Universal Travel.~~UTA. It received a very unlikely 100% response rate. In reality, because of human nature, it is not plausible that every third party would respond to a confirmation. Some will not receive the confirmations, some will forget, others will not wish to be bothered with a supplier or customer's audit.

46

177.178.      Upon examining the confirmations, Windes found that they had certain similarities, suggesting to Windes that they were prepared by the same person. Windes then attempted to match customer addresses to public information about the purported customers. They did not match. Windes also attempted a public visit, choosing a purported ~~Universal Travel~~UTA hotel customer in Shenzhen. The address provided by ~~Universal Travel~~UTA, which had confirmed Windes's inquiry, was a public restroom.

178.179.      Windes also made calls to a sampling of the entities that had purportedly confirmed Windes's inquiries. Many told Windes they had never received a confirmation or ~~answered~~responded to one; others stated that the corporate chops and handwritten marks on the confirmations were not familiar.

179.180.      Further, ~~Universal Travel~~UTA was not able to supply some backup documents Windes requested such as invoices or receipts to support entries in its books and records. In some cases, ~~Universal Travel~~UTA did produce documents, but they appeared to Windes to have been forged in response to Windes's requests, rather than created contemporaneously with the transaction they purportedly evidenced, or were otherwise suspicious in Windes's view.

180.181.      In response, Windes advised ~~Universal Travel's~~UTA's audit committee that it would need explanations from ~~Universal Travel's~~UTA's management and that it would need to conduct further procedures to obtain reasonable assurances that ~~Universal Travel~~UTA was not engaged in fraud. These were simple procedures that were obviously reasonable in light of what Windes had discovered. For example, Windes sought to have ~~Universal Travel~~UTA obtain original supporting documents directly from

47

its files in the presence of Windes audit staff.  But ~~Universal Travel's~~UTA's audit committee refused Windes's request.

~~181.~~182._____Thus, Windes added that "certain statements made by Management and the Audit Committee [on or after] March 29, 2011 [] impaired its independence as it related to the Company." And indeed, on March 29, ~~Universal Travel~~UTA had pushed off disclosure of its financial results, falsely stating that "[t]he postponement was not due to any accounting irregularities." In fact, the postponement was due to Windes's discovery of ~~Universal Travel's~~UTA's fraud.

~~182.~~183._____For these reasons, Windes noisily withdrew.

~~183.~~184._____On the day it announced Windes's resignation, UTA also announced that it had retained audit firm EFP Rotenberg to be its registered independent auditor. UTA later obtained an audit report from Rotenberg certifying its 2010 financial statements.

~~184.~~185._____Rotenberg is a deeply troubled firm. In 2008, a PCAOB team reviewed its audits, and found material deficiencies, including the failure to sufficiently confirm *revenue*.[18] In 2010, a PCAOB team reviewed eight of its audit reports, and found material deficiencies in *all eight*.[19] ~~Rotenberg did a little better in~~In its 2012~~, with~~ inspection, the PCAOB found material deficiencies in ~~five~~5 of Rotenberg's audits, though the PCAOB did not provide the total number of audits it reviewed.[20]

---

[18]< http://pcaobus.org/Inspections/Reports/Documents/2011_EFP_Rotenberg_LLP.pdf>.
[19] <
http://pcaobus.org/Inspections/Reports/Documents/2011_EFP_Rotenberg_LLP_2010.pdf
>.
[20] < http://pcaobus.org/Inspections/Reports/Documents/2013_EFP_Rotenberg_LLP.pdf>.

~~185.~~186.    UTA's audits for every year between 2008 and 2010 were deficient:

| Year | Auditor | Deficiency |
|------|---------|------------|
| 2008 | MSB/Svoboda | Defendant Svoboda was the auditor. |
| 2009 | ACS/Svoboda | Defendant Svoboda was the auditor. |
| 2010 – First ~~try~~auditor | Windes | Windes accused UTA of fraud |
| 2010 – Second ~~try~~auditor | Rotenberg | Rotenberg is the auditor. |

~~186.~~187.    Rotenberg issued a clean audit report on UTA's 2010 financial statements. But in July 2014, the SEC issued an order making detailed legal and factual findings showing that Rotenberg's audit ~~was reckless~~of UTA's 2010 financial statements provides no assurance that UTA's financial statements are adequately stated. The SEC made detailed findings of fact, including that Rotenberg violated PCAOB Standards, as it:

> **Formatted:** Font color: Black, Pattern: Clear (White)

~~187.    A month after Defendants filed their motion to dismiss Plaintiffs' Second Amended Complaint, the SEC filed a settled administrative proceeding against Rotenberg, charging it with misconduct in connection with Rotenberg's audit of Universal Travel's 2010 financial statements. The SEC made detailed findings of fact, including that Rotenberg, as it:~~

a. Never requested that Defendants authorize them to obtain Windes's audit working papers. SEC Complaint against Rotenberg, at ¶ 13;

b. Sent all confirmations by mail to addresses provided by ~~Universal Travel~~UTA, even though Windes had found that Defendants had defrauded it by routing confirmations by mail to addresses they controlled. *Id.* at ¶ 17;

49

c. At ~~Universal Travel's~~UTA's suggestion, left allowed ~~Universal Travel~~UTA to conduct pickup and delivery of the confirmation, thus allowing Defendants easily to tamper with the confirmations. *Id.* at ¶ 22;

d. Accepted as evidence confirmations that did not include information expressly sought in the confirmation, such as the name, title, and telephone number of the person filling out the confirmation. Since Defendants were themselves providing confirmations, they did not have a third-party's phone number, name, or title to provide, *id.*

e. ~~Rotenberg failed~~Failed to obtain ~~Universal Travel's~~UTA's SAIC filings, defined below, and analyze the discrepancies between Universal Travel's SAIC filings and its SEC filings.

~~V.   OTHER FACTS PROBATIVE OF UTA DEFENDANTS' SCIENTER.~~

~~a.   UTA delists, its officers resign, and it disappears.~~

~~188.   Following Windes's resignation, the NYSE halted trading in UTA's stock.~~

~~189.260.   On April 16, 2012, UTA announced that it was voluntarily withdrawing its shares from listing on the NYSE.~~

~~190.261.   At that time, the NYSE had had trading in UTA's shares halted for over a year.~~

~~191.262.   UTA's voluntary withdrawal noted that the NYSE "has indicated that [UTA] faces the prospect of delisting" because of the following issues (among others):~~

~~[I]ssues raised by Windes & McGlaughry Accountancy Corporation when it resigned as the Company's independent public accounting firm in April 2011, including with respect to the adequacy of the Company's cooperation in the audit being conducted by Windes prior to its resignation and the authenticity of certain documents provided to Windes in~~

connection with the audit, as reflected in the Company's Form 8-K filed April 14, 2011 and exhibits thereto; on-going delays in the filing of certain periodic SEC filings; the Exchange's concerns with respect to the adequacy of certain of the Company's filings in light of the extensive comments that the Company has received on such filings from the SEC Division of Corporation Finance; certain discrepancies between and among certain of the Company's PRC subsidiaries' filings with the PRC's State Administration for Industry and Commerce and its SEC filings; the Exchange's concerns with respect to the accuracy of certain information provided by the Company to the Exchange; the tax implications of the Company's cash payments for acquisitions in 2010; and the adequacy of the Company's internal controls.

192.1.   In the Press Release announcing delisting of its stock from the NYSE dated April 16, 2012, UTA announced that "the Company will continue to be subject to the reporting requirements of the Securities Exchange Act of 1934."

193.264.      UTA added that "by the next 10-Q reporting date, [it] intends to regain compliance in connection with the timely filing of all periodic and other reports with the SEC".

194.265.      On June 23, 2012, Defendants Wang and Lee resigned from UTA's Board of Directors. They both cited personal reasons, and were replaced by UTA insiders.

195.266.      Since making this announcement, UTA has not filed any periodic reports with the SEC.

196.267.      As of the filing of this complaint, UTA was required to file, but did not:

     a.  Its 10-K for fiscal year 2011;

     b.a.Its 10-Q for Q1 2012;

     c.a.Its 10-Q for Q2 2012;

     d.a.Its 10-Q for Q3 2012;

e.a. Its 10-K for fiscal year 2012;

f.a. Its 10-Q for Q1 2013; and

g.a. Its 10-Q for Q2 2012.

197.1. On February 9, 2013, Defendant Xie resigned as UTA's CFO. Defendant Xie cited personal reasons. He was not replaced.

198.1. On April 1, 2013, Defendant Jiang resigned as CEO. She cited personal reasons. UTA appointed its COO Caying Yan to be interim CEO; she will also continue as UTA's COO. UTA reported that Ms. Yan would not be paid to be its interim CEO, only drawing compensation she was already receiving as its COO.

b.  The SEC discovers that UTA, Xie, and Jiang committed fraud.
    i.  SEC complaints are only filed after the Commission itself, with the proposed defendants' response in hand, votes to authorize filing.

199.1. The SEC Division of Enforcement is tasked with bringing enforcement actions on behalf of the commission.

200.1. Before filing an enforcement action, the Division of Enforcement will ordinarily provide potential defendants with a Wells notice. A Wells notice (a) informs the potential defendant that the SEC staff has made a preliminary determination to recommend that the SEC bring an enforcement action, (b) identifies the violations that the staff has preliminarily decided to include in the recommendation, and (c) informs the potential defendant of the defendant's right to make a submission to the SEC. See SEC Enforcement Manual, 2.4. A Wells notice may only be issued with the approval of an SEC Associate or Regional Director. Id.

201.1. After issuing a Wells Notice and receiving the defendants response, if any, the Enforcement Division Director or Secretary must present to the Commission itself an

52

Action Memo, setting forth the Division's recommendations and a comprehensive explanation of the reasons therefor. Enforcement Manual 2.5.1

202.1. A quorum of three or more SEC Commissioners must authorize any enforcement action, by majority vote. Enforcement Manual, 2.5.2.

203.1. The SEC has five commissioners. They are each officers of the United States, and are appointed by the President with the advice and consent of the Senate.

*ii.i. The SEC charges UTA, Jiang, and Xie with fraud.*

204.1. In September 2013, the SEC filed a complaint against UTA, Jiang, and Xie.

205. The SEC's complaint charged all three with having violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. That is, the SEC charged that all three had committed securities fraud. *Securities and Exchange Commission v. Universal Travel Group, 13-cv-1492 (D.D.C.)*

206.1. All three consented to entry of judgment, and consented to significant penalties:

207.1. Defendant Jiang:

    a. Paid a civil penalty of $125,000. UTA reported that Jiang was paid salary and bonus of about $10,000 in 2009, and about $30,000 in 2010;

    b.a. Consented to a permanent injunction against violating, among others, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and

    c.a. Consented to a five year bar from being an officer or director of an SEC-reporting company.

53

208.1.   Defendant Xie:

  a.   Paid a civil penalty of $60,000. UTA reported that Xie was paid salary and
       bonus of about $12,000 in 2009, and about $30,000 in 2010.

  b.a.   Consented to a permanent injunction against violating, among others,
       Section 10(b) of the Exchange Act and Rule 10b-5 promulgated
       thereunder; and

  c.a. Consented to a five year bar from being an officer or director of an SEC-
       reporting company.

209.1.   Defendant UTA:

  a.   Paid a civil penalty of $750,000;

  b.a. Consented to a permanent injunction against violating, among others,
       Section 10(b) of the Exchange Act and Rule 10b-5 promulgated
       thereunder; and

  c.a. Had its securities' registration permanently revoked.

210.1.   Thus, UTA, Xie, and Jiang all paid substantial penalties to settle the
SEC's charges against them.

  c.a. *UTA's non-existent internal controls.*
211.1.   UTA's books and records reflected that in 2010, it received 85% of its
packaged tour revenues in cash.

212.1.   UTA did not deposit its purported cash revenues in bank accounts on a
regular basis.

213.1.   Rather, UTA's books and records claim that it kept the cash on site, at
more than 30 branch offices, and then paid out much of it to suppliers and employees.

54

214.1.  UTA's books did not reflect that it prepared records for cash transactions. It did not make a practice of preparing purchase or sales invoices, though such invoices are how persons pay Value Added Tax in the PRC, and failure to prepare them may be criminal tax fraud. For many significant purported revenue generating tours, the only records UTA retained were a tour contract or a tour summary report.

215.1.  UTA never disclosed any risks related to the company's uses of, internal controls over, or documentation of cash and cash transactions.

216.1.  A plausible alternative explanation for these purported deficiencies in UTA's books is that UTA had simply lied about its revenues. It did not deposit cash in bank accounts on a regular basis, and rather purportedly disposed of it in other cash transactions, not because it kept poor records but because UTA overstated its revenues and the cash therefore was not there to be deposited. It did not fill out invoices for its purported purchases and sales because the purchases and sales never happened, and it kept no records for its tours because the tours, likewise, never happened.

217.1.  Rotenberg preliminarily determined that it would need to provide an opinion of UTA's internal controls over financial reporting, as required by Section 404(b) of the Sarbanes-Oxley Act of 2002. UTA, however, falsely told Rotenberg that UTA was exempt from the attestation because two unrelated entities were UTA "affiliates." Rotenberg never examined UTA's internal controls over financial reporting to express an opinion. Instead, and because of UTA's false statement, Rotenberg allowed Jiang and Xie falsely to certify that UTA's internal controls over financial reporting were designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements.

55

       d.   A huge number of Chinese reverse mergers have committed spectacular fraud

    218.1.  UTA became a U.S. publicly traded company through a process called a "reverse merger". In a reverse merger, a non-operating U.S. publicly-traded company "buys" a closely-held company. In return, the closely-held company's owners receive substantially all of the shares of the publicly-traded company. The reverse merger process, particularly where the closely-held company is Chinese, has recently raised concerns among regulators that it is too open to fraud. In a speech on April 4 2011, SEC commissioner Luis Aguilar stated that "a growing number of [Chinese reverse-merged companies] are proving to have significant accounting deficiencies or being vessels of outright fraud."[21]  As of June 19, 2012, 67 China-based issuers had had their auditors resign, and 126 issuers had been delisted from U.S. exchanges or simply stopped filing reports with the SEC.[22] Even Chinese regulators have expressed contempt for these companies, noting that the companies could not have listed on major Chinese exchanges.[23]

    219.1.  That these companies are sited in China is no accident. China does not extradite its nationals. Extradition Law of the People's Republic of China, Article 8(1), available at http://english.gov.cn/laws/2005-09/22/content_68710.htm. U.S. judgments are notoriously difficult to enforce in China. Donald C. Clarke, The Enforcement of

---

[21] Full text available at:  http://www.sec.gov/news/speech/2011/spch040411laa.htm
[22] Lewis H. Ferguson, Investor Protection Through Audit Oversight, Speech delivered in Shanghai SEC Conference, June 19, 2012, available at < http://pcaobus.org/News/Speech/Pages/06192012_FergusonSECConference.aspx>.
[23] Statement of Professor John C. Coffee, Jr., at Hearings Before the Subcommittee on Capital Markets and Government Sponsored Entities of the Committee on Financial Services of the United States House of Representatives, at 3, available at http://financialservices.house.gov/uploadedfiles/hhrg-112-ba16-wstate-jcoffee-20120726.pdf.

~~United States Court Judgments in China: A Research Note, George Washington~~

~~University Law School Legal Studies Research Paper No. 236, at 1 (2004) ("At present,~~

~~at least, the answer is straightforward: U.S. judgments will not be enforced [in China]")~~

~~(available at http://ssrn.com/abstract=943922). China-based defendants thus, as a~~

~~practical matter, have little to fear from civil enforcement or criminal charges arising~~

~~from their violations of the US securities laws.~~

## ~~VI.~~    ~~THE AUDITOR DEFENDANTS' LIABILITY~~

### ~~a.~~ _b._ _Auditor defendants' positions and roles._

~~220.~~188.        ACSB was a small audit firm whose main offices were located at

517 Route One South, Iselin, NJ, 08830. It was founded by Defendants Acquavella,

Chiarelli, and Shuster.

~~221.~~189.        Firms seeking audit U.S. publicly-traded companies must be

licensed by the PCAOB. Such firms must also file annual reports on PCAOB Form 2.

These annual reports must be certified by a partner or officer of the firm.

~~222.~~190.        On June 22, 2010, ACSB filed its annual report for the 12 months

ending March 30, 2010 (the "2010 Annual Report"). The 2010 Annual Report covered

the period in which ACSB drafted and issued its report on UTA's 2009 financial

statements. Defendant Chiarelli signed and certified the 2010 Annual Report.

~~223.~~191.        As of March 30, 2010, ACSB employed 52 accountants.

~~224.~~192.        In the period between April 1, 2009, and March 30, 2010, ACSB

drew 100% of its revenues from auditing U.S. publicly-traded companies.

~~225.~~193.        In the period covered by the 2010 Annual Report, ACSB issued

audit reports on 12 companies, including UTA. Each of these audit reports certified that

(a) ACSB had conducted its audit in accordance with PCAOB Standards, and (b) the

client's financial statements were presented in conformity with GAAP in all material respects.

226.194.     8 of ~~UTA's~~ACSB's former audit clients were based in China. None of these 8 clients – and only one of ~~UTA's remaining~~ACSB's other former clients – are current in their SEC filings.

*b.c Auditor defendants' statements.*

227.195.     Defendant ACSB was ~~Universal Travel's~~UTA's registered independent auditor and audited its financial statements for the year ended December 31, 2009, filed with the SEC on March 5, 2010. Defendant David T. Svoboda was the head of ACSB's public company practice, and had ultimate responsibility for ACSB's ~~Universal Travel~~UTA audit, including whether to issue an opinion. Defendant Svoboda was previously an MSB partner, where he had ultimate responsibility for MSB's 2006-2008 UTA audits.

228.196.     Svoboda and ~~ACSA~~ACSB made false statements in the audit report certifying UTA's 2009 annual financial statements and provided to and relied on by ~~Universal Travel's~~UTA's investors:

    a.  Svoboda and ACSB falsely and recklessly stated that ACSB performed their audit of UTA in accordance with PCAOB auditing standards;

    b.   Svoboda and ACSB falsely stated that they had considered UTA's internal control over financial reporting in determining how to conduct the UTA audit;

    c.  Svoboda and ACSB falsely stated that UTA's financial statements present fairly, in all material respects, the financial position of UTA as of

December 31, 2009 and 2008, and the results of its operations and its cash

flows for the three years ended December 31, 2009; and

d.   Svoboda and ACSB falsely stated that UTA had prepared its own financial

statements.

~~229.~~197.   Svoboda and ACSB's false statements are set out in full below,

with these four false statements emphasized:

We have audited the accompanying consolidated balance sheets of Universal
Travel Group as of December 31, 2009 and 2008, and the related consolidated
statements of income, stockholders' equity and comprehensive income, and cash
flows for each of the years in the three-year period ended December 31,
2009. We have also audited Universal Travel Group's internal control over
financial reporting as of December 31, 2009, based on criteria established in the
Internal Control-Integrated Framework issued by the Committee of Sponsoring
Organizations of the Treadway Commission (COSO). *Universal Travel Group's
management is responsible for these financial statements, for maintaining
effective control over financial reporting, and for its assessment of the
effectiveness of internal control over financial reporting included. Our
responsibility is to express an opinion on these financial statements based on
our audits.*

*We conducted our audit in accordance with the standards of the Public
Company Accounting Oversight Board (United States).* Those standards required
that we plan and perform the audit to obtain reasonable assurance about whether
the financial statements are free of material misstatement and whether effective
internal control over financial reporting was maintained in all material respects.
Our audits of the financial statements included examining, on a test basis,
evidence supporting the amounts and disclosures in the financial statements,
assessing the accounting principles used and significant estimates made by
management, and evaluating the overall financial statement presentation. Our
audit of internal control over financial reporting included obtaining an
understanding on internal control over financial reporting, assessing the risk that a
material weakness exists, and testing and evaluating the design and operating
effectiveness of internal control based on the assessed risk. Our audit also
included performing such other procedures as we considered necessary in the
circumstances. We believe that our audit provides a reasonable basis for our audit.

A company's internal control over financial reporting is a process designed to
provide reasonable assurance regarding the reliability of financial reporting and
the preparation of financial statements for external purposes in accordance with
generally accepted accounting principles. A company's internal control over

financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses were identified:

- The Company's policy documentation of all controls identified during their assessment and remediation process was incomplete.

- Lack of technical accounting expertise among financial staff regarding US GAAP and the requirements of the PCAOB, and regarding preparation of financial statements.

*These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2009 consolidated financial statements of the Company as of and for the year ended December 31, 2009.*

*In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Universal Travel Group as of December 31, 2009 and 2008, and the results of its operations and its cash flows for the three years ended December 31, 2009, in conformity with accounting principles generally accepted in the United States of America.*

Also in our opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the internal control criteria, Universal Travel Group did not maintain effective internal control over financial reporting as of December 31, 2009 based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring

60

Organizations of the Treadway Commission (COSO). Our opinion on the effectiveness of internal control over financial reporting does not affect our opinion on the consolidated financial statements.

~~c.   Auditors' responsibilities~~

*/s/Acquavella, Chiarelli, Shuster, Berkower & Co., LLP*
Certified Public Accountants
New York, N.Y.
February 22, 2010

(the "ACSB Audit Report")

> d.   *The PCAOB finds that the Auditor Defendants violated PCAOB Standards.*

~~230.~~199._____An audit aims to provide reasonable assurance that the financial

statements are free of material errors. The auditor must, at the audit's conclusion, report

on whether the audited financial statements comport with Generally Accepted

Accounting Principles ("GAAP"). Here, ~~ACSB's audit report~~the ACSB Audit Report

concluded that ~~Universal Travel's~~UTA's financial statements comported with GAAP.

~~231.~~199._____The Public Company Accounting Oversight Board (the "PCAOB")

has promulgated specific standards that the auditors of public companies must follow (the

"PCAOB Standards"). If it issues any audit report at all, an auditor must, as ACSB did

here, state that it conducted its audit in accordance with PCAOB Standards. PCAOB

Standards include:

> a.   *Audit planning*: An audit begins with an audit plan drafted by the audit
>
>   firm, identifying the audit procedures it will conduct to obtain reasonable
>
>   assurance that risks specific to the audited company have not led to
>
>   misstatements in the financial statements. The audit plan is documented in
>
>   an audit planning memorandum. The audit planning memorandum is not a
>
>   boilerplate document; PCAOB Standards list eight different client-specific

61

facts the auditor should determine and consider, such as the client's business and the industry in which it operates. {AU 150.02, AU 230, AU 311}.

b. *Independence*: The auditor must be independent of the client. A serious violation of this fundamental PCAOB auditing rule occurs when an auditor prepares financial statements, and then also audits them. PCAOB auditing standards are crystal clear that the auditor *may not* prepare the financial statements.  When the auditor audits the same financial statements it prepares, it will not express professional skepticism to its own work and violates its duty of due care. {Section 10A(g) of the Exchange Act, PCAOB Rule 3520, and AU § 220}. Under such circumstances, the auditor lacks objectivity and the fundamental basis of the audit is compromised. This has been a fundamental rule of public company auditor practice for decades.

c. *Due care*: The auditor must exercise due care throughout the audit process, including planning and conducting the audit.  "Due care" means performing tasks with "the degree of skill commonly possessed by others in the same employment." {AU Section 230.07}. "The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence." AU Section 230.07.

d. *Professional skepticism*: As part of due care, auditors must express professional skepticism at all times. Professional skepticism is an attitude

62

that includes a questioning mind and a critical assessment of audit

evidence. AU Section 230.07

e. *Quality control*: The auditor must ensure that work is conducted by

personnel with sufficient technical training and proficiency. This includes

ensuring that audit procedures are conducted by staff experienced enough

to comply with PCAOB Standards, directing their efforts, reviewing their

work, and determining whether the results of audit procedures is

consistent with the ultimate opinion. [QC Section 20.03, .11, .13, .17.; AU

Section 311]. Auditors must also design quality control policies that will

allow them to obtain reasonable assurance that its quality control system is

effective. [QC 30.03].

f. *Audit Performance*: After determining the audit scope and procedure, the

auditor carries out the audit plan. This means, at a minimum, conducting

the procedures outlined in the audit plan, but it also means conducting

additional procedures if the first procedures turn up unusual, inadequate or

suspicious results. AU 330.31.

200.    ~~In~~ On November 21, 2013, the PCAOB issued a release announcing that it

had found that ACSB and Svoboda violated PCAOB Standards in ~~auditing Universal~~

~~Travel, ACSB violated every one~~ UTA and two other China-based issuers. *In the Matter*

*of* ~~these cardinal principles.~~ *Acquavella, Chiarelli, Shuster, Berkower & Co., LLP,*

PCAOB Release No. 105-2013-010 (Nov. 21, 2013) ("ACSB Release"); *In the Matter of*

*David T. Svoboda, CPA,* PCAOB Release No. 105-2013-011 (Nov. 21, 2013) ("Svoboda

Release", and collectively "PCAOB ACSB Misconduct Releases"). The ACSB and

Formatted: Font: Italic

Svoboda Releases are attached as Exhibits 3 and 4 to this Complaint, respectively, and are incorporated by reference.

201.    The PCAOB ACSB Misconduct Releases announced that the Auditor Defendants had decided to settle the actions. The PCAOB:

    a.   Censured ACSB;

    b.   Revoked ACSB's registration. While ACSB could reapply after two years, the PCAOB would have no obligation to grant its application;

    c.   Imposed a monetary penalty on ACSB;

    d.   Censured Svoboda; and

    e.   Barred Svoboda from being an "associated person"[24] under SOX of any registered firm. While after 3 years Svoboda could petition the PCAOB for permission to serve as an "associated person," the PCAOB had no obligation to grant such petition.

202.    The PCAOB ACSB Misconduct Releases included detailed factual findings concerning the Auditor Defendants' ACSB audits. The PCAOB ACSB Misconduct Releases establish that the Auditor Defendants violated each of the PCAOB Standards set out in ¶199, above in ACSB's audit of UTA's financial statements. Indeed, the PCAOB ACSB Misconduct Releases specifically found that the Auditor Defendants' conduct amounted to violations of each of the PCAOB Standards set out in ¶199, above.

232.203.    Accordingly, ~~ACS violated PCAOB Standards in its audit of UTA, and its statement that it had performed the~~ the Defendants made false statements in the

---

[24] SOX defines "associated person" to include anyone who receives compensation in connection with a PCAOB-registered firm's audit or acts as its agent in any capacity. 15 U.S.C. § 7201(a)(9).

ACSB Audit Report when they claimed that ACSB's audit ~~in accordance~~had comported with PCAOB Standards ~~was false~~.

> *~~d.~~e.ACSB and Svoboda violated PCAOB Standards because they did not plan the audit.*

~~233.~~204.      Neither Svoboda nor ACSB analyzed UTA's specific risks or any other company-specific information in planning the audit or in drafting the audit plan. Rather, ACSB's UTA audit plan was simply copied from the audit plan for another ~~company's~~company. As a result, the audit plan included irrelevant procedures, and did not include procedures which were necessary to obtain reasonable assurance that UTA's financial statements were free of misstatements. Svoboda and ACSB thus failed to exercise due care to ensure that the audit plan was appropriate for ~~Universal Travel's~~the UTA audit – a clear and obvious violation of PCAOB Standards. ACSB Release ¶18; Svoboda Release ¶12.

~~234.~~205.      ~~But ACS went further, and~~Moreover, ACSB specifically claimed that it had considered ~~Universal Travel's~~UTA's internal control deficiencies in planning the nature, timing, and extent of its audit procedures. The statement was false; ACSB merely copied the audit plan for another company and did not take into account UTA's internal control deficiencies, or any other UTA-specific facts.

~~235.~~206.      ACSB and Svoboda also failed to draft a company-specific planning memorandum in connection with two other China-based companies whose audits the PCAOB inspected: Sinocom Pharmaceutical, Inc., and Home System Group. Thus, this was not an isolated instance. ACSB Release ¶¶28, 36; Svoboda Release ¶¶22, 30.

> *~~e.~~f.ACSB and Svoboda violated PCAOB Standards because they were not independent and did not express professional skepticism.*

65

236.   In the ACSB Audit Report, the Auditor Defendants specifically claimed that UTA, and not ACSB, had prepared UTA's consolidated financial statements. *See* ¶196, above. In fact, Svoboda prepared the consolidation and financial statements that formed the basis of ~~Universal Travel's~~UTA's financial statements for the year ended December 31, 2009. ~~Thus~~And because Svoboda both prepared and audited UTA's financial statements, Svoboda and ACSB specifically violated ~~the~~ independence ~~requirement.~~

~~237.~~207.     ~~Svoboda and ACSB went further, and specifically claimed that Universal Travel Group's management was responsible for its financial statements, and~~requirements that ~~ACSB and Svoboda's responsibility was limited to expressing an opinion on the~~auditors may not audit financial statements. ~~This statement, too, was false.~~ they have themselves prepared. ACSB Release ¶¶45-46; Svoboda Release ¶5

~~238.~~208.     Similarly, because ACSB and Svoboda were auditing financial statements Svoboda himself had drafted, they did not express appropriate professional skepticism towards the representations made in the financial statements.

~~239.~~209.     Svoboda habitually prepared the financial statements of ACSB's audit clients, which he then audited; he also prepared and audited the financial statements of Sinocom Pharmaceutical, Inc. Svoboda Release ¶48.

*f.g. ACSB and Svoboda violated PCAOB Standards because they did not maintain adequate quality control.*

~~240.~~210.     The ~~PCAOB~~ACSB Release found that ACSB "failed to develop quality control policies and procedures sufficient to ensure that the audit personnel possessed the degree of technical training and proficiency required to fulfill their engagement responsibilities." ACSB Release ¶4.

66

241.211.      UTA operates entirely in China and its accounting records and other information supporting the financial statements were in Chinese. Svoboda does not speak, understand, or read Chinese, and so relied on accounting assistants with Chinese language skills to identify issues, communicate with management and third-parties, and translate and analyze documents provided by ~~Universal Travel.~~ UTA. ACSB Release ¶9.

242.212.      Indeed, much of ~~Universal Travel's~~UTA's 2009 audit, as well as that of ACSB's other China-based clients, was conducted not by ACSB directly but by a Chinese audit firm hired by ACSB. ACSB's entire ~~Universal Travel~~UTA team consisted of Svoboda and two assistants from ACSB itself, and a variety of assistants from the Chinese audit firm. *Id.*

243.213.      Virtually all audit tasks were performed by ACSB ~~and the China audit firm's staff, who had~~ employees with little ~~experience with~~ public ~~company auditing, conducted virtually all of the Universal Travel~~ audit ~~procedures~~experience and the assistants from the China audit firm. ACSB Release ¶10.

244.214.      ACSB did not control which of the China firm's employees were assigned to the ~~Universal Travel audits.~~ UTA audit. ACSB Release ¶9.

245.      PCAOB standards required ACSB to assign work "to personnel having the degree of technical training and proficiency required" to provide reasonable assurance that the financial statements comport with GAAP. ACSB Release ¶8 citing QC 20.13. ACSB did not assess whether the China firm's employees assigned to the ~~Universal Travel~~UTA audit were knowledgeable about U.S. GAAP or PCAOB Standards. ACSB Release ¶9. Chinese accountants may not ~~be knowledgeable about~~know U.S. GAAP or PCAOB Standards, which govern U.S. audits. But having no control over which China-

67

based employee actually conducted the audit work, ACSB could not ensure that whichever employee ~~was~~the Chinese firm selected would ~~be knowledgeable about~~know U.S. GAAP or PCAOB Standards.

246.215.    And ACSB did not provide any GAAP or PCAOB Standards training to the China firm's employees who worked on the ~~Universal Travel~~UTA audit. ACSB Release ¶9.

247.216.      Indeed, much of the audit work was never reviewed by Svoboda or anyone senior at ACSB, who did not even determine whether the audit procedures they had determined to perform were even performed. Svoboda Release ¶¶14, 44.

248.217.      ACSB similarly did not control, assess, or train the China firm's employees involved in the Sinocom and Home System Group audits, or review their work. ACSB Release ¶¶30, 38.

249.218.      ACSB's written internal control policies provided that "[a]nnually, the Quality Control Partner/Manager selects an individual or a team [...] to review the Firm's quality control system", but ACSB did not perform any internal review in 2009 or 2010. ACSB Release ¶11.

g.h.*ACSB did not follow up when its confirmations were not returned.*
250.219.      Auditors ~~must obtain,~~ must obtain sufficient appropriate audit evidence to substantiate the information presented in the client's financial statements. To do so, an auditor corresponds directly with third parties to confirm balances or transactions. ~~(~~AU Section 330.04~~.).~~ For example, to confirm cash, the auditor will ask the client's banks to confirm the cash balance stated in the bank statement the client would provide to the auditor.

251.220.     The auditor corresponds with the entities by sending a confirmation form to the address obtained either from the audited company's accounting records or from their own research, depending on the circumstances. *(Id.).* These entities then reply, confirming the amounts provided by the audited company. *(Id.).*

252.221.     For example, UTA's financial statements reported net accounts receivable of $17.3 million, about 20% of reported assets. The Chinese audit firms sought to confirm the entire amount, but only received confirmations for about $10.9 million of the accounts receivable, or 63%. ACSB did nothing to determine that the remaining accounts receivable truly existed. ACSB Release ¶21.

253.222.     ACSB knowingly failed to follow up and perform sufficient alternative procedures to confirm accounts receivable to reduce audit risk to an acceptably low level. The auditorIt was required either to follow up on every confirmation which was not returned until it was returned, or to design alternative procedures to provide reasonable assurance that the accounts receivable were accurately stated.

254.223.     Similarly, packaged tours accounted for 69% of Universal Travel'sUTA's revenues and were thus a major part of Universal Travel'sUTA's business. ACSB did not perform procedures to determine whether Universal TravelUTA recognized revenues from the packaged-tour business in accordance with its own revenue recognition policy. In reality, Universal Travel'sUTA's packaged tour business was an 85% cash business. Rather than placing the purported cash in its bank accounts, itUTA claimed in internal records to keep the cash on site to pay expenses at each of its purported branch offices. Universal Travel UTA did not maintain uniform records for

69

cash transactions, and in many of its purported sales, did not prepare invoices used to

report Value Added Tax to the PRC government – which, if the transactions actually

occurred, is tax fraud. For many significant revenue generating tours, the only records

~~Universal Travel~~ UTA retained were a tour contract or a tour summary report. ~~Thus, had~~

~~ACS attempted~~ *SEC v. Universal Travel Group, Inc.*, 11-cv-1492, Dkt.# 1, ¶¶21-22

(D.D.C.) (attached as Exhibit 2 to ~~discover whether Universal Travel adhered to its~~

~~disclosed revenue recognition policy, it would not have been able to determine whether it~~

~~did, but it would quickly have determined that Universal Travel's internal controls were~~

~~virtually non-existent.~~ this Complaint and incorporated by reference).

224.    Thus, had ACSB attempted to discover whether UTA adhered to its

disclosed revenue recognition policy, ACSB would quickly have determined that UTA's

internal controls were virtually non-existent.

~~255.~~225.     As noted above, ~~Universal Travel~~ UTA had transferred ownership

of STA to third parties in June 2007. In fact, official ownership records filed with the

SAIC showed that ~~Universal Travel~~ UTA did not own STA. ~~Universal Travel's~~ UTA's

SEC filings nonetheless claimed that it owned the subsidiary, and its financial statements

nonetheless consolidated the subsidiary's financials into its own, which is not permitted if

~~Universal Travel~~ UTA did not own the subsidiary. ~~ACS~~ACSB was required to confirm

ownership of STA and all of UTA's other subsidiaries before permitting the subsidiaries'

financial statements to be consolidated into UTA financial statements.

~~256.~~226.      Finally, ~~ACS~~ACSB did not take any action to confirm that about

$5 million in cash it claimed was in its bank accounts – about 13.6% of ~~Universal~~

~~Travel's~~UTA's total cash – actually existed. ~~It didn't.~~ Svoboda Release ¶17. The cash did not exist.

257. And ACSB ignored red flags. ~~For example, Universal Travel had raised $7.1 million in a private offering in August 2008, and raised a further $20 million in cash in a private offering closing December 10, 2009. But shortly after both offerings, Universal Travel wired the money raised to a bank account held in the name of "Universal Travel Group (Hong Kong) Limited" (UTA HK). That Universal Travel's cash was held by UTA HK was a red flag because Universal Travel has never disclosed that UTA HK existed, nor was it included in Universal Travel's organizational chart. A further red flag was that Defendant Jiang had sole authority over the account.~~

258. ~~Between~~As set out above in ¶¶89-94, between September 2008 and March 2011, Jiang and Xie transferred all the funds raised in multiple offerings to the third-party Transferees through ~~the two offerings and another raising $20 million in June 2010 out~~ an account held in the name of "Universal Travel Group (Hong Kong) Limited" ("UTA HK"). Both the fact that UTA HK is not a subsidiary of UTA ~~HK's account, and to the bank accounts of fifteen unknown, purportedly unrelated companies, another of UTA HK's bank accounts and, through individuals registered with the government of Hong Kong as "remittance agents" or "money changers", to twelve more unrelated corporations and five individuals.~~

~~259.~~227.     ~~The cash, once transferred to UTA HK or the other 27 unrelated companies or five individuals, was not within Universal Travel's control, it should not have been included in Universal Travel's cash and cash equivalents. Similarly, this very serious deficiency in internal controls~~and that only UTA's CEO's signature was required

71

to have been disclosed to investors for a transfer from the UTA HK bank account are red flags.

260.   Universal Travel made similar reckless mistakes in its audit of Sinocom and Home System.

261. 228.   Auditors must annually test the company's goodwill to determine whether impairment is necessary. The auditor may not rely on the client's impairment analysis. UTA's 2009 financial statements reflected goodwill of $9.9 million, or 11.5% of its total assets as of December 31, 2009. Instead of performing its own goodwill impairment analysis, ACS ACSB obtained a goodwill impairment analysis for UTA and did not perform any audit procedures either to test the impairment analysis or the assumptions made in drafting it. ACSB Release ¶23.

*h. i. Svoboda commits fraud to pass an inspection.*

262. 229.   The PCAOB was created by the Sarbanes-Oxley Act of 2002, and is empowered to issue auditing standards binding on auditors who audit U.S. publicly traded companies. The PCAOB also regularly inspects firms that audit public companies.

263. 230.   Svoboda signed and released ACSB's audit report on the Universal Travel financial statements ACSB Audit Report on February 22, 2010,[25] and the ACSB Audit Report was filed on March 5, 2010.

264. 231.   On March 25, 2010, Svoboda learned that the PCAOB would inspect ACSB the week of June 28, 2010. Audit working papers document all of the procedures that have been conducted by the auditor. PCAOB inspections, in turn, examine what is documented in the working papers. – Svoboda Release ¶39.

_____

[25] As noted above, the report was not filed until March 5, 2010.

72

265.232.      On May 27, 2010, Svoboda held a meeting with ACSB staff, and directed them to alter the UTA's working papers (as well as Sinocom's and Home System's). *Id.*

266.233.      Svoboda directed staff to forge documents purporting to set out the results of audit procedures that ACSB should have, but did not, conduct in the three audits. Svoboda Release ¶¶39-40. Svoboda and staff also altered existing work papers. *Id.*

Formatted: Font: Italic

Altering working papers is an attempt to mislead the PCAOB and subverts its oversight role.

267.234.      ~~Svoboda also directed them to backdate the documents, to make it appear they had been drafted before Svoboda released ACSB's audit reports. All procedures entered into audit working papers must be dated. Thus, while~~While the auditor may include some limited information or documents received after the date of an audit report – for example, if an auditor has asked for but has not yet received a signed contract – the working papers ~~will~~must show that the material was received after the audit report was released. But Svoboda also directed ACSB staff to backdate the documents, to make it appear they had been drafted before Svoboda released ACSB's audit reports. Svoboda Release ¶¶39-40. Svoboda and ACSB staff also omitted the name of the person making modifications or additions and the reason for the modification or additions. Svoboda Release ¶40.

268.235.      Svoboda and ACSB presented the forged, altered, and fraudulently dated documents to the PCAOB inspection team without disclosing that the documents were forged.

269. The PCAOB has determined that ACSB violated PCAOB Standards in conducting the Universal Travel audit, among other audits. The PCAOB has also determined that Svoboda "knew, or was reckless in not knowing, [that his conduct] would directly and substantially contribute to ACSB's violations."

i. *The Auditor Defendants continue to assert that their audit report the ACSB Audit Report was true even accurate after they tampered with the audit ACSB Audit Report's working papers to pass a ng PCAOB inspection.*

270. On June 7, 2010, UTA filed two documents with the SEC.[26] The documents each bore one attachment—a letter from ACSB. In it, ACSB consents to the use of its 2009 audit report in connection with the UTA Registration Statement for the sale of securities to which it was attached. ACSB's letters were dated June 4, 2010. Thus, ACSB (through Svoboda) signed its letter reiterating its audit report about one week after Svoboda met with ACS staff to instruct them to tamper with ACS's audit working papers to make it seem that the clearly defective audit was acceptable.

---

[26] Exactly what UTA filed on June 7, 2010 is not clear. A registration statement, filed on forms S-1 or S-3, is used to register newly issued publicly tradable shares. A 10-K, filed on Form 10-K, is used to provide an annual report to shareholders, including annual financial statements. On June 7, 2010, UTA filed two documents. UTA called both documents amendments to its 2009 10-K. In the first, UTA stated that it was amending its 10-K for the year ended December 31, 2009, to include a consent of ACS. But the attached document, a letter from ACS, states that it is a consent to the inclusion of ACS's report on "the foregoing Registration Statement on Form S-3," and that ACS also consents to its listing under the caption "experts." There was no Registration Statement, and there was no "experts" caption in the Amended 10-K—indeed, there is no "Experts" caption in 10-Ks, as it is Registration Statements that must be expertised. The second filing was an amendment to UTA's 2009 10-K, which again stated that it was amending the 10-K to add the auditor's consent, but this time stated that it was correcting the 2009 10-K filed on March 5, 2009. This second filing attached the same letter from ACSB. Shortly after the two Amended 10-Ks were filed, UTA filed a prospectus to sell $20 million of its stock. Accordingly, it seems likely that UTA believed it had filed an amended registration statement, rather than an amended 10-K, having confused the two forms.

271.   On June 6, 2011, ACSB provided a letter consenting to have UTA use the 2009 audit report in UTA's 2010 10-K. UTA filed ACS's letter with the SEC.

236.    On June 4, 2010, after Svoboda's meeting in which he asked ACSB staff to forge documents to pass the PCAOB inspection, ACSB consented in writing to UTA's use the ACSB Audit Report in a registration statement (the "2010 Registration Statement"). By providing its consent, ACSB represented that nothing had come to ACSB's attention calling into question the ACSB Audit Report since the report's initial filing. ACSB's June 4 letter also consented to ACSB's designation as an expert in the 2010 Registration Statement.

237.    Pursuant to the SEC's rules, UTA was required to file ACSB's June 4 letter publicly as an exhibit to the 2010 Registration Statement. 17 C.F.R. §230.436(a). UTA filed ACSB's June 4 letter on June 7, 2010.[27] In reliance on ACSB's consent, the ACSB Audit Report was included in the 2010 Registration Statement, filed June 16, 2010.

238.    ACSB continued to represent to investors that its audit complied with PCAOB Standards and that UTA's financial statements were accurately stated even after Windes's resignation. For example, on June 6, 2011, ACSB consented in writing to the use of the ACSB Audit Report in UTA's 2010 financial statements.

    j. k. *Successor liability.*
272. 239.     In 2012, faced with mounting liabilities from private plaintiff lawsuits as well as PCAOB proceedings, the Auditor Defendants played a simple shell game to leave their liabilities behind.

---

[27] UTA erroneously attached ACSB's consent to UTA's annual financial statements rather than the 2010 Registration Statement.

273. 240.      The Auditor Defendants dissolved ACSB, and formed ACS.[28] ACS is a mere continuation of ACSB:

   a.  ACS's name partners are Defendants Acquavella, Chiarelli, and Shuster.

   b.  Like ACSB, ACS operates at 517 Route One South, Iselin, NJ, 08830.

   c.  ACS's ACS was formed from ACSB employees

   d.  ACSB maintained a website at www.acsbco.com (named for ACSB's four principals). As of March 21, 2015, the page located at www.acsbco.com was *ACS's*, not ACSB's.

   e.  ACS maintains a website at www.acsaccounting.com. It represents that "Acquavella, Chiarelli, Shuster, LLP was founded in New York City in 1986 by Joseph P. Acquavella, Santo Chiarelli, and Samuel Shuster". It adds "[i]n 2015, Acquavella, Chiarelli, Shuster, LLP is proud and grateful to be celebrating its 29th year in business". The two statements refer to ACSB, not ACS. ACSB has admitted in a judicial filing that the purpose of the statement was not to leave clients in the lurch -- i.e., business continuity.

   *I.   Relation back of amendments.*
241.    Plaintiffs filed their Second Amended Class Action Complaint for Violation of the Securities Laws (the "SAC") on May 1, 2014. ACS was served on May 5, 2014. The SAC promptly came to the attention of Acquavella, a name partner of both ACS. Mr. Acquavella was also the managing partner of ACSB at the time. Dkt. # 136-2, at ¶1. Accordingly, ACSB received notice of the action within 120 days of the filing of the SAC.

---

[28] Defendant Berkower did not join them, instead leaving to join another firm.

76

242.    Within a few days of May 1, 2014, Acquavella had forwarded the SAC to the insurer of ACSB. *Id.* at ¶10. The Auditor Defendants have all represented to this Court that "ACS assumed that because ACSB was the only arguably relevant party, [the insurer] would assign counsel." Dkt. # 150, at 10. And Acquavella has represented in a declaration under penalty of perjury that he believed plaintiffs "su[ed] the wrong entity". Dkt. # 140-1, at ¶4. Accordingly, ACSB knew or should have known that the action would have been brought against ACSB but for a mistake concerning its identity.

## ~~VII.~~VI.    LOSS CAUSATION

~~274.~~243.    This case involves several fraudulent statements. Disclosures correcting each of the fraudulent statements caused immediate drops in UTA's stock price.

> a.  *The fraudulent claims that UTA was an online travel agency and that it had tens of millions of dollars in cash reserves.*

~~275.~~244.    On September 15, 2010, before trading hours, Mr. Hempton issued a report showing that (a) though UTA claimed to operate as an online travel agency, its website could not be used to book a flight, and (b) that UTA's claim to have cash reserves of $43 million was likely untrue.

~~276.~~245.    The news caused UTA's stock price to fall from a close of $4.77 on September 14 to a close of $3.86 on September 15, or $0.91, a fall of 19%, damaging investors.

~~277.~~246.    On September 20, 2010, Mr. Hempton issued a second report, which showed that UTA's low interest income also proved that its claims to hold $43 million in cash were false. On September 20, UTA's stock price fell from $4.63 to $4.35.

UTA's stock price continued to fall on September 21, closing on $4.09 that day. The two-day stock price decline was $0.54, or about 12.7%.

     *b.  The fraudulent claim regarding the number of employees*

278.247.     On March 8, 2011, Glaucus issued a report that, among other things, revealed that UTA had approximately 100 employees in its call centers, rather than the 320 it claimed in its SEC filings.

279.248.     The report caused UTA's stock price to fall from $6.18 to $5.71 on heavy volume, a fall of 7.6%.

     *c.  UTA Fails to File its Annual Report Because its Auditor Suspects Fraud*

280.249.     On March 29, 2011 UTA announced that it was postponing its fiscal year 2010 earnings conference call.  UTA falsely claimed the postponement *was not* due to any accounting irregularities.

281.250.     On March 30, 2011, UTA announced that it was unable to file its annual report on form 10-K because of "a delay in assembling the information."

282.251.     In truth, UTA's accountants had refused to certify the financial statements because they suspected fraud on the part of UTA management.

283.252.     As a result of its inability to file its annual financial statements, UTA stock dropped or $1.06 per share, or 19.6%.

     *d.  Auditor Resignation Leads to Trading Halt and Share Price Decline*

284.253.     On April 11, 2011, trading in UTA's shares was halted. The halt price was $3.96.

285.254.     On April 14, 2011, UTA filed an 8-K with the SEC announcing Windes's resignation, and the reasons for it.

286.255.     On April 16, 2012, UTA issued a Press Release announcing its intention to voluntarily delist its shares in light of the NYSE's intention to delist them.

The letter also set out the concerns the NYSE had regarding the accuracy of UTA's financial statements.

287.256.      On June 8, 2011, UTA issued its annual report on form 10-K, which disclosed for the first time that UTA did not own many of its subsidiaries, for which it had previously claimed ownership.

288.257.      On May 7, 2012, UTA resumed trading, and closed that day at $0.71/share, declining $3.15, or over 82%.

289.258.      This drop was the direct result of, among others, the news that Windes had resigned due to Defendants' accounting improprieties, that the NYSE was to delist itsUTA's shares as a result of suspected fraud, and the news that UTA did not own its subsidiaries.

## VII.    OTHER FACTS PROBATIVE OF SCIENTER.

*a.  UTA delists, its officers resign, and it disappears.*

259.    On April 14, 2011, the NYSE halted trading in UTA's stock.

260.    On April 16, 2012, UTA announced that it was voluntarily withdrawing its shares from listing on the NYSE.

261.    At that time, the NYSE had had trading in UTA's shares halted for over a year.

262.    UTA's voluntary withdrawal noted that the NYSE "has indicated that [UTA] faces the prospect of delisting" because of the following issues (among others):

[I]ssues raised by Windes & McGlaughry Accountancy Corporation when it resigned as the Company's independent public accounting firm in April 2011, including with respect to the adequacy of the Company's cooperation in the audit being conducted by Windes prior to its resignation and the authenticity of certain documents provided to Windes in connection with the audit, as reflected in the Company's Form 8-K filed April 14, 2011 and exhibits thereto; on-going delays in the filing of certain periodic SEC filings; the Exchange's concerns with respect to the

adequacy of certain of the Company's filings in light of the extensive comments that the Company has received on such filings from the SEC Division of Corporation Finance; certain discrepancies between and among certain of the Company's PRC subsidiaries' filings with the PRC's State Administration for Industry and Commerce and its SEC filings; the Exchange's concerns with respect to the accuracy of certain information provided by the Company to the Exchange; the tax implications of the Company's cash payments for acquisitions in 2010; and the adequacy of the Company's internal controls.

263.  In the Press Release announcing delisting of its stock from the NYSE dated April 16, 2012, UTA announced that "the Company will continue to be subject to the reporting requirements of the Securities Exchange Act of 1934."

264.  UTA added that "by the next 10-Q reporting date, [it] intends to regain compliance in connection with the timely filing of all periodic and other reports with the SEC".

265.  On June 23, 2012, Defendants Wang and Lee resigned from UTA's Board of Directors. They both cited personal reasons, and were replaced by UTA insiders.

266.  Since making this announcement, UTA has not filed any periodic reports with the SEC.

267.  As of the filing of this complaint, UTA was required to file, but did not:

   a.  Its 10-K for fiscal year 2011;

   b.  Its 10-Q for Q1 2012;

   c.  Its 10-Q for Q2 2012;

   d.  Its 10-Q for Q3 2012;

   e.  Its 10-K for fiscal year 2012;

   f.  Its 10-Q for Q1 2013; and

   g.  Its 10-Q for Q2 2013.

268.    On February 9, 2013, Defendant Xie resigned as UTA's CFO. Defendant Xie cited personal reasons. He was not replaced.

269.    On April 1, 2013, Defendant Jiang resigned as CEO. She cited personal reasons. UTA appointed its COO Caying Yan to be interim CEO; she will also continue as UTA's COO. UTA reported that Ms. Yan would not be paid to be its interim CEO, only drawing compensation she was already receiving as its COO.

> *b. The SEC charges that UTA, Xie, and Jiang committed fraud.*
> *i.   SEC complaints are only filed after the Commission itself, with the proposed defendants' response in hand, votes to authorize filing.*

270.    The SEC Division of Enforcement is tasked with bringing enforcement actions on behalf of the commission.

271.    Before filing an enforcement action, the Division of Enforcement will ordinarily provide potential defendants with a Wells notice. A Wells notice (a) informs the potential defendant that the SEC staff has made a preliminary determination to recommend that the SEC bring an enforcement action, (b) identifies the violations that the staff has preliminarily decided to include in the recommendation, and (c) informs the potential defendant of the defendant's right to make a submission to the SEC. *See* SEC Enforcement Manual, 2.4. A Wells notice may only be issued with the approval of an SEC Associate or Regional Director. *Id.*

272.    After issuing a Wells Notice and receiving the defendants response, if any, the Enforcement Division Director or Secretary must present to the Commission itself an Action Memo, setting forth the Division's recommendations and a comprehensive explanation of the reasons therefor. Enforcement Manual 2.5.1

273.    A quorum of three or more SEC Commissioners must authorize any enforcement action, by majority vote. Enforcement Manual, 2.5.2.

274.    The SEC has five commissioners. They are each officers of the United States, and are appointed by the President with the advice and consent of the Senate.

        *ii.   The SEC charges UTA, Jiang, and Xie with fraud.*

275.    In September 2013, the SEC filed a complaint against UTA, Jiang, and Xie.

276.    The SEC's complaint charged all three with having violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. That is, the SEC charged that all three had committed securities fraud. *Securities and Exchange Commission v. Universal Travel Group*, 13-cv-1492 (D.D.C.). The SEC's complaint is attached as Exhibit 2 to this Complaint and incorporated by reference.

277.    All three consented to entry of judgment, and consented to significant penalties:

278.    Defendant Jiang:

    a.   Paid a civil penalty of $125,000. UTA reported that Jiang was paid salary and bonus of about $10,000 in 2009, and about $30,000 in 2010;

    b.   Consented to a permanent injunction against violating, among others, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and

    c.   Consented to a five year bar from being an officer or director of an SEC-reporting company.

279.    Defendant Xie:

Formatted: Font: Italic

    a.  Paid a civil penalty of $60,000. UTA reported that Xie was paid salary and bonus of about $12,000 in 2009, and about $30,000 in 2010.

    b.  Consented to a permanent injunction against violating, among others, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and

    c.  Consented to a five year bar from being an officer or director of an SEC-reporting company.

280.   Defendant UTA:

    a.  Paid a civil penalty of $750,000;

    b.  Consented to a permanent injunction against violating, among others, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and

    c.  Had its securities' registration permanently revoked.

281.   Thus, UTA, Xie, and Jiang all paid substantial penalties to settle the SEC's charges against them.

    *c.  UTA's non-existent internal controls.*

282.   UTA's books and records reflected that in 2010, it received 85% of its packaged tour revenues in cash.

283.   UTA did not deposit its purported cash revenues in bank accounts on a regular basis.

284.   Rather, UTA's books and records claim that it kept the cash on site, at more than 30 branch offices, and then paid out much of it to suppliers and employees.

285.   UTA's books did not reflect that it prepared records for cash transactions. It did not make a practice of preparing purchase or sales invoices, though such invoices

are how persons pay Value Added Tax in the PRC, and failure to prepare them may be criminal tax fraud. For many significant purported revenue generating tours, the only records UTA retained were a tour contract or a tour summary report.

286.     UTA never disclosed any risks related to the company's uses of, internal controls over, or documentation of cash and cash transactions.

287.     A plausible alternative explanation for these purported deficiencies in UTA's books is that UTA had simply lied about its revenues. It did not deposit cash in bank accounts on a regular basis, and rather purportedly disposed of it in other cash transactions, not because it kept poor records but because UTA overstated its revenues and the cash therefore was not there to be deposited. It did not fill out invoices for its purported purchases and sales because the purchases and sales never happened, and it kept no records for its tours because the tours, likewise, never happened.

288.     Rotenberg preliminarily determined that it would need to provide an opinion of UTA's internal controls over financial reporting, as required by Section 404(b) of the Sarbanes-Oxley of 2002. UTA, however, falsely told Rotenberg that UTA was exempt from the attestation because two unrelated entities were UTA "affiliates." Rotenberg never examined UTA's internal controls over financial reporting to express an opinion. Instead, and because of UTA's false statement, Rotenberg allowed Jiang and Xie falsely to certify that UTA's internal controls over financial reporting were designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements.

> d.  *A large proportion of all Chinese reverse mergers were spectacular*
>     *frauds.*

289.   UTA became a U.S. publicly traded company through a process called a "reverse merger". In a reverse merger, a non-operating U.S. publicly-traded company "buys" a closely-held company. In return, the closely-held company's owners receive substantially all of the shares of the publicly-traded company. The reverse merger process, particularly where the closely-held company is Chinese, has recently raised concerns among regulators that it is too open to fraud. In a speech on April 4 2011, SEC commissioner Luis Aguilar stated that "a growing number of [Chinese reverse-merged companies] are proving to have significant accounting deficiencies or being vessels of outright fraud."[29] As of June 19, 2012, 67 China-based issuers had had their auditors resign, and 126 issuers had been delisted from U.S. exchanges or simply stopped filing reports with the SEC.[30] Even Chinese regulators have expressed contempt for these companies, noting that the companies could not have listed on major Chinese exchanges.[31]

290.   That these companies are sited in China is no accident. China does not extradite its nationals. Extradition Law of the People's Republic of China, Article 8(1), available at http://english.gov.cn/laws/2005-09/22/content_68710.htm. U.S. judgments are notoriously difficult to enforce in China. Donald C. Clarke. The Enforcement of United States Court Judgments in China: A Research Note, George Washington

---

[29] Full text available at:  http://www.sec.gov/news/speech/2011/spch040411aa.htm
[30] Lewis H. Ferguson, Investor Protection Through Audit Oversight, Speech delivered in Shanghai SEC Conference, June 19, 2012, available at < http://pcaobus.org/News/Speech/Pages/06192012_FergusonSECConference.aspx>.
[31] Statement of Professor John C. Coffee, Jr., at Hearings Before the Subcommittee on Capital Markets and Government Sponsored Entities of the Committee on Financial Services of the United States House of Representatives, at 3, available at http://financialservices.house.gov/uploadedfiles/hhrg-112-ba16-wstate-jcoffee-20120726.pdf.

University Law School Legal Studies Research Paper No. 236, at 1 (2004) ("At present, at least, the answer is straightforward: U.S. judgments will not be enforced [in China]") (available at http://ssrn.com/abstract=943922). China-based defendants thus, as a practical matter, have little to fear from civil enforcement or criminal charges arising from their violations of the US securities laws.

## VIII.   RESPONDEAT SUPERIOR LIABILITY

290.291.        UTA is liable for the acts of the Individual UTA Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

291.292.        The scienter of the Individual UTA Defendants and other employees and agents of the Company is similarly imputed to UTA under *respondeat superior* and agency principles.

292.293.        ACSB is liable for the acts of principals and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

293.294.        The scienter of ACSB's principals and other employees and agents is similarly imputed to ACSB under *respondeat superior* and agency principles.

## IX.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

   a.   *Class action allegations*

294.295.      Plaintiffs bring this action as a class action pursuant to Federal

Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who

purchased or otherwise acquired the securities of UTA during the Class Period. Excluded

from the Class are the officers and directors of the Company at all relevant times,

members of their immediate families and their legal representatives, heirs, successors or

assigns and any entity in which Defendants have or had a controlling interest.

295.296.      The members of the Class are so numerous that joinder of all

members is impracticable.  Between March 12 and May 27, 2009,  UTA's stock was

actively traded on the OTC:BB.  Between May 28 and October 26, 2009, UTA's stock

was actively traded on the NYSE Amex (the "AMEX"). Between October 27, 2009, and

the close of the Class Period, UTA was actively traded on the NYSE.

296.297.      While the exact number of Class members is unknown to

Plaintiffs at this time, and can only be ascertained through appropriate discovery,

Plaintiffs believe that there are at least hundreds of members in the proposed Class.

Members of the Class may be identified from records maintained by UTA or its transfer

agent, and may be notified of the pendency of this action by mail using a form of notice

customarily used in securities class actions.

297.298.      Plaintiffs' claims are typical of the claims of the members of the

Class, as all members of the Class are similarly affected by Defendants' wrongful

conduct in violation of federal law that is complained of herein.

298.299.      Plaintiffs will fairly and adequately protect the interests of the

members of the Class and has retained counsel competent and experienced in class and

securities litigation.

299. 300.      Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

     a.  whether the federal securities laws were violated by Defendants' acts as alleged herein;

     b.  whether statements made by the Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of the Company; and

     c.  to what extent the members of the Class have sustained damages, and the proper measure of damages.

300. 301.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

     b.  *Applicability of presumption of reliance: Fraud-on-the-market doctrine*

301. 302.      At all relevant times, the market for UTA's common stock was an efficient market for the following reasons, among others:

     a.  Between March 12 and May 27, 2009, UTA's stock was actively traded on the OTC:BB. Between May 28 and October 26, 2009, UTA's stock was actively traded on the NYSE Amex (the "AMEX"). Between October 27,

2009, and the close of the Class Period, UTA was actively traded on the NYSE. All three of these exchanges are highly automated and efficient;

b. During the class period over 2% of all outstanding shares were bought and sold on a weekly basis, establishing a strong presumption of an efficient market;

c. As a regulated issuer, UTA filed periodic public reports with the SEC, the OTC:BB, the AMEX, and the NYSE;

d. UTA was eligible to file (and did file) a Registration Statement on Form S-3 with the SEC during the Class Period;

e. UTA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

f. At least 25 NASD member firms were active market-makers in UTA stock at all times during the Class Period that it was traded on the OTC:BB; and

g. Unexpected material news about UTA was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

h. UTA was followed by several securities analysts employed by major brokerage firms including RedChip Companies, Inc., Dutton Associates, the Maxim Group, Glaucus Research, and Bronte Capital (among others), who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period;

302.303.     As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices, and a presumption of reliance applies.

**Formatted:** Not Expanded by / Condensed by

**FIRST CLAIM**
Violation of Section 10(b) of
The Exchange Act and Rule 10b-5
Promulgated Thereunder Against the Officer Defendants,
UTA, ACSB, ACS, and Svoboda

~~303.~~304.      Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

~~304.~~305.      During the Class Period, defendants named in this count carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase UTA's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants named in this count, and each of them, took the actions set forth herein.

~~305.~~306.      Defendants named in this count (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for UTA's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

~~306.~~307.      Defendants named in this count, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of UTA as specified herein.

91

~~307.~~308.	Defendants named in this count employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

~~308.~~309.	Defendants named in this count had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by overstatements and misstatements of the Company's financial condition throughout the Class Period, if the Defendants named in this count did not have actual knowledge of the misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

309.310.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of UTA's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants named in this count, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Defendants named in this count, but not disclosed in public statements by the Defendants named in this count during the Class Period, Plaintiffs and the other members of the Class acquired UTA common stock during the Class Period at artificially high prices, and were damaged thereby.

310.311.     At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding UTA's financial results, which was not disclosed by the Defendants named in this count, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their UTA's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

311.312.     As a direct and proximate result of the Defendants named in this count's wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of UTA's securities during the Class Period.

93

~~312.~~313.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiffs' purchases of securities giving rise to the cause of action.

### SECOND CLAIM
**Violation of Section 20(a) Of**
**The Exchange Act Against the Individual UTA Defendants, Svoboda, Acquavella,**
**Chiarelli, Shuster, and Berkower**

~~313.~~314.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

~~314.~~315.     The Individual UTA Defendants, Svoboda, Acquavella, Chiarelli, Shuster, and Berkower acted as controlling persons of UTA or ~~ACS~~ACSB within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of ~~the~~ UTA's or ~~ACS's~~ACSB's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, defendants named in this count had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.  Defendants named in this count were provided with or had unlimited access to copies of the Company and/or ~~ACS's~~ACSB's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

~~315.~~316.     In particular, each defendant named in this count had direct and supervisory involvement in the day-to-day operations of the Company or ~~ACS~~ACSB and,

therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

~~316.~~317.      As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

~~317.~~318.      By virtue of their positions as controlling persons, the defendants named in this count are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

~~318.~~319.      This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)   Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

(b)   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Awarding such other and further relief as the Court may deem just and

proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: December 2, 2015                                Respectfully submitted,

THE ROSEN LAW FIRM, P.A.

~~[PROPOSED] COMPLAINT~~
/s/ Laurence M. Rosen
Laurence M. Rosen LR-5733
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Telephone: (973) 313-1887
Fax: (973) 833-0399
lrosen@rosenlegal.com

Lead Counsel for Lead Plaintiffs

96

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 11, 2015, the foregoing document was filed through the Court's CM/ECF system and will be sent electronically to all counsel of record, and that paper copies will be sent to those indicated as non-registered participants on November 11, 2015.

Dated: November 11, 2015                    /s/ Laurence M. Rosen