## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

P. VAN HOVE BVBA, et al., individually
and on behalf all others similarly situated,

Civil Action No. 11-2164

*Plaintiffs*,

v.

**OPINION**

UNIVERSAL TRAVEL GROUP, INC., et
al.,

*Defendants*.

This matter comes before the Court by way of the motions for final approval of the proposed settlement and for attorney fees filed by Lead Plaintiffs P. Van Hove BVBA, Pascal Van Hove GVC, John Thollon, Michael Zabinski, Jean Doyle, and Mark Larosa. D.E. 211, 212. The motions are unopposed. The Court reviewed the submissions in support of the motions and held a settlement hearing on June 6, 2017. For the reasons stated below, both motions are **GRANTED**.

## I.    FACTUAL BACKGROUND

This is a securities class action brought on behalf of investors in Universal Travel Group, Inc. ("UTG") who purchased or otherwise acquired UTG securities from March 12, 2009 through April 11, 2011. UTG was allegedly an online travel agency, and although its stock was listed on a United States exchange, its operations were based entirely in the People's Republic of China. Second Amended Complaint ("SAC") ¶¶ 2, 4-7, 226, D.E. 106. Lead Plaintiffs allege violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934, maintaining the UTG overstated its revenues and profitability in SEC financial statements. *See id.* ¶ 10. For example, Lead

Plaintiffs contend that UTG raised more than $43 million raised through securities offerings, which its CEO then embezzl by transferring the money to accounts in China that were unaffiliated with UTG. *Id.* ¶ 10. In addition, in September 2010, a third-party analyst published a report showing that individuals could not actually book flights through UTG's website. *Id.* ¶ 9. Lead Plaintiffs asserted claims against UTG as well as its officers and directors. *Id.* ¶¶ 29-41.

Lead Plaintiffs also asserted claims against UTG's auditor, Acquavella, Chiarelli, Shuster, Berkower & Co., LLP ("ACSB") and David Svoboda, the ACSB partner in charge of the UTG audits (collectively, the "Auditor Defendants"), who during the proposed class period issued reports stating that clean audits were conducted in accordance with the standards of the Public Company Accounting Oversight Board (the "PCAOB"). *Id.* ¶¶ 14-17. Lead Plaintiffs further allege that when the Auditor Defendants learned about an inspection related to UTG, Svoboda ordered employees to forge and backdate documents. *Id.* ¶ 17.

## II.    PROCEDURAL HISTORY

Plaintiffs filed their initial class action complaint on April 15, 2011. D.E. 1. On July 19, 2012, the Rosen Firm was appointed Lead Counsel and Lead Plaintiffs were also appointed. D.E. 49. Lead Plaintiffs then filed their First Amended Complaint on September 7, 2012. D.E. 52. Certain UTG Defendants subsequently filed a motion to dismiss (D.E. 57), and discovery was therefore stayed as required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B).

After the motion to dismiss was fully brief, the Securities and Exchange Commission (the "SEC") filed a settled action against certain UTG Defendants. Among other things, the SEC action alleged that the UTG Defendants failed to disclose that approximately $41 million raised through stock offerings was transferred from UTG to unknown entities. The SEC alleged that these

transfers caused UTG's public disclosures regarding risk factors and liquidity to be false and misleading. *See* SEC Litigation Release No. 22823, https://www.sec.gov/litigation/litreleases/2013/lr22823.htm (Sept. 27, 2013). Although the UTG Defendants involved in the SEC action neither admitted nor denied the allegations, they collectively agreed to pay almost $1 million in civil fines. *Id.*

On November 21, 2013, the PCAOB announced that it was disciplining and imposing sanctions on ACSB and Svoboda due to violations of accounting standards. *See* PCOAB Press Release, https://pcaobus.org/News/Releases/Pages/11212013_Enforcement.aspx (Nov. 22, 2013). While ACSB and Svoboda did not admit liability, the PCAOB imposed a $10,000 civil penalty on ACSB and barred Svoboda from associating with a registered firm for at least three years. *Id.*

After learning of these proceedings, Lead Plaintiffs sought judicial notice of the SEC complaint and one of the PCAOB proceedings. D.E. 84, 90. During oral argument on the pending motions to dismiss, the Court informed Lead Plaintiffs that it was going to terminate the motions, providing Lead Plaintiffs leave to file an amended complaint that included new facts learned through the SEC and PCAOB actions. D.E. 105.

Lead Plaintiffs filed their Second Amended Complaint ("SAC") on May 1, 2014 (D.E. 106), and certain UTG Defendants filed a motion to dismiss on June 27, 2014. D.E. 113. Lead Plaintiffs then learned that the SEC settled an administrative proceeding against a different auditor associated with UTG that revealed additional facts as to ACSB. Order Instituting Public Administrative and Cease-And-Desist Proceedings, https://www.sec.gov/litigation/admin/2014/33-9608.pdf (July 1, 2014). Due to the additional facts revealed through this SEC matter, the Court terminated the pending motion to dismiss and

provided Lead Plaintiffs leave to file a third amended complaint. The Court also stayed the case in light of settlement discussions between Lead Plaintiffs and the UTG Defendants. D.E. 122.

These parties participated in a one-day mediation in September 2014 but were unable to reach a settlement. Lead Plaintiffs and the UTG Defendants, however, continued their settlement negotiations and in November 2014, agreed to settle the claims asserted against the UTG Defendants for $2 million. *See* Declaration of Laurence M. Rosen in Support of Motions for Final Approval of Settlement and Plan of Allocation ("Rosen Decl.") ¶ 3, D.E. 215. The parties filed a motion for preliminary approval of the settlement on January 26, 2015. D.E. 132.

While the Lead Plaintiffs negotiated a settlement with the UTG Defendants, they continued to litigate their claims against the Auditor Defendants; this included moving for default against the Auditor Defendants, addressing a motion to vacate the default, and a motion to dismiss. D.E. 128, 136, 145, 169, 170, 178. While the Auditor Defendants' motion to dismiss was pending, the Lead Plaintiffs and the Auditor Defendants agreed to a $2.075 million settlement. Rosen Decl. ¶ 4. The parties then amended the existing UTG settlement documents to include the Auditor Defendants. On July 1, 2016, Lead Plaintiffs filed their motion for preliminary approval of the settlement. D.E. 196. This Court granted preliminary approval and approved the proposed class notice in December 2016. D.E. 205.

The settlement states that in exchange for the UTG Defendants' payment of $2 million and the Auditor Defendants' payment of $2.075 million, Lead Plaintiffs and the settlement class will release their securities claims against Defendants. *See* Settlement Stipulation, D.E. 197-1. The Auditor Defendants and the UTG Defendants are each using assets from their respective insurance policies. Specifically, UTG is using $2 million of the remaining $2.5 million in its policy and the

Auditor Defendants will contribute almost half of the remaining $4.4 million from its policy.[1] *See* Rosen Decl. ¶¶ 2-4.

After it preliminarily certified the class and approved the settlement, the Court scheduled a settlement hearing for June 6, 2017. D.E. 206. Lead Plaintiffs filed the pending motions in advance of the hearing. In their motion for final approval of the class action settlement, Lead Plaintiffs ask the Court to certify a class, find that notice was adequate, and approve the settlement. *See generally* Settlement Approval Br., D.E. 213. Concerning the motion for attorneys' fees, Lead Counsel seeks an award of attorneys' fees of one-third of the settlement fund, or $1,368,333; reimbursement of $67,552.15 in out-of-pocket expenses; and a $4,000 award for each Lead Plaintiff; all of which would be paid from the settlement fund. *See generally* Attorneys' Fees Br., D.E. 214.

### III.  **CLASS CERTIFICATION**

To approve a settlement agreement in a class action where a class has not yet been certified, "a district court must determine that the requirements for class certification under Federal Rule of Civil Procedure 23(a) and (b) are met and must determine that the settlement is fair to the class under Federal Rule of Civil Procedure 23(e)." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257-58 (3d Cir. 2009). The prerequisites for class certification are:

> 1) the class is so numerous that joinder of all members is impracticable;
> 2) there are questions of law or fact common to the class;
> 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> 4) the representative parties will fairly and adequately protect the interests of the class.

---

[1] The other half of ACSB's policy is being used for settlement in *Dartell v. Tibet Pharmaceuticals, Inc.*, Civ. No. 14-3620. The Court held a settlement hearing in *Dartell* immediately after the hearing in this case. The Court required counsel for Lead Plaintiffs to adequately explain the reasons by which the parties determined the apportionment of ACSB's total amount between the two matters.

Fed. R. Civ. P. 23(a). "Upon finding each of these prerequisites satisfied, a district court must then determine that the proposed class fits within one of the categories of class actions enumerated in Rule 23(b)." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011). Certification under Rule 23(b)(3), which Lead Plaintiffs maintain is appropriate here, is permitted where (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. . . . Accordingly, class certification is proper only if the court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *Yedlowski v. Roka Bioscience, Inc.*, No. 14-8020, 2016 WL 6661336, at *4 (D.N.J. Nov. 10, 2016) (quoting *In re Ins. Brokerage*, 552 F.3d at 258) (internal citations and brackets omitted).

When considering class certification in the context of approving a settlement, a court "need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 308 (3d Cir. 1998). The other aspects of the Rule 23 requirements, "those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). "[I]f a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed." *Amchem Prods., Inc.*, 521 U.S. at 621. As a result, class certification and the terms of the settlement must be analyzed separately. *Yedlowski*, 2016 WL 6661336, at *5.

## 1. The Rule 23(a) Factors are Satisfied

In this instance, Lead Plaintiffs seek to certify a class of all persons who purchased or otherwise acquired UTG securities from March 12, 2009 through April 11, 2011, and who were allegedly damaged thereby. SAC ¶ 1. The Rule 23(a) prerequisites for the proposed class are satisfied here.

### a. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). Class Counsel represented at the Settlement Hearing that to date, the claims administrator, Strategic Claims Services ("SCS") has received 996 valid claims. Accordingly, the numerosity prerequisite is satisfied.

### b. Commonality

Pursuant to Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement is met "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596-97 (3d Cir. 2009) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). Class members claims need not be identical; "demonstrating that all class members are subject to the same harm will suffice." *Yedlowski*, 2016 WL 6661336, at *5 (quoting *Hassine v. Jeffes*, 846 F.2d 169, 177-78 (3d Cir. 1988)).

Lead Plaintiffs allege that the UTG Defendants made the same misrepresentations and omissions regarding UTG's profitability and revenues to each class member, and that ACSB's audits, which contained materially false statements and were not conducted pursuant to

7

professional auditing standards, also impacted each class member. These alleged omissions and misrepresentations led class members and lead plaintiffs to purchase UTG securities. Consequently, Lead Plaintiffs share common questions of law or fact with the proposed class.

### c. Typicality

"The claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This prerequisite "evaluates the sufficiency of the named plaintiff." *Hassine*, 846 F.2d at 177 n.4. This requirement is satisfied if "representatives and the class claims arise from the same event or practice or course of conduct and are based on the same legal theory." *Brosious v. Children's Place Retail Stores*, 189 F.R.D. 138, 146 (D.N.J. 1999). In this instance, Lead Plaintiffs' claims are typical of the class. The entire class allegedly suffered losses because they bought shares at artificially inflated prices due to Defendants' misrepresentations and omissions, and were allegedly damaged when the true nature of UTG's operations were revealed. Moreover, the class also suffered losses due to ACSB's materially false statements in the audit reports.

### d. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy this requirement, "the named plaintiff's interests must be sufficiently aligned with the interests of the absentees; and [] the plaintiff's counsel must be qualified to represent the class." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 800 (3d Cir. 1995). Both elements are satisfied here. The Court is not aware of any conflicts between Lead Plaintiffs and other class members, and the Rosen Firm has extensive experience in securities class actions. *See* Declaration of Laurence M. Rosen Concerning Fees and Expenses ("Rosen Fee Decl.") Ex. A.

## 2. Rule 23(b)(3) Factors

Even if a plaintiff establishes that the Rule 23(a) prerequisites are satisfied, he must also demonstrate that the proposed class meets the requirements necessary to certify a class under Rule 23(b). For a Rule 23(b)(3) class, a court must find that common questions of law or fact "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In determining whether common questions predominate, courts "focus on the claims of liability against defendants." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977). "When common questions are a significant aspect of a case and they can be resolved in a single action, class certification is appropriate." *Yedlowski*, 2016 WL 6661336, at *7.

Here, if each class member brought individual claims against Defendants he or she would need to prove that the alleged misrepresentations and omissions caused harm. Consequently, as with many securities class actions, "the predominance requirement is 'readily met.'" *Id.* at *8 (quoting *Amchem*, 521 U.S. at 625). Moreover, based on the valid claims returned to date, the average claim for a class member is approximately $20,000. Thus, it would be impractical and inefficient for a class member to bring individual claims outside the class action context in order to recover this relatively small amount in light of litigation costs. Consequently, the requirements for a Rule 23(b)(3) class are satisfied.

## IV.    ADEQUACY OF NOTICE

Through the Order preliminarily approving the settlement, the Court ruled that the class notice materials and the proposed method of dissemination satisfied Due Process requirements, Rule 23, and the PSLRA. D.E. 205. The Court reaffirms its early conclusions concerning the adequacy of notice.

Because Lead Plaintiffs seek both class certification and settlement approval, the Court must consider the requirements set forth in Rule 23(c)(2) and (e). *See, e.g., In re Prudential*, 148 F.3d at 326-27. For a Rule 23(b)(3) class, notice to class members must be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2). Such notice must be clear, concise, and easily understood. *Id.* In addition, the notice must explain

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on class members under Rule 23(c)(3).

*Id.* Rule 23(e) provides that when a class action is settled, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e). If the notice satisfies Rule 23(c)(2), it will also satisfy Rule 23(e). *Yedlowski*, 2016 WL 6661336, at *8. Due Process concerns are also satisfied by the requirements of Rule 23(c)(2). *Id.*

The PSLRA also imposes additional notice requirements upon the settlement of a securities class action. *See* 15 U.S.C. § 77z-1. The PSLRA requires that class members receive notice regarding a settlement that includes the following:

> 1) a statement of recovery in the aggregate and on an average per share basis;
> 2) a statement of the potential outcome of the case, which includes an explanation on the average amount of damages per share;
> 3) a statement of attorneys' fees or costs sought;
> 4) the name and contact information for at least one representative of class counsel who can be available for questions; and
> 5) the reasons for settlement.

15 U.S.C. § 77z-1(a)(7).

### 1. Notice Methodology

The means by which notice was provided to class members here met all the requirements of Rule 23(c)(3). Notice was sent by first class mail to 32,351 potential class members or their nominees; this number includes the notice provided to 268 individuals and organizations identified in the records of UTG's transfer agent. Declaration of Josephine Bravata ("Bravata Decl.") ¶¶ 4, 6, D.E. 215-1. SCS also posted a copy of the notice, claim form, and other documents relevant to this litigation on its website and published notice electronically once on *Globe Newswire* and in print once in the *Investor's Business Daily*. *Id.* ¶¶ 7, 10. The contents of the notice, which was approved by this Court in its December Order, contained all the necessary information about this class action and the settlement as required by Rule 23(c)(3) and the PSLRA. These procedures satisfy the requirement that notice be given to all members "who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(3).

**2. Contents of the Notice**

Rule 23(c)(2) requires that class notice "contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting to the settlement or, when relevant, opting out of the class." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 435 (3d Cir. 2016) (internal quotations omitted). The Court-approved class notice here contained such information. It informed class members of (a) the nature, history and progress of the litigation; (b) the rights of class members, including how to lodge objections and opt out of the class; (c) the proposed settlement; (d) how to file a proof of claim; and (e) the fees and expenses sought by Lead Counsel. *See* Bravata Decl. Ex. A. As a result, Rule 23(c)(2) is satisfied. The class notice here also satisfies the requirements of the PSLRA. *See* 15 U.S.C. § 77z-1(a)(7).

Because the class notice methodology and contents satisfied the requirements of Rule 23, the PSLRA, and Due Process, the Court reaffirms its finding in the Preliminary Approval Order: the notice that was provided to potential class members was the best practical notice under the circumstances and met all the applicable requirements. Moreover, the Court finds that the notice plan was implemented as set forth in the Preliminary Approval Order.

## V.  **FINAL SETTLEMENT APPROVAL**

A class action cannot be settled under Rule 23(e) without a determination that the proposed settlement is "fair, reasonable and adequate." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004). In cases where settlement negotiations precede a motion for class certification such that class certification and settlement approval are sought at the same time, the Third Circuit requires courts "to be even more scrupulous than usual when examining the fairness of the proposed settlement." *Id.* (quoting *In re Gen. Motors*, 55 F.3d at 785). At the same time, the law encourages and favors settlement of civil actions in federal courts, particularly in complex class actions. *Id.* As a result, when a settlement is reached on terms agreeable to all parties, it is to be encouraged. *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1314 n.16 (3d Cir. 1993).

In determining the reasonableness, fairness, and adequacy of a proposed settlement for the purposes of Rule 23(e), courts consider the following factors, known as the *Girsch* factors:

1) the complexity, expense and likely duration of the litigation;
2) the reaction of the class to the settlement;
3) the stage of the proceedings and the amount of discovery completed;
4) the risks of establishing liability;
5) the risks of establishing damages;
6) the risks of maintaining the class action through the trial;
7) the ability of the defendants to withstand a greater judgment;
8) the range of reasonableness of the settlement fund in light of the best possible recovery; and
9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*In re Nat'l Football League*, 821 F.3d at 437 (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)). The settling parties bear the burden of establishing that the *Girsh* factors weigh in favor of approval. But the ultimate decision of whether to approve a proposed settlement "is left to the sound discretion of the district court." *Girsh*, 521 F.2d at 157.

The Third Circuit also requires courts to consider whether the settlement satisfies several additional factors, as set forth in *In re Prudential Insurance Company America Sales Practice Litigation Agent Actions*. *See, e.g.*, *Yedlowski*, 2016 WL 6661336, at *12 (quoting *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010)). The *Prudential* factors include:

> [1] [T]he maturity of the underlying substantive issues . . . .; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved – or likely to be achieved –for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Id.* In this instance, the proposed settlement satisfies the *Girsh* factors, as well as the relevant *Prudential* factors.

### 1. Complexity, Expense, and Likely Duration of Litigation

The first factor considers "the probable costs, in both time and money, of continued litigation." *In re Gen. Motors*, 55 F.3d at 812 (quoting *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir. 1974)). "Settlement is favored under this factor if litigation is expected to be complex, expensive and time consuming." *Yedlowski*, 2016 WL 6661336, at *12 (quoting *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-374, 2008 WL 9447623, at *17 (D.N.J. Dec. 9, 2008)).

"Federal securities class actions by definition involve complicated issues of fact and law." *In re Royal Dutch*, 2008 WL 9447623, at *17. This observation is applies here. Lead Plaintiffs face significant burdens to obtain class certification, survive motions for summary judgment, and ultimately, to succeed at trial. To succeed, Lead Plaintiffs would need to retain experts to testify as to multiple issues including loss causation, damages, auditing issues, and market efficiencies. Settlement Approval Br. at 14-16. Moreover, this case has an additional degree of difficulty because much of the relevant evidence is likely located in China. Gathering evidence in China for litigation that is occurring in the United States is a difficult and expensive process. *See, e.g.*, Elizabeth Fahey & Zhirong Tao, The Pretrial Discovery Process in Civil Cases: A Comparison of Evidence Discovery Between China & the United States, 37 B.C. Int'l & Comp. L. Rev. 281, 283-86 (2014). Consequently, this factor weighs in favor of approving the settlement.

## 2. Reaction to Settlement

The second *Girsh* factor "gauge[s] whether members of the class support the settlement." *In re Prudential*, 148 F.3d at 318. As such, courts look at the "number and vociferousness of the objectors. . . . [and] generally assume[] that silence constitutes tacit consent to the agreement." *In re Gen. Motors*, 55 F.3d at 812 (quoting *Bell Atl. Corp.*, 2 F.3d at 1313 n.15).

Here, SCS sent notice and claim forms to 32,351 potential class members or nominees. Bravata Decl. ¶ 6. To date, not a single class member objected to any portion of the settlement and only one class member opted out. *Id.* ¶ 10. Accordingly, the lack of objectors weighs in favor of approving the settlement.[2]

---

[2] The Court notes that some courts have suggested that the lack of objectors essentially *requires* a finding that the settlement is fair and reasonable. *See, e.g., In re Linerboard Antitrust Litig*, 296 F. Supp. 2d 568, 578 (E.D. Pa. 2003) ("'[T]his unanimous approval of the proposed settlement[ ] by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlement.'" (quoting *Fisher Bros v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 451

### 3. Stage of Proceedings

The purpose of this factor is to determine "the degree of case development that class counsel have accomplished prior to settlement." *In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001). "[C]ourts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Id.* (citing *In re Gen. Motors*, 55 F.3d at 813). The fact that a case has not proceeded through discovery does not necessarily weigh against settlement approval. "Indeed, courts in this district have approved settlements while the case was in the pre-trial stage and formal discovery had not yet commenced." *See In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 482 (D.N.J. 2012). In addition, because this case is subject to the PLSRA, the parties were statutorily prohibited from taking discovery while Defendants' motions to dismiss were pending.

In this instance, although the parties did not engage in formal discovery, Lead Plaintiffs and Counsel sufficiently understood the applicable claims and defenses. Lead Plaintiffs hired an investigator who conducted site visits in China and interviewed former UTG employees. Rosen Decl. ¶ 11. Lead Plaintiffs also consulted with accounting and damages experts to help evaluate their claims and defenses. *Id.* ¶ 12. In addition, because the UTG defendants and ACSB filed motions to dismiss, Lead Plaintiffs were required to flesh out relevant legal issues through the motion to dismiss briefing. Settlement Approval Br. at 18.

Importantly, the settlement proceeds here come from wasting insurance policies. *See, e.g., id.* at 19. This means that the policy limit was reduced by payment of defense costs while the matter was being litigated. In other words, as litigation continues less money is available to the

---

(E.D. Pa. 1985))). The Court does not agree with this conclusion but recognizes that the lack of objectors provides a strong indication that the settlement is fair and reasonable.

class. If the parties did not settle and instead proceeded to discovery, the insurance funds available for any potential settlement would be quickly diminished and perhaps exhausted. Accordingly, this factor weighs in favor of the fairness of the settlement.

### 4. The Risks of Establishing Liability and Damages

The purpose of these factors is to "balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *In re Prudential*, 148 F.3d at 319. "By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *In re Gen. Motors*, 55 F.3d at 814. Where there is a prospect of long, contentious, and uncertain litigation along with a lack of evidence required to support claims in such protracted litigation, these factors weigh in favor of approval. *See In re Cendant Corp. Litig.*, 264 F.3d at 238.

#### a. Liability

Lead Plaintiffs face multiple obstacles in moving this case forward if it does not settle. As discussed, discovery will be difficult and time consuming because much of the evidence is located in China (particularly as to defendant UTG), and Section 10b-5 cases have difficult elements of proof that require expert testimony. There is simply no guarantee that Lead Plaintiffs would be successful if this matter went to trial.

#### b. Damages

Assuming that Lead Plaintiffs could prove liability, proving damages is also difficult in Section 10b-5 cases. Plaintiffs in Section 10b-5 cases bear the burden of establishing that the alleged misrepresentations caused their losses and damages. *See, e.g., Steiner v. MedQuest Inc.*, No. 04-5487, 2006 WL 2827740, at *19 (D.N.J. Sept. 29, 2006) ("[T]o establish loss causation, a

claim must demonstrate that the fraudulent conduct proximately caused or substantially contributed to causing plaintiff's economic loss."). In addition, proof of loss causation typically requires expert testimony. "Thus in the end, loss causation would be reduced to a 'battle of experts.' The reaction of a jury to such competing expert testimony is impossible to predict." Settlement Approval Br. at 20. Moreover, this expert testimony would likely be expensive and, therefore, deplete the money available from the insurance policies for defense experts. As a result, this factor also weighs in favor of concluding that the settlement is fair and reasonable.

### 5. Risk of Retaining Class Certification throughout Trial

The risk of obtaining and maintaining class certification through trial also supports approval of the settlement. As discussed, a class was not certified before the parties entered into the preliminary settlement agreement. But if the case moved forward instead of settling, Lead Plaintiffs would likely file a motion to certify a class, relying on expert testimony to establish that damages can be proven on a class-wide basis. Defendants would, in turn, most likely rely on an expert who would reach the opposite conclusion. Consequently, a motion for class certification would also boil down to a battle of the experts. In addition, "[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." *In re Prudential*, 148 F.3d at 321.

### 6. Defendants' Ability to Withstand Greater Judgment

This factor "is concerned with whether defendants could withstand a judgment for an amount *significantly* greater than the [s]ettlement." *In re Cendant Corp. Litig.*, 264 F.3d at 240 (emphasis added). UTG's only asset in the United States is its insurance policy. "Of that policy's $2.5 million remaining balance, $2.0 million is being contributed to the settlement." Settlement Approval Br. at 23. To the extent that UTG has any assets in China, which Lead Plaintiffs contend

is unlikely, these funds are probably not recoverable due to the difficulty of enforcing judgments in China. *See* Supplemental Brief Concerning Enforcement of Judgments in China at 2-4, D.E. 220. Similarly, ACSB was dissolved during the pendency of this litigation and its sole remaining asset is its insurance policy. Almost half of the remaining $4.4 million in the policy will be contributed to the common fund here.[3] Settlement Approval Br. at 23. Accordingly, the settlement encompasses virtually all of Defendants' available funds.

Thus, these factors weighs in favor of approving the settlement.

### 7. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risk of Litigation

These factors aim to "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." *In re Warfarin*, 391 F.3d at 538. "In conducting this evaluation, it is recognized that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding to[o] large a settlement based on the court's view of the merits of the litigation." *In re Johnson & Johnson*, 900 F. Supp. 2d at 484-85 (internal quotations omitted). These factors consider "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Pro v. Hertz Equip. Rental Corp.*, No. 06-3830, 2013 WL 3167736, at *5 (D.N.J. June 20, 2013) (quoting *In re Prudential*, 148 F.3d at 322). As discussed, this settlement provides a good recovery to the class in light of the risks of litigation. Moreover, because the settlement fund consists of money from two wasting insurance policies, any further litigation will only decrease the amount of money available to the class. Consequently, these factors also weighs in favor of settlement.

---

[3] As discussed in note 1, *supra*, the other half ACSB's policy is being used to settle another class action, *Dartell v. Tibet Pharmaceuticals, Inc.*, Civ. No. 14-3620.

### 8. The Relevant Prudential Factors

In this instance, the relevant *Prudential* factors are whether class members may opt out of the settlement and whether the procedure for processing individual claims is fair and reasonable.[4] *In re Prudential*, 148 F.3d at 323-24.

Class members may opt out of the class here and the claims procedure is fair and reasonable. As made clear in the class notice, class members may elect to opt out of the class and were informed of the procedures to do so. *See* Bravata Decl. Ex. A, at 9-10. Potential class members are required to submit claims to SCS, who assesses whether the potential member is a valid member of the class. The claims process is standardized and Lead Counsel represented at the Settlement Hearing that SCS provides claimants with the ability to resolve problems with their claims if it determines that the initial submission is lacking. In addition, SCS will continue to accept late claims if practicable, up until the time that the settlement funds are actually distributed. Thus, the claims procedure appears to be fair and reasonable.

Having considered each of the *Girsch* and *Prudential* factors, the Court approves the settlement as fair and reasonable.

### VI.   MOTION FOR ATTORNEYS' FEES AND EXPENSES

Lead Plaintiffs also make a claim for attorneys' fees of one-third of the settlement amount, or $1,368,333; reimbursement of litigation expenses; and a nominal award for the five Lead Plaintiffs. The fees and expenses would be paid from the settlement fund. *See generally* Attorneys' Fees Br. In common fund cases such as this one, attorneys' fees are typically awarded

---

[4] The reasonableness of plaintiffs' request for attorneys' fees is another *Prudential* factor. Because Lead Plaintiffs here filed a motion for attorneys' fees along with their motion for final settlement approval this factor will be addressed at length below. As will be discussed, the Court finds that the requested fees and costs are reasonable. Thus this factor weighs in favor of settlement.

through the percentage-of-recovery method. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005). The percentage-of-recovery method provides for attorneys' fees by awarding a reasonable percentage of the common fund. *Id.* The percentage-of-recovery method is preferred in common fund cases because it "rewards counsel for success and penalizes it for failure." *Id.* (quoting *In re Prudential*, 148 F.3d at 333).

The Third Circuit, however, suggests that when district courts use the percentage-of-recovery method, they also employ the lodestar method to cross-check the fee and ensure that it is reasonable. *Id.* at 305. "The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Id.* The cross-check occurs by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier. If "the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." *Id.* at 306.

## A. The Percentage-of-Recovery Method

As discussed, Lead Counsel seeks a fee award of one-third of the settlement fund. When analyzing a fee award under the percentage-of-recovery method, courts consider several factors, including:

> 1) the size of the fund created and the number of persons benefitted;
> 2) the presence or absence of substantial objections by members of the class
> to the settlement terms and/or fees requested by counsel;
> 3) the skill and efficiency of the attorneys involved;
> 4) the complexity and duration of the litigation;
> 5) the risk of nonpayment;
> 6) the amount of time devoted to the case by plaintiffs' counsel; and
> 7) the awards in similar cases.

*Id.* at 301 (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)). The list is not exhaustive. *Yedlowski*, 2016 WL 6661336, at *19. As such, in *In re Prudential*, the Third Circuit enumerated three additional factors that may be relevant. *Id.* The additional factors are:

> 1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations;
> 2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and
> (3) any "innovative" terms of settlement.

*Id.* (quoting *In re Prudential*, 148 F.3d at 338-40). A court, however, need not apply these factors "in a formulaic way because each case is different." *Id.* (quoting *In re Rite Aid*, 396 F.3d at 301).

Here, because the *Gunter* factors substantially overlap with the *Girsch* factors, the Court will refer to its earlier findings when reviewing the fee application. An analysis of these factors supports the requested one-third fee award.

### 1. The Size of the Fund and the Benefit to Class Members

For this factor, courts "consider the fee request in comparison to the size of the fund created and the number of class members to be benefitted." *Id.* at *20 (quoting *Rowe v. E.I. DuPont de Nemours & Co.*, Nos. 06-1810, 06-3080, 2011 WL 3837106, at *18 (D.N.J. Aug. 26, 2011)). A smaller fund does not necessarily equate to a smaller percentage award. In fact,

> because of fixed costs and economies of scale, attorneys' fees and costs do not increase dollar-for-dollar with the size of the case. Thus, it takes a greater percentage of the settlement to support litigation in a smaller case.

*Id.*

This is a relatively small securities class action. In addition, the average percentage of estimated damages that were recovered through securities class action settlements in 2016 was nine percent. *See* Securities Class Action Settlements 2016 Review & Analysis, at 1, Rosen Decl.

Ex. 3; *see also In re Par Pharm. Sec. Litig.*, No. 06-3226, 2013 WL 3930091, at *2 (D.N.J. July 29, 2013) (approving settlement with total sum of $8.1 million, which amounted to approximately 7% of class-wide damages). Here, total maximum damages are optimistically valued at approximately $45 million. The settlement fund is $4.5 million. Attorneys' Fees Br. at 7. However, at the Settlement Hearing, Lead Counsel represented that SCS has only received 996 valid claims and expects only half of the 265 deficient claims to be validated. Consequently, although this is a relatively small settlement fund, the small amount of class members ensures that each class member will receive a proportionally larger payment. Thus, this factor supports the fee request.

### 2. Objections to the Fee Request

In this instance, class notice informed potential class members that Lead Counsel was seeking an award of up to one-third of the settlement fund. The notice also advised class members that they could object to the settlement and explained the procedure to do so. Bravata Decl. ¶ 6, Ex. A. To date, no class member has objected to the requested fees and/or expenses and only one class member has opted out of the settlement. *Id.* ¶¶ 12-13. Accordingly, the reaction from the class supports the fee request.

### 3. The skill and efficiency of the attorneys involved

"Lead Counsel's skill and efficiency is 'measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel.'" *Yedlowski*, 2016 WL 6661336, at *20 (quoting *Hall v. AT&T Mobility LLC*, No. 07-5325, 2010 WL 4053547, at *19 (D.N.J. Oct. 13, 2010)). In

addition, "[t]he quality and vigor of opposing counsel" is relevant when evaluating the quality of services rendered by Lead Counsel. *Id.* at *21.

Here, as set forth in its firm resume, the Rosen Firm is experienced in the complex field of securities fraud class action litigation. *See* Rosen Fee Decl. Ex. 2-A. Moreover, courts have recognized that the Rosen Firm "has extensive experience navigating the particular complexities of litigation with Chinese companies." *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 540 (S.D.N.Y. 2015). The performance and quality of defense counsel is also high. Thus, the competence of opposing counsel demonstrates that Lead Counsel prosecuted this case with skill and efficiency. Therefore, this factor also supports the fee request.

### 4. The complexity and duration of the litigation

The fourth factor captures "the probable costs, in both time and money of continued litigation." *In re Gen. Motors*, 55 F.3d at 812 (quoting *Bryan*, 494 F.2d at 801). As discussed, the settlement fund is financed through wasting insurance policies. Any continued litigation would decrease the amount of money available for settlement and attorneys' fees. Moreover, due to the complexity and nature of securities litigation, any further litigation would likely be time consuming as well as expensive due to the need for experts. In light of the potential length, the likely additional costs of this securities class action, and the fact that the Defendants have wasting insurance policies, a one-third fee is reasonable.

### 5. The risk of nonpayment

"Courts across the country have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees." *Yedlowski*, 2016 WL 6661336, at *21. This risk of no recovery "is especially high in securities class actions, as they are 'notably difficult and notoriously uncertain.'" *Id.* (quoting *Trief v. Dun & Bradstreet Corp.*,

840 F. Supp. 277, 281 (S.D.N.Y. 1993)). In this instance, Lead Counsel undertook this action on a contingency basis with no guarantee that it would be compensated for its time or expenses. Attorneys' Fee Br. at 11. In addition, there was an increased risk here because much evidence was located in China as were many of the Defendants. As noted, China does not enforce judgments from the United States.

### 6. The amount of time devoted to the case by plaintiffs' counsel

The sixth factor considers the time that counsel devoted to this litigation. *Gunter*, 223 F.3d at 199. While this factor will be addressed in the Court's discussion of the lodestar cross-check, the 941 hours that Lead Counsel devoted to this case appears reasonable.

### 7. The awards in similar cases

The one-third fee is within the range of fees typically awarded within the Third Circuit through the percentage-of-recovery method; the Circuit has observed that fee awards generally range from 19% to 45% of the settlement fund. *See In re Gen. Motors*, 55 F.3d at 822. "For smaller securities fraud class actions, 'courts within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses.'" *Yedlowski*, 2016 WL 6661336, at *22 (quoting *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005)). Thus, the requested fee in this matter is within the normal range.

### 8. The Recovery is Solely Attributable to the Efforts of Class Counsel

When Lead Plaintiffs filed their initial complaint in this case, no governmental or other actions related to UTG were pending. But after this litigation commenced and briefing on the first motion to dismiss was complete, the SEC filed a settled complaint against certain UTG Defendants. The UTG Defendants who were involved in the SEC investigation admitted no wrongdoing and collectively paid less than $1 million in fines. Attorneys' Fees Br. at 14. Lead

Plaintiffs had no prior knowledge of this SEC investigation, which was filed approximately two years after the case was commenced. At the settlement hearing, Lead Counsel noted that the only benefit it received from the SEC investigation was that it learned that the $40 million that UTG had raised was transferred to different accounts in China. Moreover, the settling defendants did not admit fault in the SEC case. Consequently, the Court does not find that the SEC action led to this settlement other than informing Lead Plaintiffs that they were unlikely to ever recover the $40 million.

In addition, a PCAOB action against ACSB and Svoboda was announced in November 2013. Much like the SEC action, these Defendants accepted a $10,000 sanction but neither admitted nor denied any wrongdoing. At the settlement hearing, Lead Counsel noted that the only benefit it received from the PCAOB action was that the PCAOB alleged that ACSB back-dated documents, which would help Lead Plaintiffs establish scienter for the auditor defendants. Overall, however, recovery with the auditor Defendants is attributable to the efforts of Lead Counsel.

### 9. The Percentage Fee is Consistent with Contingent Fee Arrangements in Privately Negotiated Non-Class Litigation

A one-third fee is consistent with fee awards in non-class cases. *See Yedlowski*, 2016 WL 6661336, at *23. In individual cases, "the customary contingent fee would likely range between 30 and 40 percent of the recovery." *Id.* Consequently, this factor also supports Lead Counsel's fee request.

### B. LODESTAR CROSS-CHECK

The lodestar cross-check "ensures that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a 'windfall' to lead counsel." *In re Cendant Corp. Litig.*, 264 F.3d at 285. Again, to

perform the cross-check, a court divides the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier. *In re AT&T*, 455 F.3d at 164.

Had the Rosen Firm been paid an hourly rate, it would hypothetically receive $606,587 for 941.21 hours, with a blended hourly rate of $644. *See* Rosen Fee Decl. ¶ 4. While the blended hourly rate here is on the higher end of the spectrum, the Court recognizes that it is based upon a reasonable hourly rate for such services given the geographical area, the nature of the services provided, and the experience of each attorney. Moreover, the hours expended in this matter were reasonable; among other things, the Rosen Firm researched and investigated the facts and claims in this case, prepared the Complaint and three Amended Complaints, drafted opposition briefs for multiple motions, hired an investigator to obtain information in China, prepared for and attended mediation, and drafted documents related to settlement. Attorneys' Fees Br. at 16-17.

In this instance, the lodestar cross-check results in a multiplier of 2.24. Rosen Fee Dec. ¶ 5. Again, while on the higher end of the spectrum, it is within the range of reasonable multipliers that have been approved in this Circuit. "[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Yedlowski*, 2016 WL 6661336, at *19. However, the Court acknowledges that although in the early stages of litigation, Lead Counsel has expended many hours through, for example, its investigation in China and opposing numerous motions to dismiss. In addition, pursuant to the PLSRA, Lead Counsel was prohibited in engaging in formal discovery while the motions to dismiss were pending. In light of these facts, the Court finds that the lodestar cross-check demonstrates that the requested fee award here is reasonable.

## C. LEAD COUNSEL'S REQUEST FOR REIMBURSEMENT OF FEES

"Counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *In re Cendant Corp.*, 232 F. Supp. 2d 327, 343 (D.N.J. 2002). Class notice here stated that Lead Counsel may seek reimbursement for expenses not to exceed $80,000. Bravata Decl. Ex. A at 2. Nobody opposed the proposed request for expenses. *Id.* ¶ 13.

Through their motion, Lead Counsel now seeks to be reimbursed for $67,552.15 of litigation expenses that it incurred. Lead Counsel's request is supported with adequate documentation; approximately $50,700 of the expenses are associated with expert fees and the private investigation in China, $7,300 was incurred from the mediation, and the remaining $9,000 includes online legal research fees, press releases, translation, and miscellaneous fees. Rosen Fee Decl. ¶ 6. These fees are all properly charged to the class. *Yedlowski*, 2016 WL 6661336, at *23. The Court finds that these expenses are reasonable and will award the requested amount of $67,552.12 to Lead Counsel.

### D. LEAD PLAINTIFF AWARD

Finally, Lead Counsel requests an award of $4,000 for each Lead Plaintiff, or a total of $20,000, to compensate them for the time devoted to this case over the last six years. Attorneys' Fees Br. at 19. The PSLRA does not specifically provide for incentive awards to lead plaintiffs but does acknowledge that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). In addition, "the Third Circuit favors encouraging class representatives, by appropriate means, to create common funds and to enforce laws—even approving 'incentive awards' to class representatives." *In re Schering-Plough Corp.*, 2013 WL 5505744, at *56.

Lead Counsel argues that the Lead Plaintiffs should each receive a $4,000 award because collectively, they spent more than 150 hours reviewing pleadings, discussing the case with Lead Counsel, and independently following developments regarding UTG. Rosen Decl. Exs. 5-9. In addition, Class Notice informed potential class members that Lead Plaintiffs were seeking this award and to date, no objections have been received. Bravata Decl. ¶ 13, Ex. A. Lead Counsel contends that this request is reasonable and that others courts have approved similar awards for Lead Plaintiffs' efforts. *See, e.g.*, *Yedlowski*, 2016 WL 6661336, at *24.

Although Lead Plaintiffs engaged in the type of activities that warrant reimbursement, the Court is concerned by the disparity between the hours spent on this case amongst the individual Lead Plaintiffs. Specifically, Lead Plaintiffs' efforts range from 25 to 45 hours. Rosen Decl. Ex. 5-9. Due to this large range, each Lead Plaintiff's award will be based on the hours he or she devoted to this case. As a result, P. Van Hove BVBA and Pascal Van Hove GCV will collectively receive $3,200; John Thollon will receive $4,500; Michael Zabinski will receive $2,500; Jean Doyle will receive $3,000; and Mark Larosa will receive $3,300.

## VII.   CONCLUSION

In sum, Lead Plaintiffs' motion for final approval of the settlement [D.E. 211] is **GRANTED**. Subject to modifications to the Lead Plaintiffs' award, the motion for attorneys' fees [D.E. 212] is also **GRANTED**. An appropriate form of Order accompanies this Opinion.

Dated:  June 26, 2017

John Michael Vazquez, U.S.D.J.